ROBBINS GELLER RUDMAN
  & DOWD LLP
ROBERT R. HENSSLER JR. (216165)
TRIG R. SMITH (237399)
TING H. LIU (307747)
SARAH A. FALLON (345821)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
bhenssler@rgrdlaw.com
tsmith@rgrdlaw.com
tliu@rgrdlaw.com
sfallon@rgrdlaw.com

Lead Counsel for Lead Plaintiff and the Class

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALI HADIAN, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> FATE THERAPEUTICS, INC., et al. <br><br> Defendants. | Case No. 3:23-cv-00111-RBM-AHG <br><br> <u>CLASS ACTION</u> <br><br> CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS <br><br> <u>DEMAND FOR JURY TRIAL</u> |

4860-7313-5729.v2

Heating, Piping, and Refrigeration Pension Fund, and United Food & Commercial Workers' Union Local 919 and Contributing Employers' Food Pension Fund (collectively, "Plaintiff" or "Lead Plaintiff") (ECF 28), hereby brings this action on behalf of itself and all persons or entities who purchased or otherwise acquired the common stock of Fate Therapeutics, Inc. ("Fate" or the "Company") between August 5, 2020 and January 5, 2023, inclusive (the "Class Period"), and were damaged thereby (the "Class"). Excluded from the Class, as defined below, are Defendants, present or former executive officers and directors of Fate and their immediate family members (as defined in 17 C.F.R. §229.404, Instructions (1)(a)(iii) and (1)(b)(ii)). Plaintiff seeks to recover damages caused by Defendants' violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and Rule 10b-5 promulgated thereunder.

Plaintiff alleges the following based upon personal knowledge as to itself and its own acts and upon information and belief as to all other matters. Plaintiff's information and belief is based on, *inter alia*, the independent investigation of its counsel, Robbins Geller Rudman & Dowd LLP. This investigation included, but was not limited to, a review and analysis of: (i) Fate's public filings with the Securities and Exchange Commission ("SEC"); (ii) transcripts of Fate's public conference calls; (iii) Fate's press releases; (iv) independent media reports regarding Fate; (v) economic analyses of Fate's stock price movement and pricing and volume data; (vi) consultations with relevant experts; (vii) other publicly available material and data identified herein; and (viii) interviews of former employees of the Company. Plaintiff's investigation of the alleged fraud continues.

## INTRODUCTION AND OVERVIEW

1.    Fate is a clinical-stage pharmaceutical company formed in 2007, with a primary focus on the development of programmed cellular immunotherapies for patients with cancer. Since its formation, the Company has not received marketing approval for any drug product. During the Class Period, the Company's primary

4860-7313-5729.v2

focus was on strategic partnerships and collaboration agreements for development and commercialization of its product candidates.

2. In particular, on April 2, 2020, Fate entered into a collaboration agreement with Janssen Pharmaceuticals ("Janssen" and the "Collaboration Agreement"). Under the terms of the Collaboration Agreement, Janssen would provide Fate with proprietary antigen binding domains for up to four tumor-associated antigen targets. Fate, in turn, would apply its "iPSC product platform" to develop new iPSC-derived NK and T-cell product candidates. "iPSC" refers to human "induced pluripotent stem cells" throughout, described in more detail *infra*, ¶¶21, 22. Fate represented to investors that it stood to earn billions in revenue if the Collaboration Agreement was a success. In April 2020, for example, Defendants characterized the Collaboration Agreement as "***transformative***" to Fate and its future prospects.[1]

3. Defendants' misleading Class Period statements include:

- February 24, 2021: "***We also continue to innovate and optimize our manufacturing process, including under our collaborations with Ono and Janssen***."

- November 15, 2021: With respect to progress against the Collaboration Agreement, Fate was "***proceeding well through preclinical development with the aim of IND submissions over the course of the next 18 months***."

- February 9, 2022: With respect to how things were going under the Collaboration Agreement: "***Good. I expect that in the next couple months, we will nominate our second and third IND candidates under the J&J collaboration***."

- February 28, 2022: "***In addition, we are also developing multiplexed-engineered CAR NK and CAR T-cell product candidates for solid tumors, alongside our 2 partners, Janssen and Ono***."

---

[1] Emphasis is added throughout unless otherwise noted.

4860-7313-5729.v2

- March 16, 2022: "*We have 4 different targets, solid and liquid tumors, can be NK or T cells. Those programs are going very, very well. J&J has already selected the first 3 targets. We have – we're not able to disclose those yet*. . . ."

- May 4, 2022: "*Under our collaboration with Janssen, we have now initiated IND-enabling activities for 2 iPS-derived CAR NK cell collaboration candidates*."

- September 12, 2022: "*And then importantly, we have a collaboration with J&J and in that collaboration with J&J, we have 4 targets that are under that collaboration. 2 are in hematologic malignancies, 2 are in solid tumors. With the J&J, the 2 hematologic malignancy candidates, we expect to file an IND this year on the first one and early next year on the second one*."

4.    At the time Defendants made their positive statements about the Collaboration Agreement and its underlying product candidates, the Company was experiencing difficulties in replicating Collaboration Agreement product candidate cells from batch-to-batch, and thereby failures in replicating efficacy signals from batch-to-batch. By 4Q21, for example, these difficulties manifested themselves when Janssen rejected the first product candidate – designated FT562 – because Fate was unable to demonstrate its efficacy. This failure was critical. Janssen required Fate to demonstrate candidate efficacy as Janssen was responsible for all clinical research costs and expenses to obtain approval for the drug from various regulatory bodies.

5.    Fate's reciprocal responsibility was to acquire an investigational new drug ("IND") approval from the regulatory agency charged with approving drugs, including the United States Food and Drug Administration ("FDA"), before Janssen conducted studies in humans. An IND is an application made with the FDA when the sponsor, here, Fate, desires to ask the agency for permission to begin administering a drug to a human. An IND contains information from three general areas:    (a) preclinical data from which the agency can determine safety; (b)

- 3 -    3:23-cv-00111-RBM-AHG

4860-7313-5729.v2

information supporting whether the sponsor can adequately and consistently produce a supply of the drug; and (c) detailed clinical protocols for proposed clinical studies. After Janssen's rejection of FT562, Fate could not proceed with an IND application for the product. Yet, Defendants remained silent regarding these challenges Fate was experiencing with its iPSC product platform and the increased risk these challenges presented with regard to the Collaboration Agreement.

6. After Defendants collected their bonuses and cashed in by selling tens of millions of dollars of their personal holdings of Fate common stock, the undisclosed risks associated with the Collaboration Agreement materialized. After the market closed on January 5, 2023, the Company announced that the Collaboration Agreement had been terminated, and all collaboration activities would be wound down during 1Q23. On January 6, 2023, *FierceBiotech* reported the termination as "*a big reset*" of Fate's business and a "*retreat*" from the Company's efforts to develop cell therapies in indications including myeloid leukemia, B-cell lymphoma, and solid tumors. On the same day, a Cantor Fitzgerald analyst reported that the termination of the Collaboration Agreement posed "*increased risks for the IPSC platform*," and noted that it "*sent back [Fate's] pipeline to a new iteration, which means a longer road to critical value creation*."

7. Investors' bewilderment with the sudden termination was swift and severe. Between after-hours trading on January 5, 2023 and the close of trading on January 6, 2023, *the Company's stock price fell 61%*, from $11.00 to $6.76 per share. As a consequence, Plaintiff and members of the Class collectively suffered damages.

4860-7313-5729.v2



**JURISDICTION AND VENUE**

8.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

9.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 27 of the Exchange Act.

10.    Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa and 28 U.S.C. §1391(b)).  Fate is headquartered in this Judicial District, Defendants conduct business in this Judicial District, and a significant portion of Defendants' activities took place within this Judicial District.

11.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

4860-7313-5729.v2

**PARTIES**

12. Plaintiff acquired Fate common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures. *See* ECF 17-4.

13. Defendant Fate is a Delaware corporation with its principal executive offices located at 12278 Scripps Summit Drive, San Diego, California 92131. Fate's common stock trades in an efficient market on the Nasdaq Global Market ("NASDAQ") under the ticker symbol "FATE."

14. Defendant J. Scott Wolchko ("Wolchko") has served as Fate's President and Chief Executive Officer ("CEO") at all relevant times, and, prior to the start of the Class Period until August of 2020, served as Fate's Principal Financial officer. Pursuant to the Company's Code of Business Conduct and Ethics ("Ethics Policy"), during the Class Period, Fate was committed to providing investors complete and accurate information about the Company's results of operations. It was Fate's policy to ensure that its SEC filings, earnings releases, and public communications included fair, timely, and understandable disclosures. Further, Fate officers and employees responsible for those disclosures – specifically, Fate's senior management – were charged with using reasonable judgment to ensure the policy was fulfilled, including monitoring the Company's public disclosures. During the Class Period, Wolchko had $43.9 million in net sales of Fate common stock.

15. Defendant Edward J. Dulac III ("Dulac") has served as Fate's Chief Financial Officer since August 2020. Prior to joining Fate, Dulac worked for Celgene Corporation in support of business development, strategy, and marketing. Pursuant to the Company's Ethics Policy, during the Class Period, Fate was committed to providing investors complete and accurate information about the Company's results of operations. It was Fate's policy to ensure that its SEC filings, earnings releases, and public communications included fair, timely, and understandable disclosures. Further, Fate's officers and employees responsible for

- 6 -                                    3:23-cv-00111-RBM-AHG

those disclosures – specifically, Fate's senior management – were charged with using reasonable judgment to ensure the policy was fulfilled, including monitoring the Company's public disclosures.  During the Class Period, Dulac had $1.6 million in net sales of Fate common stock.

16. Defendant Bahram Valamehr ("Valamehr") has served as Fate's Chief Research and Development Officer since March 2021, and oversaw the Company's research and development ("R&D") activities.  Prior to March 2021, Valamehr served as the Company's Chief Development Officer and oversaw Fate's development activities regarding "off-the-shelf" product candidates derived from the Company's iPSC platform.  Pursuant to the Company's Ethics Policy, during the Class Period, Fate was committed to providing investors complete and accurate information about the Company's results of operations.  It was Fate's policy to ensure that its SEC filings, earnings releases, and public communications included fair, timely, and understandable disclosures.  Further, Fate's officers and employees responsible for those disclosures – specifically, Fate's senior management – were charged with using reasonable judgment to ensure the policy was fulfilled, including monitoring the Company's public disclosures.  During the Class Period, Valamehr had $13.3 million in net sales of Fate common stock.

17. Defendants Wolchko, Dulac, and Valamehr are sometimes referred to herein as the "Individual Defendants."

18. The Individual Defendants possessed the power and authority to control the contents of Fate's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of Fate's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with Fate and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being

- 7 -                              3:23-cv-00111-RBM-AHG

concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

## BACKGROUND AND PRE-CLASS PERIOD EVENTS

19. Fate, incorporated in Delaware in April 2007, began as a biopharmaceutical company engaged in the discovery and development of pharmacologic modulators of stem cells to treat orphan diseases, including blood malignancies and muscular dystrophies.

20. Throughout the Class Period, Fate presented itself as a clinical-stage biopharmaceutical company focused on the development of programmed cellular immunotherapies for cancer and various immune disorders. For certain of its product candidates, Fate continued to utilize pharmacologic modulators (*e.g.*, small molecules) to enhance the biological properties of human donor cells before the cells are administered to humans. For other products, Fate utilized its iPSC technology to generate a clonal master iPSC line characterized as having "preferred biological properties." These cells are thereafter scientifically manipulated to create a potential cell therapy product candidate. In short, Fate's iPSC technology allowed the Company to direct stem cells to become "programmed" cellular therapies to treat disease.

**iPSC Technology**

21. According to the National Institute of Health, in 2006, a major technology breakthrough in medicine and science was made when cells similar to embryonic stem cells could be generated from somatic cells (such as fibroblasts, which are cells in connective tissue which produce collagen and other fibers). Human iPSC technology has rapidly evolved since 2006 and has resulted in a new era for the fields of stem cell biology, regenerative medicine, disease modeling, and drug discovery. Shortly after the development of iPSC technology, human iPSCs were deployed to create human "disease-in-a-dish" models and used for screening

- 8 -                                    3:23-cv-00111-RBM-AHG

4860-7313-5729.v2

for efficacy and toxicities.  Some of the key advantages of human iPSCs include the ability to generate almost any cell type desired and the ability to develop customized medical treatments by utilizing the patient's iPSCs.

22.     Rather than utilizing a patient's own cells to develop a potential therapy for disease, Fate's iPSC technology allowed it to rely on healthy donor-sourced cells and clonal master iPSC lines to manufacture, develop, and commercialize cellular immunotherapies.  The Company touted its leadership in iPSC technology to differentiate itself from competitors, claiming the technology allowed Fate to develop and commercialize universal, off-the-shelf cell products for the treatment of cancers and other diseases.  Fate relied on the human-donor cells to create their "natural killer" ("NK") cells and/or T cells from a master iPSC line of cells.  As explained by Defendants in its public filings with the SEC:

> We have amassed significant expertise in the manufacture of natural killer (NK) cells and T cells from clonal master iPSC lines.  Our expertise includes: generating, engineering, isolating and characterizing single-cell iPSC clones; creating and cryopreserving clonal master iPSC lines; differentiating these clonal master cell lines to produce NK cells and T cells; and regulatory affairs to enable clinical investigation of iPSC-derived cell products.  We believe our iPSC-derived NK cell and T-cell product candidates have the potential to be administered in multi-dose, multi-cycle treatment regimens, including in combination with cycles of other cancer treatments, to drive deeper and more durable responses.

**NK Cells**

23.     According to the National Cancer Institute, an NK cell is a "type of immune cell that has granules (small particles) with enzymes that can kill tumor cells or cells infected with a virus.  An NK cell is a type of white blood cell."  They are also referred to as "natural killer" cells or "NK-LGL."

**T Cells**

24.     According to the National Institute of Health, T-cells "are a diverse group of lymphocytes that mature and undergo positive and negative selection processes in the thymus.  These cells play a vital role in both components of active immunity, including cell-mediated and to some extent humoral immunity."

4860-7313-5729.v2

**Fate/Janssen Worldwide Collaboration**

25. On April 2, 2020, Fate issued a press release announcing the Collaboration Agreement it entered into with Janssen, the Pharmaceutical Companies of Johnson & Johnson. The Company disclosed that, under the terms of the Collaboration Agreement, Fate would be eligible to receive $1.8 billion upon the achievement of development and regulatory milestones, and up to an additional $1.2 billion upon the reaching of certain commercial milestones. The Collaboration Agreement further provided that the Company could potentially receive double-digit percentage royalty payments from Janssen for Fate product candidates Janssen selected for clinical development, presuming regulatory bodies across the globe approved a product candidate for use in humans.

26. In announcing the Collaboration Agreement in April 2020, the Company also touted its proprietary iPSC platform, stating: "[T]he Company's [iPSC] platform is uniquely capable of overcoming numerous limitations associated with the production of cell therapies using patient- or donor-sourced cells, [including] batch-to-batch and cell-to-cell variability that can affect clinical safety and efficacy."

27. The potential future revenue to Fate pursuant to the Collaboration Agreement was significant. On March 2, 2020, the Company filed its 2019 Form 10-K with the SEC. In that document, the Company reported a mere $10.1 million in revenue.

28. As Wolchko informed investors on May 11, 2020, "*[t]he partnership is transformative for us*. And I believe it significantly increases our ability to invest in innovation, build commercial-scale iPSC manufacturing operations, bring [sic] best-in-class IPS-derived cell-based cancer immunotherapies to patients, and *deliver value to shareholders*."

29. On August 5, 2020, Wolchko reinforced how important the Collaboration Agreement was for the Company and its shareholders. Wolchko

4860-7313-5729.v2

- 10 -                3:23-cv-00111-RBM-AHG

stated: "***We're launching and informing a transformative partnership with Janssen***, bringing together our industry-leading iPSC product platform with Janssen's proprietary tumor-targeting antigen binders to develop off-the-shelf CAR NK and CAR T-cell immunotherapies for both hematologic malignancies and solid tumors."

30.   Regarding the scope of the Collaboration Agreement, on August 5, 2020, Wolchko added:

> [T]he collaboration is antigen targeted-based and includes both CAR NK and CAR-T cell candidates directed to up to 4 tumor-associated antigens. The binding domains directed to the 4 antigen targets are proprietary to and are being contributed by Janssen for construction of the CAR constructs. The cancers we are seeking to treat include both hematologic malignancies and solid tumors. Note that this is a deep collaboration in that it is not limited to a specific number of collaboration candidates. In fact, we can continue to innovate and develop next-generation collaboration candidates together against those 4 specific antigen targets.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS

31.   On August 5, 2020, Fate held a conference call to discuss its 2Q20 earnings with investors and analysts. In his prepared remarks touting the Company's product candidates and the "profound advantages of [its] proprietary iPSC product platform," Wolchko discussed the progress under the Janssen collaboration:

> ***We are also leveraging our unique ability to build multiplexed engineered cell products of increasing complexity using already established clonal master engineered iPSC lines with our collaboration partners, including under our newly formed collaboration with Janssen***, which brings together Janssen's deep domain expertise in oncology and our industry-leading iPS cell product platform. We have successfully launched this collaboration with strong momentum.

32.   Defendants' August 5, 2020 statement regarding the utilization of "already established clonal master engineered iPSC lines," in connection with the Collaboration Agreement was materially misleading because Defendants failed to disclose that Fate's process development group was experiencing difficulties attempting to replicate iPSCs that had been developed by the Company's R&D

- 11 -                          3:23-cv-00111-RBM-AHG

group, and it was the process development group's job to produce a larger number of cells intended for use in a clinical setting. *See* ¶¶77-82. These difficulties led to Fate being unable to demonstrate to Janssen that the Company would be able to create a sufficient number of cells for use in a clinical setting with the same efficacy results previously observed by Fate's research and development group in, for example, solid-tumor steroid assays. *Id.*

33. After the market closed on February 24, 2021, Fate held a conference call with analysts and investors to discuss its 4Q20 results. In his prepared remarks discussing the upcoming clinical trial of an iPSC T-cell candidate, Wolchko stated, "***We also continue to innovate and optimize our manufacturing process, including under our collaborations with Ono and Janssen***."

34. Defendants' February 24, 2021 statement regarding continuing to optimize the Company's manufacturing process, including under the Collaboration Agreement, was materially misleading for the same reasons stated in ¶32.

35. During the same February 24, 2021 conference call, Wolchko responded to a question from analyst Michael Schmidt of Guggenheim Securities regarding the focus of Fate's pipeline between NK and T-cells:

> And our collaborations, including our Ono collaboration and our Janssen collaboration, do involve the development of iPS-derived CAR T cell candidates. So I would say that, while, for instance, our NK cell pipeline is more mature, I would not take that as an indication that we were -- we are significantly betting on an NK cell approach over a T cell approach. ***We are absolutely developing both cell types aggressively***.

36. Defendants' February 24, 2021 statement regarding aggressively developing T cells and NK cells in support of the Collaboration Agreement was materially misleading for the same reasons stated in ¶32.

37. As a response to this conference call, multiple analysts rated Fate a "buy," and Guggenheim, for example, specifically attributed this rating to its "continued belief that FATE has a differentiated and robust product engine capable of generating potentially best-in-class oncology assets spanning both hematologic

4860-7313-5729.v2

and solid tumors longer term." During the February 24, 2021 conference call, Wolchko projected to investors that the Company expected to submit an IND to the FDA for FT562, "our first CAR NK cell program . . . under our collaboration with Janssen." In turn, Wells Fargo analyst Nick Abbott issued an analyst report on March 3, 2021, listing a 2021 IND filing for FT562 as a selected upcoming catalyst for the Company.

38.    After the market closed on November 4, 2021, Fate held a conference call with analysts and investors to discuss its 3Q20 results. In response to a question from analyst Mara Goldstein of Mizuho Securities requesting the "next public disclosure" on the Janssen collaboration given its contribution to quarterly revenue, Wolchko stated:

> *Yes. So I mean the Janssen collaboration has continued to go very well*. And obviously, as you can tell from the revenue that continues to increase, we continue to increase the resources under the collaboration. *I think we've disclosed in the past that the collaboration started with 2 antigen targets, 1 in hematologic malignancies, 1 in solid tumors. A third antigen target has now been added to the collaboration, and Janssen reserves the right to add a fourth target to the collaboration*. So collaboration is moving forward, we're really pleased with it. I think we'll be able to get a – give a little bit of visibility on the first product candidate at the solid tumor day, although we may not be able to disclose the target quite yet.

39.    Defendants' November 4, 2021 statement describing the Collaboration Agreement as going "well," and Fate starting the Collaboration Agreement with 2 antigen targets and that a third antigen target had been added was materially misleading for the same reasons stated in ¶32.

40.    On November 15, 2021, Fate held an investor call for the purpose of updating the market regarding the Company's "emerging cell-based cancer immunotherapy pipeline for solid tumors." During his prepared remarks, Valamehr disclosed limited information about the Janssen collaboration, noting:

> In addition to our wholly-owned solid tumor programs, we are collaborating with Janssen and Ono to develop multiplex engineered IPS-derived CAR NK and CAR-T cell product candidates for solid tumors. *While I can't disclose how – much about these programs today, under our Janssen collaboration, we are incorporating novel*

- 13 -                              3:23-cv-00111-RBM-AHG

4860-7313-5729.v2

*Janssen binding domains into our multiplex ITC drug NK cell and T cell backbones.  On the left-hand side, the potency and specificity of our first Janssen collaboration product candidate [i.e., FT562] is highlighted in a solid tumor steroid assay, where steroids of antigen-bearing cancer cells are effectively eliminated at lower effective target ratio.*

41.    Defendants' November 15, 2021 reference to FT562 was materially misleading for the same reasons stated in ¶32.

42.    During the same call, Valamehr assured investors that progress under the Collaboration Agreement was "*proceeding well through preclinical development with the aim of IND submissions over the course of the next 18 months*."

43.    Defendants' November 15, 2021 reference to the Collaboration Agreement "proceeding well" through preclinical development with the goal of filing multiple IND submissions over the next 18 months was materially misleading for the same reasons stated in ¶32.

44.    In response to Defendants' November 15, 2021 statement referencing the Collaboration Agreement, analysts at Guggenheim noted concern with the Company's lack of transparency with investors regarding the Collaboration Agreement, noting "FATE's partners JNJ and Ono Pharmaceuticals (OPHLY) each work on respective undisclosed solid tumor programs."

45.    On February 9, 2022, Fate attended Guggenheim Oncology Days, where it boasted of the Company's expectations under the Collaboration Agreement. In response to analyst Michael Schmidt of Guggenheim Securities asking "how things are moving along there," Wolchko reassured that they were "*[g]ood.  I expect that in the next couple months, we will nominate our second and third IND candidates under the J&J collaboration*."

46.    Defendants' February 9, 2022 statement regarding nominating a second and third IND candidate pursuant to the Collaboration Agreement was materially misleading for the same reasons stated in ¶32.  In addition, during 4Q21, Janssen

- 14 -                          3:23-cv-00111-RBM-AHG

4860-7313-5729.v2

declined to proceed on the FT562 program because that product candidate did not demonstrate efficacy against solid tumors. ¶¶83-84. Further, Fate would not be filing an IND for FT562 with the FDA because Janssen's declination effectively killed the project. *Id.*

47. After the market closed on February 28, 2022, Fate held a conference call to discuss its 4Q21 results with analysts and investors. In his prepared remarks regarding the Company's "robust pipeline of 5 multiplexed-engineered iPSC-derived NK and T-cell product candidates for solid tumors," Wolchko specifically highlighted the candidates under the Collaboration Agreement: "***In addition, we are also developing multiplexed-engineered CAR NK and CAR T-cell product candidates for solid tumors, alongside our 2 partners, Janssen and Ono***."

48. Following the Company's February 28, 2022 earnings call, Wells Fargo analyst Nick Abbott issued an analyst report dated the same day, in which he changed the potential catalyst of Fate filing an IND for FT562 in 2021 to sometime in 2022.

49. Defendants' February 28, 2022 statement regarding developing product candidates for solid tumors with Janssen was materially misleading for the same reasons stated in ¶¶32, 46.

50. Also on February 28, 2022, Fate filed its 2021 Form 10-K with the SEC, which was signed by Wolchko and Dulac. The 2021 Form 10-K described Fate's business and touted its unique approach to cell-based cancer immunotherapy research, adding:

> Cell-based cancer immunotherapies undergoing clinical investigation today most often rely on the use of autologous, or a patient's own, cells. The requirement to source, engineer, expand and deliver cells patient-by-patient is logistically complex, resource intensive and expensive, and can result in significant batch-to-batch variability in product identity, purity and potency as well as in manufacturing failures. Significant hurdles remain to ensure that cell-based cancer immunotherapies can be consistently manufactured and reliably delivered, in a cost-effective manner and at the scale necessary, to support broad patient access and wide-spread commercialization.

- 15 -                                    3:23-cv-00111-RBM-AHG

4860-7313-5729.v2

Rather than rely on the use of a patient's own cells, we seek to use clonal master iPSC lines to manufacture, develop and commercialize first-in-class cellular immunotherapies. ***We believe our approach has the potential to improve cell product consistency and potency, reduce manufacturing costs, shorten time to treatment and reach more patients***.

51.     Defendants' statement contained in the December 31, 2021, Form 10-K, filed on February 28, 2022, was materially misleading for the same reasons stated in ¶¶32, 46.

52.     The 2021 Form 10-K also included the following risk disclosure, purporting to warn of the risk posed to the Company due to its reliance on commercial collaborations:

Because we expect to continue to rely on our current corporate collaborators and to enter into new collaborations in the future, the development and commercialization of any of our product candidates could be substantially delayed, and ***our ability to receive future funding could be substantially impaired if one or more of our current or future collaborators . . . fails to select a product candidate for advancement into preclinical development, clinical development, or subsequent clinical development into a marketed product***.

53.     Fate's risk disclosure contained in the December 31, 2021 Form 10-K, was materially misleading because the risk that Janssen might fail to select a product candidate had already materialized when Janssen killed FT562 in 4Q21. *See* ¶46.

54.     On March 16, 2022, Fate presented at the Barclays Global Healthcare Conference. In response to a question from analyst Peter Lawson of Barclays regarding partnerships, Dulac emphasized Fate's partnership with Janssen:

We do benefit from 2 collaborations. [A]nd then Janssen, just to remind everyone, it's a pretty big collaboration for us. ***We have 4 different targets, solid and liquid tumors, can be NK or T cells. Those programs are going very, very well. J&J has already selected the first 3 targets. We have – we're not able to disclose those yet, and they're working on the fourth target, and we've been accelerating that work. So that collaboration is 2 years in. It's going really, really well. And we expect to file at least the first IND for the [first] program for J&J by the end of the year***. It's important from an innovation perspective. We really value our partners. We could choose to do more such collaborations, but I also think what's on the table are potentially larger strategic collaborations. We're at that point where at the end of the Phase I study, where we have a derisked profile for lymphoma and then to myeloma that aligns really well with what larger biopharma companies look more on what they do well, right? We can take it

- 16 -                3:23-cv-00111-RBM-AHG

through Phase I. They can be a great partner to help broaden the development program move very, very quickly and then commercializing the footprint that a very small up-and-coming company like ours cannot do. So I think there's multiple levers to consider around that. The collaborations are on the forefront of our minds, and we're constantly talking to existing parties and trying to see what might be possible.

55. Defendants' March 16, 2022 statement about the collaboration with Janssen going "very, very" well and that Fate expected to file at least the first IND for Janssen by the end of the year was materially misleading for the same reasons stated in ¶¶32, 46.

56. After the market closed on May 4, 2022, Fate held a conference call to discuss its 1Q22 results with analysts and investors. In his prepared remarks, Wolchko provided an update on the progress under the Collaboration Agreement, assuring investors that Fate "continue[s] to show strong momentum" with existing and future product candidates:

Turning to our collaborations with Janssen and Ono. We continue to show strong momentum in bringing multiplexed-engineered iPS-derived CAR NK and CAR T cell product candidates to patients for the treatment of hematologic malignancies and solid tumors. ***Under our collaboration with Janssen, we have now initiated IND-enabling activities for 2 iPS-derived CAR NK cell collaboration candidates. And we are actively working together with Janssen to prepare and submit IND applications for both of these candidates***.

For each of these collaboration candidates, Janssen maintains the option subject to its payment of an option fee prior to IND submission to initiate worldwide clinical development. We maintain the right in the U.S. alongside Janssen to co-commercialize and share equally in profits and losses of each collaboration candidate. As a reminder, under our collaboration, Janssen has the right to designate and contribute novel binding domains targeting up to 4 tumor-associated antigens. Janssen has now designated and contributed novel binding domains targeting 3 antigens. And we have now successfully achieved preclinical milestones for collaboration candidates targeting all 3 antigens.

57. Defendants' May 4, 2022 statement regarding preparing INDs for product candidates in support of the Collaboration Agreement was materially misleading for the same reasons stated in ¶¶32, 46.

- 17 -                        3:23-cv-00111-RBM-AHG

58.    On August 3, 2022, after the market closed, Fate held a conference call to discuss its 2Q22 results with analysts and investors.  In his prepared remarks, Wolchko provided an update on the progress under the Collaboration Agreement:

> We maintain an opt-in right to co-commercialize and share equally in profits and losses of collaboration products in the U.S. under each antigen program.  In May, Janssen exercised its option on a first antigen program, triggering a $10 million payment to fee, and we have now advanced a second antigen program to the stage of option exercise decision.  ***We are currently working with Janssen to prepare and submit 2 IND applications: one for each of these 2 antigen programs for off-the-shelf iPS-derived CAR NK cell collaboration products***.

59.    Defendants' August 3, 2022 statement regarding preparing INDs for product candidates in support of the Collaboration Agreement was materially misleading for the same reasons stated in ¶¶32, 46.

60.    On September 12, 2022, Fate presented at the Morgan Stanley Global Healthcare Conference.  Responding to analyst Michael Ulz of Morgan Stanley, Wolchko pointed to the Collaboration Agreement as its own "channel of conversation" "guiding [Fate's] development strategy":

> Obviously, the third channel of conversation is around the clinical data that we're generating.  ***And then importantly, we have a collaboration with J&J and in that collaboration with J&J, we have 4 targets that are under that collaboration. 2 are in hematologic malignancies, 2 are in solid tumors.  With the J&J, the 2 hematologic malignancy candidates, we expect to file an IND this year on the first one and early next year on the second one***.

61.    Defendants' September 12, 2022 statement regarding product candidate targets and expected IND filings were materially misleading for the same reasons stated in ¶¶32, 46.

62.    On November 2, 2022, after the market closed, Fate held a conference call to discuss its 3Q22 results with analysts and investors.  In his prepared remarks, Wolchko provided a foretaste of what investors should expect to hear the following week at the Society for Immunotherapy of Cancer Annual Meeting regarding Fate's preclinical data for its iPSC T-cell product candidates:

> ***The second CAR T-cell product candidate, FT862, is partnered with Janssen and targets KLK2, an antigen with prostate-restricted***

- 18 -                        3:23-cv-00111-RBM-AHG

*expression that is maintained during prostate cancer progression. Preclinical data generated under our collaboration with Janssen demonstrated that multiplexed-engineered iPS-derived CAR T-cells targeting KLK2 have the potential to effectively infiltrate tumor mass and eliminate tumor cells in a highly selective manner and to prolong survival in xenograft models of prostate cancer.* As a reminder, Janssen funds all preclinical development of the FT862 program, and has the right to exercise an exclusive option to conduct worldwide clinical development and commercialization, and we maintain the right to co-commercialize and share equally in profits and losses of FT862 in the US.

63.    Defendants' November 2, 2022 statement regarding clinical data that purportedly demonstrated the efficacy of potential Collaboration Agreement targets was materially misleading for the same reasons stated in ¶¶32, 46.

## THE TRUTH IS REVEALED

64.    After the market closed on January 5, 2023, the Company announced that the Collaboration Agreement had been terminated and all collaboration activities would be wound down during 1Q23.

65.    As *FierceBiotech* reported in a January 6, 2023 article entitled "Fate hits reset as J&J cell therapy deal collapses, slashing pipeline and head count to stretch cash":

Fate Therapeutics has begun 2023 with a big reset of its business. Having ended its collaboration with Johnson & Johnson, the cell therapy biotech has decided to slash its head count and stop multiple clinical development programs to stretch out its cash runway.

\*        \*        \*

The update has multiple elements and will leave Fate looking distinctly different. First up, the end of that J&J deal. The Big Pharma paid Fate $50 million upfront, while also making a $50 million investment and putting $3 billion in milestones on the table, to create novel CAR NK and CAR T-cell product candidates in 2020. The partnership looked to be on track in the fourth quarter of 2022, when an IND application and exercising of a second commercial option triggered $13 million in milestone payments to Fate.

\*        \*        \*

The prioritization of clinical programs goes well beyond minor pipeline pruning. Fate is stopping its FT516, FT596, FT538 and FT536 NK cell programs. The candidates formed the core of Fate's clinical cell

4860-7313-5729.v2

therapy pipeline.  The changes represent a retreat from efforts to develop the cell therapies in indications including acute myeloid leukemia, B-cell lymphoma and solid tumors.

\*       \*       \*

Fate's employees are bearing the brunt of the rethink.  The biotech ended 2021 with 449 employees, a figure that reportedly rose to 545 last year.  After the restructuring, Fate will employ 220 people.  Mark Plavsic, Ph.D., the chief technical officer at Fate, is the most high-profile victim of the restructuring.  Fate expects Plavsic to leave in March and to complete the head count reduction in the first quarter.

The changes are intended to buy Fate more time.  The company ended the fourth quarter with the sizable sum of $475 million to its name.  But with management wanting to maintain a three-year cash runway amid a tough funding environment,  Fate has initiated mass layoffs to ensure it has the money to keep going through 2025.

66.    On January 6, 2023, Cantor Fitzgerald analysts issued a company update entitled, "Staying on the Sidelines on Increased Platform Risks and Longer Timeline."  The analysts noted (emphasis in original):

Investment Summary: We downgrade FATE from Overweight to Neutral and lower our 12-month PT to $8 from $45.  ***Following the discontinuation of the Janssen agreement, and a key program FT596 for B-cell lymphoma, we see increased risks for the iPSC platform. The setbacks essentially sent back the pipeline to a new iteration, which means a longer road to critical value creation***.  While we agree with the appealing advantages of the scalable manufacturing process for the next-gen cell therapy, we are less enthused about the platform's prospects of turning genetically enhanced NK cell therapies into commercially viable drugs.  The next iteration of CD-19 targeted CAR NK program, while intriguing in concept, likely would not generate near-term data meaningful enough to move shares (IND submission planned in mid-2023).  The retrenchment and termination of a major pharma collaboration would be a major hit to sentiment as well, in our view.  Thus, we decided to stay on the sidelines for the near-term until we gain greater visibility on the platform's potential and viable paths for its programs.

67.    In a January 6, 2023 *Barrons* article entitled "Fate Sinks, Analysts Downgrade Shares on End of Janssen Collaboration and Layoffs," it was reported:

Fate Therapeutics was sinking Friday as analysts downgraded shares of the stem-cell company after it ended a collaboration with Janssen Biotech and said it was reducing its work force.

\*       \*       \*

Shares of Fate were down 62% Friday and were on pace for their largest percent decrease on record, according to Dow Jones Market Data.  If

- 20 -                     3:23-cv-00111-RBM-AHG

the stock closes at its current share price of $6.79, it would be the lowest close for the stock since December 2017. The stock has fallen 91% over the past 52 weeks.

68. As a result of Defendants' January 5, 2023 disclosures, on January 6, 2023, Fate's stock price fell by $6.76 a share, or 61.45% from the prior day's closing price, to close at $4.24 per share. The trading volume of Fate's common stock was unusually high that day, with over 33 million shares sold, or over 25 times the average daily trading volume during the Class Period.

## LOSS CAUSATION/ECONOMIC LOSS

69. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive investors and the market and a course of conduct that artificially inflated (or maintained the artificial inflation of) the price of Fate common stock and operated as a fraud or deceit on Class Period purchasers of Fate common stock by misrepresenting and omitting material information about risks to the Collaboration Agreement and capabilities of the Company's iPSC platform. When the relevant truth was disclosed to the market, on the evening of January 5, 2023, Fate's stock price fell precipitously, as the prior artificial inflation came out of the price. As a result of their purchases of Fate common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

70. Defendants' misleading statements and omissions, identified herein at ¶¶31, 33, 35, 38, 40, 42, 45, 47, 50, 52, 54, 56, 58, 60 and 62, had the intended effect and caused Fate's common stock to trade at artificially inflated levels during the Class Period.

71. As a direct result of the disclosures on the evening of January 5, 2023, as detailed in ¶¶64-68, Fate's stock price suffered a significant decline. As set forth in the chart below, on January 6, 2023, the price of Fate's common stock traded on the NASDAQ plunged over 60%:

- 21 -                    3:23-cv-00111-RBM-AHG



**Fate's Share Price Performance**
January 3, 2023 – January 6, 2023

72. The decline in Fate's common stock price on January 5, 2023 (post-market close) and sustained on January 6, 2023, was a direct result of the disclosure of truthful information relating to Defendants' misrepresentations and omissions regarding the risks to the Collaboration Agreement. The timing and magnitude of Fate's stock price decline negates any inference that the losses suffered by Plaintiff and other Class members were caused by changed market conditions, macroeconomic or industry factors or Company-specific factors unrelated to Defendants' fraudulent conduct. On January 6, 2023, the NASDAQ remained relatively unchanged and the Dow Jones U.S. Pharmaceuticals Index ("DJUSPR") was up 1.3%.

## ADDITIONAL ALLEGATIONS OF SCIENTER

**Defendants Acted with the Requisite Scienter**

73. Throughout the Class Period, much of Fate's product development efforts were struggling, in terms of: (a) demonstrating necessary efficacy; (b) demonstrating an ability to ramp up production of cells; and (c) meeting Janssen's

4860-7313-5729.v2

standards, including for data management/managing research. As alleged below, internally, Fate personnel knew of key efficacy and replication/manufacturing difficulties affecting Fate's products, including those associated with the Collaboration Agreement. Rather than disclose material facts to shareholders, Defendants concealed them deliberately, and deprived investors of the ability to consider facts relevant to a Fate investment decision during the Class Period.

**Fate Concealed Material Risks to the Collaboration Agreement with Janssen**

74. The Collaboration Agreement with Janssen was financially "*transformative*" for Fate's operations and presented the potential of being a multi-billion dollar revenue stream. As stated in Fate's 2021 Form 10-K, at 47:

> *We depend on strategic partnerships and collaboration arrangements, such as our collaboration arrangements with Janssen and Ono*, for the development and commercialization of certain of our product candidates in certain indications or geographic territories, and if these arrangements are unsuccessful, this could result in delays and other obstacles in the development, manufacture or commercialization of any of our product candidates and *materially harm our results of operations*.

75. Defendants' public disclosures indicate they had direct knowledge that information about significant problems relating to the Collaboration Agreement, or problems regarding the continued relationship between Janssen and Fate, would have been material to investors.

76. A key part of the Collaboration Agreement detailed Fate's responsibility to provide research and data to Janssen. Section 3.8.2 of the Collaboration Agreement sets forth these specific guidelines:

> Fate (and Janssen, to the extent any activities are assigned to Janssen under a Research Plan) *shall report to Janssen (or Fate, if applicable) through the JRC its results in conducting activities under the Research Plan* for each Janssen Antigen. For each Research Program, Fate shall provide the JRC with the *deliverables set forth in the Research Plan for such Research Program, including summaries of the information, data and results generated under each Research Program, in accordance with any timelines set forth in the Research Plan, and if reasonably requested by Janssen any raw data relating to such activities*. In no event will Fate be required to provide Janssen

4860-7313-5729.v2

or the JRC any information, data, or results that Fate reasonably determines to be any Fate Confidential Methods.

77.    Confidential Source No. 1 ("CS1") is a scientist who began work at Fate in 2020 and whose employment ended in 2022. CS1 has asked that CS1's job title and specific employment dates be obscured out of concern of being identified by Fate's current management. CS1's work with T cells at Fate was done in support of the Collaboration Agreement. Part of CS1's work at Fate included determining why the T cells (being developed in support of the Collaboration Agreement) demonstrated a lack of efficacy in absence of cytokine support in the treatment of hematological malignancies. CS1's work on the T cells preceded the work done by process developers at Fate, who were responsible for attempting to replicate T cells for the purpose of ramping up their production for use in a clinical setting (however, CS1's nature of work was purely pre-clinical and he left Fate before the products that he was working on could move into IND-filing phase).

78.    CS1 had concerns that the lack of efficacy of the T cells would result in them not working as intended in a clinical application. CS1 expressed this concern about the lack of efficacy to the attention of senior management during the Class Period, including to Valamehr in late 2021 or early 2022. When CS1 communicated the concern to Valamehr, Valamehr acknowledged it but shut the communication down and failed to follow up regarding CS1's findings regarding the perceived lack of efficacy of the T cells.

79.    Confidential Source No. 2 ("CS2") was a Process Development Scientist who began work at Fate in April 2020 and resigned in October 2021. CS2 worked on developing processes to enable the manufacture of larger batches of T cells and/or NK cells in support of their use in a clinical trial. CS2's work at Fate was also related to and in support of the Collaboration Agreement. CS2's role at Fate was to attempt to: (1) replicate the results generated from iPSCs that had originally been produced for R&D, in small quantities, by Fate's R&D group; and

- 24 -                    3:23-cv-00111-RBM-AHG

4860-7313-5729.v2

(2) replicate experiments involving iPSCs produced for clinical testing in the newly formed Process Development team and the Manufacturing team.  CS2 stated that it had been an ongoing struggle trying to replicate the R&D results.

80.    CS2 stated there was a "42-day" process to manufacture both T cells and NK cells.  The first part of the process generally took 10 days to complete.  In the context of T cells (CS2 stated the process is functionally the same with regard to NK cells), CS2 stated that the iPSCs are taken from a freezer, acclimated to tissue culture environment for a few days, then cultured for 10 days to generate "iCD34 cells."  CS2 stated the second stage of the process generally took 10 days and that is where Fate created "iPro" T cells.  The third stage of the process generally took 15 days, and that was when the cells would differentiate from "iPro T cells" to "iT cells."  The fourth stage generally took 7 days, where the cells are expanded and matured.  CS2 added that the inability to replicate the previous experiments was a significant problem in process development, where it was important to have consistent results.  CS2 stated that CS2 communicated the data replication issues with another Fate employee who confirmed observing similar problems.

81.    Confidential Source No. 3 ("CS3") is a former Senior Research Associate in the Company's process development group.  CS3 worked for Fate from December 2021 through January 2023.  CS3 stated that the cell development process from R&D, which CS3's team was responsible for upscaling in terms of production, was inherently flawed.  CS3 further stated that upscaling production experienced numerous "hiccups" during CS3's employment.  CS3 stated that one reason the process development team couldn't replicate the research team's results was because data was not robust enough to ensure smooth processing.  It became evident that the process needed to return to product development to address new process issues that arose during upscaling.  CS3 is unsure what leadership decided to do to resolve this solution, but it became obvious to CS3 that repetition with different techs would be a solution.  Arising issues from cell differentiation were noticed from the team

- 25 -                3:23-cv-00111-RBM-AHG

4860-7313-5729.v2

upscaling production and noted but not resolved.  In short, CS3 stated that Fate had a problem optimizing cell production, and Fate had not been meeting Janssen's requirements under the Collaboration Agreement.

82.   CS3 stated that the process team could neither replicate the R&D team's results nor achieve the development expectations as implemented by R&D and others.  However, CS3 noted that the process team took the blame for the failure, which CS3 asserted reflected the "culture" at Fate when something did not proceed as expected.  CS3 added, in attempting to resolve the inability to adequately replicate the R&D team's results, Process Development had been given something that was essentially not properly designed.  Despite the many repeatable process runs, CS3 stated the process development team attempted to do what the R&D team should have done during late stages of the process development, but the process development team, invariably, was unable to do so, and the process needed to go back for further research development with the added challenges that were built during scale up.  CS3 added that it was perhaps necessary "to go further back" and determine all of the R&D team's processes, but the process development team was never provided with a complete data set from the R&D team during CS3's employment.  CS3 stated that, ultimately, the way to properly solve this issue was the decision of the leadership team.  Associates and scientists trusted leadership to be able to give constructive feedback as the process development team's only goal was to make the process work.

83.   Confidential Source No. 4 ("CS4") is a former biopharmaceutical manager who has asked that CS4's job title and dates of employment be obscured due to concern of being identified by current members of Fate's management team. CS4 began working at Fate prior to the start of the Class Period and left the Company prior to the end of the Class Period.  CS4's work at Fate included regular involvement with the Collaboration Agreement.  CS4 regularly attended recurring weekly and monthly meetings with representatives of Janssen concerning the status

- 26 -                          3:23-cv-00111-RBM-AHG

4860-7313-5729.v2

of the Company's work pursuant to the Collaboration Agreement.  CS4 expressed an opinion that it was apparent from those meetings that the Janssen representatives were not happy with Fate's performance under the Collaboration Agreement and appeared skeptical about the amount of transparency Fate exhibited regarding its work under the Collaboration Agreement.  CS4 stated that Valamehr was a regular participant in the weekly and monthly meetings.  CS4 stated that, generally, 10 to 20 Fate representatives attended each meeting, and slightly fewer Janssen representatives attended each meeting.  CS4 stated that each program manager from the Fate and Janssen teams would generate a summary of each meeting, and these summaries were distributed to each person who attended that particular meeting.

84.   CS4 stated that Fate experienced difficulties in scaling up the production of iPSCs for use in a clinical setting.  CS4 stated that Fate experienced difficulties in replicating efficacy results on product candidates intended to be used in support of the Collaboration Agreement.  CS4 stated that the failure to replicate efficacy was potentially due to improper edits to the cells and/or issues with process development.  CS4 added that Janssen killed the product candidate named FT562 during the fourth quarter of 2021, including potentially applying for authorization from the FDA to administer the compound to humans, because Janssen concluded that FT562 was not effective.  CS4 added that Janssen's decision to scrap FT562 was perceived as a negative blow to Valamehr because an IND application represented a significant milestone pursuant to the terms of the Collaboration Agreement.

**Defendants' Motive and Opportunity to Commit Fraud**

**Insider Stock Sales Support a Motive to Commit Fraud**

85.   During the Class Period, Wolchko had net stock sales of $43.9 million.

86.   The volume of Wolchko's sales during the Class Period was much greater than sales prior to the Class Period.  For example, in the 833 days before the

- 27 -                    3:23-cv-00111-RBM-AHG

4860-7313-5729.v2

Class Period, Wolchko had net stock sales of only $2.6 million.  Wolchko's Class Period sales were approximately 17 times greater than the previous 833-day period.

87.    Dulac also had significant stock sales during the Class Period, with net stock sales of almost $1.6 million.

88.    Valamehr had significant stock sales during the Class Period, with net stock sales of almost $13.3 million.

89.    The volume of Valamehr's sales during the Class Period was much greater than sales prior to the Class Period.  In the 883 days before the Class Period, Valamehr had net stock sales of only $203,889.  Valamehr's Class Period sales were approximately 65 times greater than the previous 883-day period.

**Defendants' Compensation Structure Incentivized Fraud**

90.    During the Class Period, the Individual Defendants had a compensation structure that incentivized high stock prices, and thus incentivized concealment of any negative news.

91.    Between 2019 and 2022, Wolchko's total compensation was as follows:

| Year | Salary | Bonus | Corporate Goal Achievement | Stock Awards | Options Awards |
|---|---|---|---|---|---|
| 2019 | $540,000 | $310,500 | 115% | $4,137,500 | $5,732,955 |
| 2020 | $570,000 | $356,250 | 125% | $1,451,340 | $3,222,577 |
| 2021 | $610,000 | $366,000 | 100% | $9,552,617 | $1,200,000 |
| 2022 | $645,000 | - | - | - | $7,500,000 |

92.    Fate's 2022 Form 14A, at 50, noted that "[t]he Compensation Committee granted Wolchko his 2022 annual equity grants entirely in the form of stock options to ensure that he is rewarded only to the extent that our stock price increases and shareholders realize value, thereby aligning CEO pay with Company performance and shareholder interests."  Tying Wolchko's compensation directly to the stock price additionally incentivized him to keep the stock price inflated.

4860-7313-5729.v2

93.     Between 2019 and 2022, Valamehr's total compensation was as follows:

| Year | Salary | Bonus | Corporate Goal Achievement | Stock Awards | Options Awards |
|------|--------|-------|---------------------------|--------------|----------------|
| 2019 | $375,000 | $150,938 | 115% | $744,750 | $1,547,898 |
| 2020 | $390,000 | $195,000 | 125% | $549,750 | $1,324,347 |
| 2021 | $430,000 | $172,000 | 100% | $5,375,416 | $500,000 |
| 2022 | $455,000 | - | - | $1,327,751 | $1,375,000 |

94.     Between August 2020 (when Dulac was hired) and 2022, Dulac's compensation was as follows:

| Year | Salary | Bonus | Corporate Goal Achievement | Stock Awards | Options Awards |
|------|--------|-------|---------------------------|--------------|----------------|
| 2020 | $390,000 (pro-rated) | $75,833 | 125% | $1,420,800 | $3,786,529 |
| 2021 | $420,000 | $168,000 | 100% | $5,296,051 | $500,000 |
| 2022 | $455,000 | - | - | $1,327,751 | $1,375,000 |

95.     Accordingly, the fact that the Individual Defendants received significant: (a) salaries (especially for a company that consistently had negative revenue); (b) bonuses based on purported "corporate goal achievements" (despite the fact that Fate's products failed to demonstrate clinical or manufacturing success); (c) stock awards; and (d) options awards (which were directly tied to keeping the stock price high), provides additional evidence that the Individual Defendants had motives to conceal material information during the Class Period in order to keep Fate's stock price artificially inflated.

**Fate's January 2021 Follow-on Offering Supports a Strong Inference of Scienter**

96.     In order to continue developing products, Fate needed to attract additional investment. As stated in Fate's 2021 Form 10-K, "[d]evelopment of our product candidates will require substantial additional funding, without which we will

- 29 -                               3:23-cv-00111-RBM-AHG

be unable to complete preclinical or clinical development of, or obtain regulatory approval for, our product candidates . . . ."

97.    During the Class Period, Fate conducted a public offering under a shelf registration statement.  Defendants had a motive to conceal any negative news about their iPSC product platform or the Collaboration Agreement, as the revelation of such news could drive down the stock price, and reduce the proceeds obtained from its shelf registration statement offering.

98.    On January 8, 2021, Fate announced the completion of a Class Period public offering of 5.1 million shares under a shelf registration statement, as well as pre-funded warrants.  As a result of this offering, Fate received net proceeds of $432.4 million.

99.    The funding obtained by the January 2021 offering was significant when compared to Fate's 2020 net loss of $173.4 million.

100.    From the start of the Class Period until January 2021, Defendants had a motive to keep Fate's stock price inflated in order to maximize the proceeds that Fate would be able to receive from the January 2021 offering.

**The Alleged Misrepresentations and Omissions Concerned Fate's Core Operations**

101.    The alleged misrepresentations and omissions at issue concern the Collaboration Agreement and the Company's ability to manufacture sufficient quantities of cells derived from its iPSC product platform.

102.    Fate's relationship with Janssen was important to the Company, and constituted a central component of the Company's operations.  As stated in Fate's 2021 Form 10-K, at 47:

> ***We depend on strategic partnerships and collaboration arrangements, such as our collaboration arrangements with Janssen and Ono***, for the development and commercialization of certain of our product candidates in certain indications or geographic territories, and if these arrangements are unsuccessful, this could result in delays and other obstacles in the development, manufacture or commercialization of any of our product candidates and ***materially harm our results of operations***.

- 30 -                                    3:23-cv-00111-RBM-AHG

4860-7313-5729.v2

Fate also noted that "Our strategy for fully developing and commercializing our product candidates *is dependent upon maintaining our current arrangements* and establishing new arrangements with research collaborators, corporate collaborators and other third parties."

103.   Fate reiterated the importance of such collaborations at a conference hosted by Barclay's on March 16, 2022, when Dulac stated that potential collaborations "*are on the forefront of our minds*, and we're constantly talking to existing parties and trying to see what might be possible."

104.   Fate's ability to manufacture sufficient quantities of cells at scale was a process core to its operations.  As Fate stated in its 2021 Form 10-K at 1, "Our *inability to manufacture sufficient quantities of our product candidates*, or the loss of our third-party contract manufacturers, or our or their *failure to supply sufficient quantities of our product candidates at acceptable quality levels or prices*, or at all, would materially and adversely affect our business."

**CLASS ACTION ALLEGATIONS**

105.   Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons or entities who purchased or otherwise acquired the common stock of Fate between August 5, 2020 and January 5, 2023.  Excluded from the Class are Defendants and their families, the officers and directors of Fate, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

106.   The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  Throughout the Class Period, Fate's common stock was actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of

- 31 -                          3:23-cv-00111-RBM-AHG

4860-7313-5729.v2

members in the proposed Class. During the Class Period, there were more than 75 million shares of Fate common stock outstanding and the average daily trading volume was over 1 million shares. Record owners and other members of the Class may be identified from records maintained by Fate or its transfer agent(s) and may be notified of the pendency of this action using the form of notice similar to that customarily used in securities class actions.

107. There is a well-defined community of interest in the questions of law and fact involved in this case. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) Whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

(b) Whether statements made by Defendants to the investing public during the Class Period misrepresented and omitted material facts about the Collaboration Agreement and the purported capabilities of the Company's iPSC platform; and

(c) To what extent the members of the Class have sustained damages and the proper measure of damages.

108. Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages as a result of Defendants' wrongful conduct.

109. Plaintiff will adequately protect the interests of the Class and has retained counsel who is experienced in securities and class action litigation. Plaintiff has no interests which conflict with those of the Class.

110. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it

- 32 -                    3:23-cv-00111-RBM-AHG

4860-7313-5729.v2

impossible for all members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

### APPLICABILITY OF THE PRESUMPTION OF RELIANCE

111.   Plaintiff and the Class are entitled to a presumption of reliance pursuant to *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and the fraud-on-the-market doctrine because, during the Class Period, Fate stock traded in an efficient market on the NASDAQ, the material misstatements and omissions alleged herein would induce a reasonable investor to misjudge the value of Fate common stock and without knowledge of the misrepresented or omitted material facts, Plaintiff and other members of the Class purchased or acquired Fate common stock between the time Defendants misrepresented and failed to disclose material facts about risks to the Collaboration Agreement and the time the true facts were disclosed.  Accordingly, Plaintiff and other members of the Class relied, and are entitled to have relied, upon the integrity of the market for Fate common stock and are entitled to a presumption of reliance on Defendants' materially false and misleading statements and omissions during the Class Period.

112.   Plaintiff and the Class are also entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material facts for which there was a duty to disclose.

### CLAIMS FOR RELIEF

### COUNT I

### For Violation of §10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

113.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.  Count I is brought pursuant to §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

- 33 -                     3:23-cv-00111-RBM-AHG

4860-7313-5729.v2

114. During the Class Period, Fate, through its officers, management, and agents, including Individual Defendants Wolchko, Dulac, and Valamehr, made or were responsible for the statements specified in ¶¶31, 33, 35, 38, 40, 42, 45, 47, 50, 52, 54, 56, 58, 60 and 62, which they knew or recklessly disregarded were misleading in that they failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

115. Defendants and the Company's officers, management, and agents directly and indirectly, by the use of means and instrumentalities of interstate commerce, the mails, and/or the facilities of a national securities exchange: (a) employed devices, schemes, and artifices to defraud; (b) made misleading statements and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Fate common stock during the Class Period. All Defendants are sued as primary participants in the wrongful and illegal conduct charged herein and as controlling persons as alleged below.

116. Defendants and the Company's officers, management, and agents did not have a reasonable basis for their alleged false statements and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of Fate common stock during the Class Period.

117. Fate is liable for all materially false and misleading statements and omissions made during the Class Period, as alleged above, including the false and misleading statements made by the Company's officers and agents, as alleged above, as the maker of such statements and under the principle of *respondent superior*.

118. Defendants and the Company's officers, management, and agents, individually and in concert, directly and indirectly, engaged and participated in a

4860-7313-5729.v2

continuous course of conduct to conceal adverse material information about the status of meeting Fate's obligations pursuant to the Collaboration Agreement, Janssen's satisfaction with Fate's performance, and the attendant material risks posed to the investing public.

119. The allegations above establish a strong inference that Fate, as an entity, acted with corporate scienter throughout the Class Period, as its officers and agents had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth because they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were done knowingly or with recklessness, and without a reasonable basis, for the purpose and effect of concealing the truth about risks posed to the Collaboration Agreement and to Fate's future operational results and strategic direction. By concealing these material facts from investors, Fate's share price was artificially inflated during the Class Period.

120. Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing the truth about risks posed to the Collaboration Agreement and to Fate's future operational results and strategic direction and artificially inflating the price of Fate common stock.

121. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Fate common stock. Plaintiff and the Class would not have purchased Fate common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements and omissions.

4860-7313-5729.v2

122. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Fate common stock during the Class Period.

## COUNT II

### For Violation of §20(a) of the Exchange Act
### Against All Defendants

123. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein. Count II is brought pursuant to §20(a) of the Exchange Act, 15 U.S.C. §78t(a).

124. Individual Defendants Wolchko, Dulac, and Valamehr acted as controlling persons of Fate within the meaning of §20(a) of the Exchange Act. Fate controlled all of its employees, including Wolchko, Dulac, and Valamehr. By virtue of their high-level positions, their ownership and contractual rights, their participation in and awareness of weekly and monthly Collaboration Agreement meetings, as well as their intimate knowledge of the false statements and omissions made by the Company and disseminated to the investing public, Individual Defendants Wolchko, Dulac, and Valamehr had the power to influence and control and did influence and control, directly or indirectly, the Company's decision-making, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Individual Defendants Wolchko, Dulac, and Valamehr participated in the conference calls with investors and analysts, described herein at ¶¶31, 33, 35, 38, 40, 42, 45, 47, 54, 56, 58, 60 and 62, and/or prepared and approved the Company's SEC filings and press release, described herein at ¶¶50, 52, alleged by Plaintiff to be misleading.

125. In particular, Individual Defendants had direct and supervisory involvement in the Company's day-to-day operations and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise

4860-7313-5729.v2

to the securities violations as alleged herein and to have exercised the same. By reason of such conduct, Individual Defendants are liable pursuant to §20(a).

126. As set forth above, Defendants each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, Individual Defendants are liable pursuant to §20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of Fate common stock during the Class Period.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays for relief and judgment, as follows:

A. Determining that this action is a proper class action and certifying Plaintiff as Class representative under Federal Rule of Civil Procedure 23 and Plaintiff's counsel as Class counsel;

B. Awarding compensatory damages in favor of Plaintiff and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' violations of the federal securities laws, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Such equitable, injunctive, or other and further relief as the Court may deem just and proper, including, but not limited to, rescission.

**DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

4860-7313-5729.v2

DATED:  July 24, 2023

Respectfully submitted,

ROBBINS GELLER RUDMAN
  & DOWD LLP
ROBERT R. HENSSLER JR.
TRIG R. SMITH
TING H. LIU
SARAH A. FALLON

s/ Trig R. Smith
TRIG R. SMITH

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

Lead Counsel for Lead Plaintiff and the Class

O'DONOGHUE & O'DONOGHUE LLP
ANDREW COSTA-KELSER
Constitution Place , Suite 515
325 Chestnut Street
Philadelphia, PA  19106
Telephone:  215/629-4970
215/629-4996 (fax)

Additional Counsel

4860-7313-5729.v2

- 38 -

3:23-cv-00111-RBM-AHG

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on July 24, 2023, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ Trig R. Smith
TRIG R. SMITH

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

Email:  trigs@rgrdlaw.com

3:23-cv-00111-RBM-AHG

4860-7313-5729.v2

## Mailing Information for a Case 3:23-cv-00111-RBM-AHG Hadian v. Fate Therapeutics, Inc. et al

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Adam Marc Apton**
  aapton@zlk.com

- **Caroline Bullerjahn**
  cbullerjahn@goodwinlaw.com

- **Sylvia R. Ewald**
  sewald@goodwinlaw.com

- **Joseph Alexander Hood , II**
  ahood@pomlaw.com,abarbosa@pomlaw.com

- **Jeremy A. Lieberman**
  jalieberman@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com

- **Danielle Suzanne Myers**
  dmyers@rgrdlaw.com,dmyers@ecf.courtdrive.com,e_file_sd@rgrdlaw.com

- **Jennifer Pafiti**
  jpafiti@pomlaw.com,ahood@pomlaw.com,tsayre@pomlaw.com,egoodman@pomlaw.com,tprzybylowski@pomlaw.com,jlopiano@pomlaw.com,disaacson@pomlaw.c

- **Robert Vincent Prongay**
  rprongay@glancylaw.com,info@glancylaw.com,robert-prongay-0232@ecf.pacerpro.com,bmurray@glancylaw.com

- **Sophia Marie Rios**
  srios@bm.net,jgionnette@bm.net

- **Trig R. Smith**
  trigs@rgrdlaw.com,E_File_SD@rgrdlaw.com

- **Justin Ward**
  jward@goodwinlaw.com

### Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)