1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

## SOUTHERN DISTRICT OF CALIFORNIA

10
11
12
13
14
15
16

| | |
|---|---|
| ALI HADIAN, individually and on behalf of all others similarly situated, <br><br>         **Plaintiffs,**<br><br>v.<br><br>FATE THERAPEUTICS, INC. et al.,<br><br>         **Defendants.** | Case No.:  3:23-cv-00111-RBM-AHG<br><br>**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED COMPLAINT**<br><br>**[Doc. 38]** |

17
18
19
20
21
22
23
24

On July 24, 2023, Lead Plaintiffs[1] Heating, Piping, and Refrigeration Pension Fund; United Food & Commercial Workers' Union Local 919; and Contributing Employers' Food Pension Fund (collectively, "Plaintiffs") filed a Consolidated Class Action Complaint ("CCAC") against Defendants Fate Therapeutics, Inc. ("Fate"); J. Scott Wolchko; Edward J. Dulac, III; and Bahram Valamehr (collectively, the "Individual Defendants") (collectively, "Defendants").  (Doc. 31.)  Plaintiffs allege two causes of action: (1)

25
26
27
28

---

[1] On May 4, 2023, the Court granted Plaintiffs Heating, Piping, and Refrigeration Pension Fund; United Food & Commercial Workers' Union Local 919; and Contributing Employers' Food Pension Fund's Motion for Appointment as Lead Plaintiff and Approval of Lead Plaintiffs' Selection of Lead Counsel.  (Doc. 28.)

violations of Section 10(b) and Rule 10b-5 of the Securities Exchange Act (the "Exchange Act") and (2) violations of Section 20(a) of the Exchange Act against all Defendants.  (*Id.* ¶¶ 113–126.)

On September 22, 2023, Defendants filed a Motion to Dismiss the Consolidated Complaint ("Motion").  (Doc. 38-1.)  On November 6, 2023, Plaintiffs filed an Opposition to Defendants' Motion ("Opposition").  (Doc. 39.)  On December 6, 2023, Defendants filed a Reply Memorandum of Points of Authorities in Support of Their Motion ("Reply").  (Doc. 41.)

The Court finds the matter suitable for determination on the papers and without oral argument pursuant to Civil Local Rule 7.1(d)(1).  For the reasons discussed below, Defendants' Motion to Dismiss is **<u>GRANTED</u>**.

## I.   <u>FACTUAL BACKGROUND</u>[2]

### A.   The Parties

Fate is a clinical-stage biopharmaceutical company formed in 2007.  (*Id.* ¶ 1.)  Wolchko is Fate's President and Chief Executive Officer ("CEO").  (*Id.* ¶ 14.)  Dulac is Fate's Chief Financial Officer.  (*Id.* ¶ 15.)   Valamehr is Fate's Chief Research and Development ("R&D") Officer.  (*Id.* ¶ 16.)

Plaintiffs bring this action on behalf of themselves and all persons or entities who purchased or otherwise acquired Fate common stock between August 5, 2020 and January 5, 2023 (the "Class Period").  (CCAC at 2.[3])

### B.   Fate Therapeutics, Inc.

Fate used iPSC—human "induced pluripotent stem cells"—technology to direct stem cells to become "programmed" cellular therapies to treat disease.  (*Id.* ¶¶ 2, 20.)  Fate's iPSC technology allowed it to rely on healthy donor-sourced cells and clonal master

---

[2] The Court's summary of the factual background reflects Plaintiffs' factual and legal allegations, not conclusions of fact or law by this Court.

[3] The Court cites to the CM/ECF pagination unless otherwise noted.

iPSC lines to manufacture, develop, and commercialize cellular immunotherapies.  (*Id.* ¶ 22.)  Fate relied on the human-donor cells to create their "natural killer" ("NK") cells or T cells from a master iPSC line of cells.  (*Id.*)  An NK cell is a "type of immune cell that has granules (small particles) with enzymes that can kill tumor cells or cells infected with a virus."  (*Id.* ¶ 23.)  T-cells "play a vital role in both components of active immunity, including cell-mediated and to some extent humoral immunity."  (*Id.* ¶ 24.)

**C.     The Collaboration Agreement**

During the Class Period, Fate's primary focus was on strategic partnerships and collaboration agreements for the development and commercialization of its product candidates.  (*Id.* ¶ 1.)  On April 2, 2020, Fate entered into a collaboration agreement (the "Collaboration Agreement") with Janssen Pharmaceuticals ("Janssen").  (*Id.* ¶ 2.)  Under the terms of the Collaboration Agreement, Janssen provided Fate with proprietary antigen binding domains for up to four tumor-associated antigen targets, and Fate used "its 'iPSC product platform' to develop new iPSC-derived NK and T-cell product candidates."  (*Id.*)  Janssen required Fate to demonstrate product candidate efficacy, and Janssen was responsible for all clinical research costs and expenses.  (*Id.* ¶ 4.)

Fate was also responsible for acquiring investigational new drug ("IND") approvals from the regulatory agency charged with approving drugs—the United States Food and Drug Administration ("FDA")—before Janssen could conduct studies in humans.  (*Id.* ¶ 5.)  "An IND is an application made with the FDA when the sponsor, here, Fate, desires to ask the agency for permission to begin administering a drug to a human.  An IND contains information from three general areas: (a) preclinical data from which the agency can determine safety; (b) information supporting whether the sponsor can adequately and consistently produce a supply of the drug; and (c) detailed clinical protocols for proposed clinical studies."  (*Id.*)

**D.      Defendants' Allegedly Materially Misleading Statements and Omissions[4]**

Following the execution of the Collaboration Agreement, Wolchko made the following allegedly materially misleading statements:

August 5, 2020: "**We are also leveraging our unique ability to build multiplexed engineered cell products of increasing complexity using already established clonal master engineered iPSC lines with our collaboration partners, including under our newly formed collaboration with Janssen**, which brings together Janssen's deep domain expertise in oncology and our industry-leading iPS cell product platform.   We have successfully launched this collaboration with strong momentum." (*Id.* ¶ 31 (emphasis in original).)

February 24, 2021: "**We also continue to innovate and optimize our manufacturing process, including under our collaboration with … Janssen.**" (*Id.* ¶ 33 (emphasis in original).)

February 24, 2021: "And our collaborations, including our … our Janssen collaboration, do involve the development of iPS-derived CAR T cell candidates. So I would say that, while, for instance, our NK cell pipeline is more mature, I would not take that as an indication that we were—we are significantly betting on an NK cell approach over a T cell approach. **We are absolutely developing both cell types aggressively.**" (*Id.* ¶ 35 (emphasis in original).)

February 24, 2021: "Wolchko projected to investors that Fate expected to submit an IND for product candidate FT562, 'our first CAR NK cell program . . . under our collaboration with Janssen.'"[5] (*Id.* ¶ 37.)

November 4, 2021: "**[T]he Janssen collaboration has continued to go very well.**   And obviously, as you can tell from the revenue that continues to increase, we continue to increase the resources under the collaboration.   **I think we've disclosed in the past that the collaboration started with 2 antigen targets, 1 in hematologic malignancies, 1 in solid tumors.   A third**

---

[4] In their CCAC, Plaintiffs bolded or italicized certain portions of the allegedly materially misleading statements.   The Court includes this emphasis to better understand Plaintiffs' position.

[5] It is unclear whether Plaintiffs intended to allege that this statement was materially misleading.   The Court will not address it below.

**antigen target has now been added to the collaboration, and Janssen reserves the right to add a fourth target to the collaboration.** So collaboration is moving forward, we're really pleased with it. I think we'll be able to get a – give a little bit of visibility on the first product candidate at the solid tumor day, although we may not be able to disclose the target quite yet." (*Id.* ¶ 38 (emphasis in original).)

Likewise, Valamehr made the following allegedly materially misleading statements:

November 15, 2021: "… we are collaborating with Janssen and Ono to develop multiplex engineered IPS-derived CAR NK and CAR-T cell product candidates for solid tumors. **While I can't disclose how—much about these programs today, under our Janssen collaboration, we are incorporating novel Janssen binding domains into our multiplex ITC drug NK cell and T cell backbones. On the left-hand side, the potency and specificity of our first Janssen collaboration product candidate [ ] is highlighted in a solid tumor steroid assay, where steroids of antigen-bearing cancer cells are effectively eliminated at lower effective target ratio.**"[6] (*Id.* ¶ 40 (emphasis in original).)

November 15, 2021: Valamehr assured investors that the Collaboration Agreement was "**proceeding well through preclinical development with the aim of IND submissions over the course of the next 18 months.**" (*Id.* ¶ 42 (emphasis in original).)

Plaintiffs allege that these statements by Wolchko and Valamehr were materially misleading because Fate was having difficulty replicating iPSCs and was unable to show Janssen that it could create enough cells for use in a clinical setting. (*Id.* ¶¶ 32, 34, 36, 39, 41, 43.)

The following year, Wolchko made the following allegedly materially misleading statements:

February 9, 2022: Wolchko stated that the Collaboration Agreement was "**good**" and that "**[he] expect[ed] that in the next couple months, [Fate] [would] nominate [their] second and third IND candidates under the J&J**

---

[6] The Court via brackets has removed text that was inserted by Plaintiffs and is not part of the original statement. Plaintiffs inserted "i.e., FT562."

**collaboration.**"  (*Id.* ¶ 45 (emphasis in original).)

February 28, 2022: "**[W]e are also developing multiplexed-engineered CAR NK and CAR T-cell product candidates for solid tumors, alongside our 2 partners, Janssen and Ono.**"  (*Id.* ¶ 47 (emphasis in original).)

Plaintiffs allege that these statements were materially misleading because Fate was having difficulty replicating its iPSCs and was unable to show Janssen that it could produce enough cells for a clinical setting.  (*Id.* ¶¶ 32, 46, 49.)  Plaintiffs also allege that these statements were materially misleading because, during the fourth quarter of 2021, before these statements were made, Janssen had declined to proceed on product candidate FT562 because it did not demonstrate efficacy against solid tumors.  (*Id.* ¶¶ 46, 49.)  Janssen's rejection of FT562 meant that Fate could not proceed with an IND application for the product, a significant milestone under the Collaboration Agreement.  (*Id.* ¶¶ 5, 84.)

On February 28, 2022, Fate filed its 2021 Form 10-K with the SEC, signed by Wolchko and Dulac, containing the following allegedly materially misleading statements:

Cell-based cancer immunotherapies undergoing clinical investigation today most often rely on the use of autologous, or a patient's own, cells. The requirement to source, engineer, expand and deliver cells patient-by-patient is logistically complex, resource intensive and expensive, and can result in significant batch-to-batch variability in product identity, purity and potency as well as in manufacturing failures. Significant hurdles remain to ensure that cell-based cancer immunotherapies can be consistently manufactured and reliably delivered, in a cost-effective manner and at the scale necessary, to support broad patient access and wide-spread commercialization. Rather than rely on the use of a patient's own cells, we seek to use clonal master iPSC lines to manufacture, develop and commercialize first-in-class cellular immunotherapies. **We believe our approach has the potential to improve cell product consistency and potency, reduce manufacturing costs, shorten time to treatment and reach more patients.** (*Id.* ¶ 50 (emphasis in original).)

Because we expect to continue to rely on our current corporate collaborators and to enter into new collaborations in the future, the development and commercialization of any of our product candidates could be substantially delayed, and **our ability to receive future funding could be substantially**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

> **impaired if one or more of our current or future collaborators … fails to select a product candidate for advancement into preclinical development, clinical development, or subsequent clinical development into a marketed product.**  (*Id.* ¶ 52 (emphasis in original).[7]

Plaintiffs allege that these statements were materially misleading because Fate was having difficulty replicating iPSCs and could not produce enough cells for a clinical setting.  (*Id.* ¶¶ 32, 46, 51.)   Plaintiffs allege that these statements were also materially misleading because Janssen had already declined to proceed with a product candidate that was not effective against solid tumors.  (*Id.* ¶¶ 46, 51, 53.)   In other words, Plaintiffs allege that these statements were materially misleading because the risk that Janssen might fail to select a product candidate had already materialized.  (*Id.* ¶ 53.)

On March 16, 2022, Dulac made the following allegedly materially misleading statements:

> We do benefit from 2 collaborations. … Janssen, just to remind everyone, it's a pretty big collaboration for us. **We have 4 different targets, solid and liquid tumors, can be NK or T cells. Those programs are going very, very well. J&J has already selected the first 3 targets. We have – we're not able to disclose those yet, and they're working on the fourth target, and we've been accelerating that work. So that collaboration is 2 years in. It's going really, really well. And we expect to file at least the first IND for the [ ] program for J&J by the end of the year.** It's important from an innovation perspective. We really value our partners. We could choose to do more such collaborations, but I also think what's on the table are potentially larger strategic collaborations. We're at that point where at the end of the Phase I study, where we have a derisked profile for lymphoma and then to myeloma that aligns really well with what larger biopharma companies look more on what they do well, right? We can take it through Phase I. They can be a great partner to help broaden the development program move very, very quickly and then commercializing the footprint that a very small up-and-coming company like ours cannot do. So I think there's multiple levers to consider around that. The collaborations are on the forefront of our minds, and we're constantly talking to existing parties and trying to see what might be

---

[7] The Court notes that Plaintiffs omitted from this statement additional language not relevant to this case.

1   possible.[8]  (*Id.* ¶ 54 (emphasis in original).)

2   Thereafter, Wolchko made the following allegedly materially misleading
3   statements:

4   May 4, 2022: "Turning to our collaborations with Janssen and Ono. We
5   continue to show strong momentum in bringing multiplexed-engineered iPS-
    derived CAR NK and CAR T cell product candidates to patients for the
6   treatment of hematologic malignancies and solid tumors. **Under our**
7   **collaboration with Janssen, we have now initiated IND-enabling activities**
    **for 2 iPS-derived CAR NK cell collaboration candidates. And we are**
8   **actively working together with Janssen to prepare and submit IND**
9   **applications for both of these candidates.** For each of these collaboration
    candidates, Janssen maintains the option subject to its payment of an option
10  fee prior to IND submission to initiate worldwide clinical development. We
11  maintain the right in the U.S. alongside Janssen to co-commercialize and share
    equally in profits and losses of each collaboration candidate. As a reminder,
12  under our collaboration, Janssen has the right to designate and contribute
13  novel binding domains targeting up to 4 tumor-associated antigens. Janssen
    has now designated and contributed novel binding domains targeting 3
14  antigens. And we have now successfully achieved preclinical milestones for
15  collaboration candidates targeting all 3 antigens."  (*Id.* ¶ 56 (emphasis in
    original).)
16

17  August 3, 2022: "We maintain an opt-in right to co-commercialize and share
18  equally in profits and losses of collaboration products in the U.S. under each
    antigen program. In May, Janssen exercised its option on a first antigen
19  program, triggering a $10 million payment to fee, and we have now advanced
20  a second antigen program to the stage of option exercise decision. **We are**
    **currently working with Janssen to prepare and submit 2 IND**
21  **applications: one for each of these 2 antigen programs for off-the-shelf**
22  **iPS-derived CAR NK cell collaboration products.**"  (*Id.* ¶ 58 (emphasis in
    original).)
23

24  September 12, 2022: "Obviously, the third channel of conversation is around
    the clinical data that we're generating.  **And then importantly, we have a**
25  **collaboration with J&J and in that collaboration with J&J, we have 4**

26  _____

27  [8] The Court via brackets has removed text that was inserted by Plaintiffs and is not part of
28  the original statement.  Plaintiffs inserted "first."

1
2
3

**targets that are under that collaboration. 2 are in hematologic malignancies, 2 are in solid tumors. With the J&J, the 2 hematologic malignancy candidates, we expect to file an IND this year on the first one and early next year on the second one.**" (*Id.* ¶ 60 (emphasis in original).)

4
5
6
7
8
9
10
11
12
13

November 2, 2022: "**The second CAR T-cell product candidate, FT862, is partnered with Janssen and targets KLK2, an antigen with prostate-restricted expression that is maintained during prostate cancer progression. Preclinical data generated under our collaboration with Janssen demonstrated that multiplexed-engineered iPS-derived CAR T-cells targeting KLK2 have the potential to effectively infiltrate tumor mass and eliminate tumor cells in a highly selective manner and to prolong survival in xenograft models of prostate cancer.** As a reminder, Janssen funds all preclinical development of the FT862 program, and has the right to exercise an exclusive option to conduct worldwide clinical development and commercialization, and we maintain the right to co-commercialize and share equally in profits and losses of FT862 in the US." (*Id.* ¶ 62 (emphasis in original).)

14
15
16
17

Plaintiffs allege that these statements were materially misleading because Fate was having difficulty replicating iPSCs, because it could not produce enough cells for a clinical setting, and because Janssen had already declined to proceed with one of Fate's product candidates. (*Id.* ¶¶ 32, 46, 57, 59, 61, 63.)

18

**E.    Termination and Economic Loss**

19
20
21

On January 5, 2023, Fate announced that the Collaboration Agreement had been terminated. (*Id.* ¶¶ 6, 64.) On January 6, 2023, Fate's stock price fell by $6.76 per share, which was 61.45% down from the prior day's closing. (*Id.* ¶¶ 7, 68, 71.)

22

**F.    Allegations Regarding Scienter**

23
24
25
26

Plaintiffs allege that Fate personnel knew about the efficacy, replication, and manufacturing difficulties affecting Fate's product candidates, including those associated with the Collaboration Agreement. (*Id.* ¶ 73.) Plaintiffs allege that Defendants deliberately concealed and deprived investors of the ability to consider these relevant facts. (*Id.*)

27
28

9

### 1.    Confidential Sources

Confidential Source No. 1 ("CS1") was a Fate scientist from sometime in 2020 to 2022.  (*Id.* ¶ 77.)  CS1 worked with T cells in support of the Collaboration Agreement; however, CS1 left Fate before the products that he was working on could move into IND-filing phase.  (*Id.*)  CS1's work at Fate included determining why the T cells lacked efficacy.  (*Id.*)  CS1's work preceded the work done by the process developers who were responsible for replicating T cells for the purpose of ramping up their production for use in a clinical setting.  (*Id.*)  "CS1 had concerns that the lack of efficacy in the T cells would result in them not working as intended in a clinical application." (*Id.* ¶ 78.)  CS1 expressed this concern to senior management, including Valamehr, in late 2021 or early 2022.  (*Id.*)  Valamehr acknowledged the concern but shut down the communication and failed to follow up.  (*Id.*)

Confidential Source No. 2 ("CS2") was a Process Development Scientist who started working at Fate in April 2020 and resigned in October 2021.  (*Id.* ¶ 79.)  CS2 worked on developing processes to enable the manufacturing of large batches of T and NK cells for use in clinical trials.  (*Id.*)  CS2's role was to replicate the results generated from iPSCs that had been produced in small quantities by Fate's R&D group and to replicate experiments involving iPSCs produced for clinical testing.  (*Id.*)  CS2's work was also related to and in support of the Collaboration Agreement.  (*Id.*)  CS2 stated that replicating the R&D results was an ongoing struggle and a significant problem in process development.  (*Id.* ¶¶ 79–80.)  CS2 added that the inability to replicate the previous experiments was a significant problem in process development, where it was important to have consistent results.  (*Id.* ¶¶ 80.)  CS2 stated that he or she communicated the data replication issues to another Fate employee who had observed similar problems.  (*Id.* ¶ 80.)

Confidential Source No. 3 ("CS3") was a Fate Senior Research Associate in the process development group from December 2021 to January 2023.  (*Id.* ¶ 81.)  CS3's team was responsible for upscaling production of the cell development process from R&D.  (*Id.*)  CS3 stated that the cell development process from R&D was inherently flawed, not

properly designed, and needed to go back for further R&D.  (*Id.* ¶¶ 81–82.)  CS3 stated that the process development team was never provided with a complete data set from the R&D team during her employment.  (*Id.* ¶ 82.)  CS3 further stated that upscaling production experienced numerous "hiccups" during his or her employment.  (*Id.* ¶ 81.)  It became obvious to CS3 that repetition with different techs would be a solution, but issues regarding cell differentiation were noted but not resolved.  (*Id.*)  "In short, CS3 stated that Fate had a problem optimizing cell production, and Fate had not been meeting Janssen's requirements under the Collaboration Agreement."  (*Id.*)  CS3 concluded that the way to solve this issue was the decision of the leadership team, and the associates and scientists trusted leadership to give feedback.  (*Id.* at 82.)

Confidential Source No. 4 ("CS4") was a Fate biopharmaceutical manager who began working at Fate prior to the beginning of the Class Period and left Fate prior to the end of the Class Period.  (*Id.* ¶ 83.)  CS4 had regular involvement with the Collaboration Agreement.  (*Id.*)  CS4 stated that Fate had difficulty increasing the production of iPSCs for use in a clinical setting.  (*Id.* ¶ 84.)  CS4 also stated that Fate experienced difficulties replicating efficacy results for product candidates intended to be used in support of the Collaboration Agreement.  (*Id.*)  "CS4 added that Janssen killed the product candidate named FT562 during the fourth quarter of 2021" because Janssen concluded that it was not effective, which "was perceived as a negative blow to Valamehr because an IND application represented a significant milestone under the Collaboration Agreement."  (*Id.*)

CS4 regularly attended recurring weekly and monthly meetings with representatives from both Fate and Janssen to discuss the status of Fate's work under the Collaboration Agreement.  (*Id.* ¶ 83.)  CS4 expressed the opinion that Janssen was not happy with Fate's performance under the Collaboration Agreement and was skeptical about Fate's transparency.  (*Id.*)  CS4 stated that Valamehr was a regular participant in these meetings.  (*Id.*)  CS4 stated that 10 to 20 Fate representatives and slightly fewer Janssen representatives attended each meeting, that each program manager from the Fate and

Janssen teams would generate a summary of each meeting, and that these summaries were distributed to each person who attended that particular meeting.  (*Id.*)

### 2. Insider Stock Sales and Compensation

Wolchko's stock sales during the Class Period totaled $43.9 million, much greater than his sales prior to his Class Period.  (*Id.* ¶¶ 85–86.)  Valamehr's stock sales during the Class Period were $13.3 million, much greater than his sales prior to the Class Period.  (*Id.* ¶¶ 88–89.)  Dulac's stock sales during the Class Period were $1.6 million.  (*Id.* ¶ 87.)  The Individual Defendants also had a compensation structure, including stock awards and options awards, that incentivized high stock prices and the concealment of negative news. (*Id.* ¶¶ 90–95.)

### 3. Public Offering

During the Class Period, Fate conducted a public offering under a shelf registration statement.  (*Id.* ¶ 97.)  Fate received net proceeds of $432.4 million.  (*Id.* ¶ 98.)

### 4. Fate's "Core Operations"

Plaintiffs allege that Fate knew that problems relating to the Collaboration Agreement and the relationship between Janssen and Fate would have been material to investors.  (*Id.* ¶ 75.)  The alleged material misrepresentations concerned the Collaboration Agreement and Fate's relationship with Janssen, a central component of Fate's operations. (*Id.* ¶¶ 101–02.)  Fate's 2021 Form 10-K stated:

> **We depend on strategic partnerships and collaboration arrangements, such as our collaboration arrangements with Janssen and Ono**, for the development and commercialization of certain of our product candidates in certain indications or geographic territories, and if these arrangements are unsuccessful, this could result in delays and other obstacles in the development, manufacture or commercialization of any of our product candidates and **materially harm our results of operations.** (*Id.* ¶¶ 74, 102 (emphasis in original).)

> Our strategy for fully developing and commercializing our product candidates **is dependent upon maintaining our current arrangements** and establishing new arrangements with research collaborators, corporate collaborators and other third parties.  (*Id.* ¶ 102 (emphasis in original).)

> Our inability to manufacture sufficient quantities of our product candidates, or the loss of our third-party contract manufacturers, or our or their failure to supply sufficient quantities of our product candidates at acceptable quality levels or prices, or at all, would materially and adversely affect our business. (*Id.* ¶ 104 (emphasis in original).)

Likewise, Dulac explained that potential collaborations "**are on the forefront of our minds**, and we're constantly talking to existing parties and trying to see what might be possible." (*Id.* ¶ 103 (emphasis in original).)

## II.    DISCUSSION

### A.    Preliminary Matters

In their Request for Judicial Notice in Support of their Motion to Dismiss ("RFJN"), Defendants assert that the Court may consider exhibits explicitly or implicitly referenced in the CCAC. (Doc. 38-2 at 4–5.) Defendants also assert that the Court may consider exhibits subject to judicial notice. (*Id.* at 5–7.) The Court addresses the incorporation by reference and judicial notice doctrines below.

### 1.    Incorporation by Reference

"[I]ncorporation-by-reference is a judicially created doctrine that treats certain documents as though they are part of the complaint itself. The doctrine prevents plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken—or doom—their claims." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018). A defendant may seek to incorporate a document into the complaint "if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

The "difficult question is whether a document can ever 'form[] the basis of the plaintiff's claim' if the complaint does not mention the document at all." *Khoja*, 899 F.3d at 1002. Courts have found that "documents crucial to the plaintiff's claims but not explicitly incorporated in a complaint can be noticed in order to prevent a plaintiff from

surviving a Rule 12(b)(6) motion by deliberately omitting references to documents upon which their claims are based." *Wietschner v. Monterey Pasta Co.*, 294 F. Supp. 2d 1102, 1109 (N.D. Cal. 2003).  However, "if the document merely creates a defense to the well-pled allegations in the complaint, then that document did not necessarily form the basis of the complaint.  Otherwise, defendants could use the doctrine to insert their own version of events into the complaint to defeat otherwise cognizable claims.  Submitting documents not mentioned in the complaint to create a defense is nothing more than another way of disputing the factual allegations in the complaint[.] … Although the incorporation-by-reference doctrine is designed to prevent artful pleading by plaintiffs, the doctrine is not a tool for defendants to short-circuit the resolution of a well-pleaded claim." *See Khoja*, 899 F.3d at 1002–03 (internal citations omitted).

Unlike judicial notice, a court generally "may assume [an incorporated document's] contents are true for purposes of a motion to dismiss under Rule 12(b)(6)." *Id.* at 1003 (citing *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006)).  However, "it is improper to assume the truth of an incorporated document if such assumptions only serve to dispute facts stated in a well-pleaded complaint" because there is a "prohibition against resolving factual disputes at the pleading stage." *Id.* (citing *In re Tracht Gut, LLC*, 836 F.3d 1146, 1150 (9th Cir. 2016) ("At the motion to dismiss phase, the trial court must accept as true all facts alleged in the complaint and draw all reasonable inferences in favor of the plaintiff.") and *Sgro v. Danone Waters of N. Am., Inc.*, 532 F.3d 940, 942, n.1 (9th Cir. 2008) (finding it proper to consider disability benefits plan referenced in complaint, but declining to accept truth of the plan's contents where the parties disputed whether defendant actually implemented the plan according to its terms)).

In their RFJN, Defendants assert that the Court may consider documents explicitly referenced in the CCAC and that Exhibits C, E, G, J, K, L, M, N, O, Q, S, T, V, and W are, therefore, incorporated by reference.  (Doc. 38-2 at 4–5.)  Exhibits C, M, and W are SEC filings; Exhibits E, G, J, K, N, Q, S, and C are call transcripts; and Exhibits L, O, and T are conference presentations.  (*Id.* at 2–3.)  Defendants also argue that Plaintiffs implicitly

referenced Defendants' publicly-filed Form 4s—Exhibits Y, Z, and AA—because they form the basis of their trading allegations and, therefore, that these documents may also be incorporated by reference.  (*Id.* at 5.)

Plaintiffs respond that they have "no qualms with the Court considering Defendants' proposed [Exhibits] C, E, J–O, Q, S–T, V–W, Y–AA" because "[e]ach of the documents were referenced in the [CCAC] (or forms the basis of certain allegations) and Plaintiff does not dispute their authenticity."  (Doc. 40 at 3–4.)  However, Plaintiffs argue that "it is still improper for this Court to consider [these exhibits] for the truth of the matters asserted therein."  (*Id.* at 5.)  For example, Plaintiffs object to the use of the SEC Form 4s (Exhibits Y–AA) to argue that the Individual Defendants entered into 10b5-1 "trading plans" for the purposes of countering Plaintiffs' scienter claims.  (*Id.*)  Plaintiffs also assert that Exhibit G is not referenced in the CCAC.  (*Id.*)

Defendants reply that "[t]his argument is contrary to numerous decisions within the Ninth Circuit evaluating scienter in light of the fact that trades were made pursuant to Rule 10b5-1 plans."  (Doc. 42 at 2.)  Defendants also reply that, contrary to Plaintiffs' assertion, Exhibit G is cited at least six times throughout the CCAC and should be incorporated by reference.  (*Id.* at 3.)

> ### a)      Exhibits C, E, J, K, L, M, N, O, Q, S, T, V, and W—SEC Filings, Call Transcripts, and Conference Presentations

Exhibits C, E, J, K, L, M, N, O, Q, S, T, V, and W—which consist of SEC filings, call transcripts, and conference presentations—are explicitly referenced in the CCAC and their incorporation is not disputed by Plaintiffs.  The question posed by Plaintiffs is whether the Court can consider the truth of the matters asserted therein.

As stated above, generally "a court 'may assume [an incorporated document's] contents are true for purposes of a motion to dismiss under Rule 12(b)(6)'" unless "such assumptions only serve to dispute facts stated in a well-pleaded complaint[.]"  *See Khoja*, 899 F.3d at 1003 (citing *Marder*, 450 F.3d at 448).  Here, Plaintiffs have not identified

material factual disputes created by each Exhibit, and neither has the Court.  Therefore, the Court will consider these exhibits without limitation.  *See id.*

    **b)**  **Exhibits Y–AA**

  As stated above, Defendants argue that Plaintiffs implicitly reference Defendants' publicly-filed Form 4s—Exhibits Y, Z, and AA—as the source of their trading allegations and, therefore, that these Exhibits may be incorporated by reference.  (Doc. 38-2 at 4.)  Then, in their Motion to Dismiss, Defendants cite Exhibits Y–AA to support their arguments that the Individual Defendants' stock sales were nondiscretionary, that the Individual Defendants increased their holdings over the Class Period, and that the timing of the sales is not suspicious, all undermining Plaintiffs' allegations regarding scienter.  (Doc. 38-1 at 21–23.)  Plaintiffs do not object to the consideration of Exhibits Y–AA but contend that "it is still improper for this Court to consider them for the truth of the matters asserted therein."  (Doc. 40 at 3–5.)

  The Court agrees with Defendants, and Plaintiffs do not seem to dispute, that Exhibits Y–AA form the basis of Plaintiffs' stock sale allegations and are therefore implicitly incorporated by reference.  *See e.g., Wietschner v. Monterey Pasta Co.*, 294 F. Supp. 2d 1102, 1109 (N.D. Cal. 2003) ("[T]he Court takes judicial notice of Mr. Hewitt and Mr. Brinkman's SEC Forms 4 … in that they are clearly, if indirectly, referenced in the Complaint as integral to the stock sale allegations made in the Complaint.").  However, the more pertinent question is whether the Court may consider the truth of the contents of Exhibits Y–AA for the purposes of disputing Plaintiffs' trading and scienter allegations.

  The Ninth Circuit in *Khoja* clarified that, while it is generally true that "a court 'may assume [an incorporated document's] contents are true for purposes of a motion to dismiss under Rule 12(b)(6)[,]" "it is improper to assume the truth of an incorporated document if such assumptions only serve to dispute facts stated in a well-pleaded complaint."  *See Khoja*, 899 F.3d at 1003.  Here, Plaintiffs allege that the Individual Defendants' stock sales are indicative of scienter (*see* CCAC ¶¶ 85–89 (identified as "additional allegations of scienter"), while Defendants argue that their stock sales were non-discretionary and,

16

therefore, not indicative of scienter (*see* Doc. 38-1 at 21–24).  Applying *Khoja*, this is a factual dispute that cannot be resolved at this stage.  *See id.* at 998, 1003 (noting "a concerning pattern in securities cases like this one: exploiting [the incorporation by reference and judicial notice doctrines] improperly to defeat what would otherwise constitute adequately stated claims at the pleading stage"); *see also Hsu v. Puma Biotechnology, Inc.*, 213 F. Supp. 3d 1275, 1281–82 (C.D. Cal. 2016) ("[E]fforts to expand courts' consideration of extrinsic evidence at the motion to dismiss stage are consistent with other developments in the law that diminish the ability of wronged plaintiffs to get their constitutionally-protected day in court.").  Thus, under *Khoja*, while the Court may consider the filing and existence of the Form 4s, it may not assume the truth of the matters asserted therein for the purposes of disputing Plaintiffs' trading and scienter allegations.[9]

### c)    Exhibit G

In their RFJN, Defendants argues that Exhibit G—a transcript of Fate's February 24, 2021 earnings call—is incorporated by reference because it is explicitly referenced in paragraphs 3 and 33–37 of Plaintiffs' CCAC.  (Doc. 38-2 at 4.)  Defendants then use

---

[9] Relatedly, there is a split in this circuit as to whether courts may take judicial notice of Form 4s to determine whether insider stock sales raise an inference of scienter.  *See e.g., Azar v. Yelp, Inc.*, Case No. 18-cv-00400-EMC, 2018 WL 6182756, at *4 (N.D. Cal. Nov. 27, 2018) ("Courts in this circuit have routinely taken judicial notice of Forms 4 to determine whether insider stock sales raise an inference of scienter to support a § 10(b) action."); *Park v. GoPro, Inc.*, Case No. 18-cv-00193-EMC, 2019 WL 1231175, at *7 (N.D. Cal. Mar. 15, 2019) (taking judicial notice of SEC Form 4s for the purpose of showing the Individual Defendants sold their shares pursuant to a 10b5-1 plan); *but see Buttonwood Tree Value Partners, LP v. Sweeney*, Case No. SACV10-00537 CJC(MLGx), 2012 WL 13026910, at *2 (C.D. Cal. Dec. 10, 2012) ("[T]he Court cannot take judicial notice of the Individual Defendants' stock purchases."); *Patel v. Parnes*, 253 F.R.D. 531, 546 (C.D. Cal. 2008) ("It is appropriate for the court to take judicial notice of the content of the SEC Forms 4 and the fact that they were filed with the agency.  The truth of the content, and the inferences properly drawn from them, however, is not a proper subject of judicial notice.").  Given this split, and the *Khoja* panel's warnings against the over-use of the incorporation by reference and judicial notice doctrines, the Court will not take judicial notice of the truth of the matters asserted in Exhibits Y–AA.

Exhibit G to support their assertion that, by February 2021, Fate and Janssen had nominated an NK cell preclinical candidate (FT562) directed to Janssen's first target (KLK2). (Doc. 38-1 at 14, 31.) Defendants also note that Exhibit G contains forward-looking disclaimers. (*Id.* at 34 n.23.) Plaintiffs respond that Exhibit G is not referenced in the CCAC and, therefore, that the incorporation by reference doctrine does not apply. (Doc. 40 at 5.) Plaintiffs also respond that Defendants use Exhibit G "to infuse a purported fact that Fate has allegedly made 'progress' under the Collaboration Agreement[,]" which is prohibited. (*Id.* at 5–6.)

Defendants are correct that Plaintiffs reference Exhibit G throughout their CCAC. (*See* CCAC ¶¶ 3, 33–37.) Therefore, contrary to Plaintiffs' assertion, the incorporation by reference doctrine applies. Further, Defendants' assertion that, by February 2021, Fate and Janssen had nominated FT562 does not appear to be in dispute, as FT562 is referenced throughout the CCAC. (*See e.g., id.* ¶ 37.) Likewise, the Court may consider that Exhibit G contains forward-looking disclaimers without assuming the truth thereof. *See Aramic LLC v. Revance Therapeutics, Inc.*, Case No. 21-cv-09585-AMO, 2024 WL 1354503, at *3 n.2 (N.D. Cal. Apr. 2, 2024) ("[T]he Court takes judicial notice of the fact that the documents [referenced in the complaint], such as the press releases, contained purportedly cautionary language about forward-looking statements."). Therefore, the Court will incorporate Exhibit G by reference and consider it for all purposes. *See Khoja*, 899 F.3d at 1003 ("[A] court 'may assume [an incorporated document's] contents are true for purposes of a motion to dismiss under Rule 12(b)(6).'") (citing *Marder*, 450 F.3d at 448); *see also McGovney v. Aerohive Networks, Inc.*, 367 F. Supp. 3d 1038, 1051 (N.D. Cal. 2019) (taking judicial notice of earnings calls referenced in the complaint).[10]

---

[10] Defendants also argue that the Court should take judicial notice of Exhibit G because courts routinely take judicial notice of earnings calls. (Doc. 38-2 at 6–7.) Defendants are also correct that earnings calls are the proper subjects of judicial notice. *See Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1124 (N.D. Cal. 2017) (taking judicial notice of Twitter's earnings calls); *City of Royal Oak Ret. Sys. v. Juniper Networks*, Inc., 880 F.

### 2.   Judicial Notice

Defendants assert that their remaining Exhibits—D, F, H, I, P, R, U, and X (all SEC filings)—are subject to judicial notice.  (Doc. 38-2 at 5–7.)  The Court categorizes and addresses each remaining exhibit below.

### a)   SEC Form 10-Ks—Exhibits F and X

Defendants argue that the Court should consider Fate's Form 10-K Annual Reports—Exhibits F and X—because they are not subject to reasonable dispute and courts routinely take judicial notice of SEC filings.  (Doc. 38-2 at 5–6.)  Defendants also argue that courts are permitted to consider risk disclosures regarding the safe-harbor provision for forward-looking statements in the Private Securities Litigation Reform Act ("PSLRA"), which states, "[o]n any motion to dismiss based upon [the safe harbor], the court shall consider any statement cited in the complaint and any cautionary statement accompanying the forward-looking statement, which are not subject to material dispute, cited by the defendant."  (*Id.* at 5 (citing 15 U.S.C. § 78u-5(e)).)

Defendants use Exhibit F for two purposes in their Motion to Dismiss.  First, Defendants use Exhibit F to support the proposition that the Collaboration Agreement generated $16.8 million in 2020.  (Doc. 38-1 at 15.)  Second, Defendants quote the disclosure "about the risks inherent in its collaboration with Janssen, including possible termination" contained therein.  (*Id.* at 34.)  Similarly, Defendants use Exhibit X to support the propositions that "[o]n December 15, 2022, the FDA allowed an IND application for the NK cell candidate against Target 3, triggering a clinical development milestone payment of $3 million" and that the Collaboration Agreement generated $79.7 million in 2022.  (*Id.* at 15.)

---

Supp. 2d 1045, 1058 (N.D. Cal. 2012) (finding that earnings calls are the proper subject of judicial notice).  Thus, even if the Court could not incorporate Exhibit G by reference, Exhibit G is still the proper subject of judicial notice.

Plaintiffs respond that "[w]ith regard to [Exhibit] F, Defendants rely on that document to infuse facts outside the [CCAC], and to bolster their falsity arguments with factual matters outside the four corners of the pleading." (Doc. 40 at 5 (citation omitted).) Similarly, Plaintiffs respond that "Defendants rely on [Exhibit] X to mine for facts outside of those alleged in the [CCAC] to bolster their arguments." (*Id.* at 6 (citation omitted).) Finally, Plaintiffs assert that case law prohibits the Court from accepting the offered facts as true.[11]

"Courts can consider securities offerings and corporate disclosure documents that are publicly available." *Gerritsen v. Warner Bros. Ent. Inc.*, 112 F. Supp. 3d 1011, 1031–32 (C.D. Cal. 2015) (citing *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1064 n.7 (9th Cir. 2008)). Likewise, "SEC forms such as a Form 8-K or Form 10-K are matters of public record and may be subject to judicial notice." *Wynn v. Chanos*, 75 F. Supp. 3d 1228, 1235 (N.D. Cal. 2014); *see also Oklahoma Firefighters Pension & Ret. Sys. v. Ixia*, 50 F. Supp. 3d 1328, 1348–49 (C.D. Cal. 2014) (taking judicial notice of several SEC filings); *Glenbrook Capital Ltd. P'ship v. Kuo*, 525 F. Supp. 2d 1130, 1137 (N.D. Cal. 2007) (taking judicial notice of SEC Forms 8-K and 10-K). However, courts "consider these documents not for the truth of the statements they contain, but for the fact that they were filed and provided certain information to the public." *Id.*; *see also Patel*, 253 F.R.D. at 546 (taking judicial notice of the SEC Forms 4 but not for the truth of the content); *In re Splunk Inc. Sec. Litig.*, 592 F. Supp. 3d 919, 930 (N.D. Cal. 2022) (taking judicial notice of statements in SEC filings, but not for the truth of the matters asserted therein or for the purpose of resolving factual disputes); *In re Am. Apparel, Inc. S'holder Litig.*, 855 F. Supp.

---

[11] In their reply in support of their RFJN, Defendants reiterate that courts routinely consider SEC Form 10-Ks to show that "Plaintiff's conclusory allegations of scienter and misleading statements fail when evaluated in light of the copious disclosures that Fate made about the Collaboration Agreement and the risks facing its business." (Doc. 42 at 3–4.) Defendants also reiterate that the PSLRA requires the Court to consider any cautionary statements or disclosures. (*Id.* at 4–5.)

2d 1043, 1062 n.143 (C.D. Cal. 2012) ("The court takes judicial notice of only of the existence and contents of the SEC filings, not the truth of information contained in them.").

Applying the foregoing principles, the Court finds that it may not use Exhibits F and X for the truth of Defendants' assertions regarding payments or revenue generated under the Collaboration Agreement.[12]  (*See* Doc. 38-1 at 15.)  However, the Court may consider the existence and contents of the disclosures contained within Exhibit F "not for the truth of the statements they contain, but for the fact that they were filed and provided certain information to the public." *Wynn*, 75 F. Supp. 3d at 1235.  (*See also id.* at 34.)

### b)    SEC Form 10-Qs—Exhibits D, H, I, P, R, and U

In their RFJN, Defendants argue that the Court should consider Fate's Form 10-Q Quarterly Reports (Exhibits D, H, I, P, R, and U) because they are not subject to reasonable dispute and courts routinely take judicial notice of SEC filings.  (Doc. 38-2 at 5–6.) Defendants also argue that these documents contain risk disclosures subject to the safe-harbor provision for forward-looking statements in the PSLRA.  (*Id.* at 5 (citing 15 U.S.C. § 78u-5(e)).)

In their Motion to Dismiss, Defendants use Exhibit D to support their arguments that Fate warned investors about the risk and complexity of manufacturing and distributing cell products, the risk of termination of the Collaboration Agreement, and the risk that manufacturing iPSCs for larger-scale clinical trials and commercialization was difficult and uncertain.[13]  (*See* Doc. 38-1 at 12–14, 17, 30, 34–35, 38.)  Defendants use Exhibits I,

---

[12] While Defendants cite to evidence of payments or revenue generated under the Collaboration Agreement in the background section of their Motion to Dismiss (*see* Doc. 38-1 at 14–15), Defendants do not rely on this evidence to support their arguments regarding the issues in dispute.  Therefore, this evidence does not inform the Court's decision below.

[13] Defendants also use Exhibit D to support the assertions that Fate believes that "clonal master iPSC lines can be used as a renewable source for manufacturing cell therapy products" and that Fate has entered into collaboration agreements with pharmaceutical

21

P, R, and U to support the proposition that "Fate's SEC filings provided extensive, clear disclosure[s] about the risks inherent in its collaboration with Janssen, including possible termination[.]"[14]  (*Id.* at 34–35.)

As stated above, "[c]ourts can consider securities offerings and corporate disclosure documents that are publicly available." *Gerritsen*, 112 F. Supp. 3d at 1031–32 (citing *Metzler Inv. GMBH*, 540 F.3d at 1064 n.7).  Likewise, "SEC forms … are matters of public record and may be subject to judicial notice." *Wynn*, 75 F. Supp. 3d at 1235.  However, courts "consider these documents not for the truth of the statements they contain, but for the fact that they were filed and provided certain information to the public." *Id.* Accordingly, the Court will take judicial notice of the existence and contents of the various disclosures set forth in Exhibits D, I, P, R, and U and the fact that they provided certain information to the public, but the Court will not take judicial notice for the truth of the statements contained therein.

---

companies. (Doc. 38-1 at 12–13.) While these assertions provide background information, they are not material and do not inform the Court's decision below.

[14] Defendants also use Exhibit P to support the proposition that "Fate achieved a research milestone for a second NK cell preclinical candidate … earning a milestone payment of $3 million." (Doc. 38-1 at 14.)  Defendant use Exhibit R to support the proposition that "a milestone for a third NK cell preclinical candidate … earned another $3 million." (*Id.*) Defendants use Exhibit U to support the proposition that "Janssen exercised a commercial option for another IND product candidate … triggering another $10 million milestone …." (*Id.*)  Defendants use Exhibit H to support the proposition that Fate achieved a research milestone for FT562, earning a $3 million payment. (*Id.*)  Applying the relevant principles, the Court finds that it may not use Exhibits P, R, U, and H for the truth of Defendants' assertions regarding milestone payments. *See Wynn*, 75 F. Supp. 3d at 1235.  Regardless, while Defendants cite to evidence of payments or revenue generated under the Collaboration Agreement in the background section of their Motion to Dismiss (*see* Doc. 38-1 at 14–15), Defendants do not rely on this evidence to support their arguments regarding the issues in dispute.  Therefore, this evidence does not inform the Court's decision below.

**B.      Exchange Act Section 10(b) and Rule 10b-5—First Cause of Action**

"Section 10(b) of the [Exchange Act] makes it unlawful for 'any person ... [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.'" *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 989 (9th Cir. 2009) (citing 15 U.S.C. § 78j(b)).

"One such rule promulgated under the [Exchange Act] is [Securities Exchange Commission] Rule 10b-5, which provides, *inter alia*, '[i]t shall be unlawful for any person ... [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.'" *Id.* at 989–90 (quoting 17 C.F.R. § 240.10b-5(c)). "Five elements are required in order to prove a primary violation of Rule 10b-5." *Id.* at 990. "[A] plaintiff must demonstrate '(1) a material misrepresentation or omission of fact [i.e., falsity], (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss.'" *Id.* (quoting *In re Daou Sys., Inc.*, 411 F.3d 1006, 1014 (9th Cir. 2005)).

Further, "[a]t the pleading stage, a complaint stating claims under section 10(b) and Rule 10b-5 must satisfy the dual pleading requirements of Federal Rule of Civil Procedure 9(b) and the PSLRA." *Id.* Federal Rule of Civil Procedure 9(b) provides, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). However, "[a]ll securities fraud complaints since 1995 … are [also] subject to the more exacting pleading requirements of the PSLRA[.]" *Zucco Partners, LLC*, 552 F.3d at 990. "The PSLRA amended the [Exchange Act] to require that a complaint plead with particularity both falsity and scienter." *Id.* at 990–91 (quotation marks and citations omitted).

23

"[T]o properly allege falsity, a securities fraud complaint must now 'specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, ... state with particularity all facts on which that belief is formed.'" *Id.* (quoting *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001) (quoting 15 U.S.C. § 78u–4(b)(1))). "To adequately plead scienter, the complaint must now 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Id.* at 991 (quoting same). "The stricter standard for pleading scienter naturally results in a stricter standard for pleading falsity, because 'falsity and scienter in private securities fraud cases are generally strongly inferred from the same set of facts[.]'" *In re Daou Sys., Inc.*, 411 F.3d at 1015 (quoting *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1091 (9th Cir.2002) (quoting *Ronconi*, 253 F.3d at 429)). Thus, the pleading requirements for falsity and scienter under the PSLRA exceed those under Rules 9(b) and 12(b)(6). Loss causation, however, is subject only to the pleading requirements of Rule 9(b). *See Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 604–05 (9th Cir. 2014) (finding, as a matter of first impression, that loss causation must satisfy the pleading requirements of Rule 9(b)).

The Court addresses each element in dispute—falsity, scienter, and loss causation—below.

### 1.    Misrepresentations or Omissions of Material Facts—Falsity

In their Motion, Defendants argue that Plaintiffs fail to allege any actionable misrepresentations or omissions because Plaintiffs do not identify any misleading statements, Fate has no duty to disclose the allegedly "significant problems" related to the Collaboration Agreement, Plaintiffs identify statements that are mere puffery, Plaintiffs challenge protected forward-looking statements, and Plaintiffs challenge inactionable opinion statements. (Doc. 38-1 at 28–37.) The Court first addresses whether each statement is materially misleading, triggering a duty to disclose. The Court then addresses

24

various safe harbors and judicial doctrines that may protect otherwise actionable materially misleading statements.

### a)    Material Misrepresentations or Omissions and the Duty to Disclose

As a preliminary matter, the Court finds that Plaintiffs' allegations are based on a theory of material omissions—primarily the iPSC replication issues and the termination of FT562.  (*See* CCAC ¶ 32 (alleging Defendants' statements "in connection with the Collaboration Agreement [were] materially misleading because Defendants **failed to disclose** that Fate's process development group was experiencing difficulties attempting to replicate iPSCs ….") (emphasis added); *id.* ¶ 46 (alleging that statements related to the Collaboration Agreement were materially misleading because Fate **failed to disclose** that, during the fourth quarter of 2021, Janssen declined to proceed with FT562).)  In their Opposition, Plaintiffs cursorily argue that the CCAC sufficiently alleges that "Defendants' statements supplied underlying facts that were untrue;" however, as noted in the preceding sentence, this argument is not consistent with the language set forth in the CCAC.  (Doc. 39 at 22; *but see* CCAC ¶¶ 32, 46.)  Therefore, the question becomes whether Fate had a duty to disclose these allegedly material omissions.

"Silence, absent a duty to disclose, is not misleading under Rule 10b-5."  *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988).  Section 10(b) and Rule 10b-5 "do not create an affirmative duty to disclose any and all material information."  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011); *see also Chiarella v. United States*, 445 U.S. 222, 235 (1980) ("[A] duty to disclose under § 10(b) does not arise from the mere possession of [material] nonpublic market information.").  "Rule 10b-5 prohibits 'only misleading and untrue statements, not statements that are incomplete.'"  *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1061 (9th Cir. 2014) (quoting *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002)); *see id.* ("We have expressly declined to require a rule of completeness for securities disclosures because 'no matter how detailed and accurate disclosure statements are, there are likely to be additional details that could have been disclosed but were not.'") (quoting *Brody*, 280 F.3d at 1006).

25

Disclosure is required "only when necessary to make ... statements made, in the light of the circumstances under which they were made, not misleading." *Matrixx Initiatives, Inc.*, 563 U.S. at 44–45 (quoting 17 C.F.R. § 240.10b-5(b) and *Basic*, 485 U.S. at 239, n.17). "In practical terms, 'to be actionable under the securities laws, an omission must be misleading ... [i.e.,] it must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists.'" *Police Ret. Sys. of St. Louis*, 759 F.3d at 1061 (quoting *Brody*, 280 F.3d at 1006).

"[I]n order to survive a motion to dismiss under the heightened pleading standards of the [PSLRA], the plaintiffs' complaint must specify the reason or reasons why the statements made by [the defendants] were misleading or untrue, not simply why the statements were incomplete." *Brody*, 280 F.3d at 1006 (citing 15 U.S.C. § 78u-4(b)(1) and *Ronconi*, 253 F.3d at 429).

Defendants argue that Fate had no duty to disclose the allegedly "significant" problems related to the Collaboration Agreement because Defendants' general statements regarding their technology, goals, progress, and risks are not materially misleading. (Doc. 38-1 at 28–32.) Plaintiffs respond that Defendants' statements are materially misleading because they "failed to disclose that Fate's product development group was experiencing prolonged difficulties in both replicating the efficacy results for potential product candidates from batch-to-batch, as well as producing sufficient quantities of CAR T or NK cells for purposes of use in a clinical setting." (Doc. 39 at 16.) Plaintiffs add that statements made after the termination of FT562 are materially misleading because, "[w]hen Defendants made those statements, they deliberately withheld from investors the fact that Janssen had killed the first product candidate under the Collaboration Agreement—i.e., FT562—during 4Q21 because … it had concluded that Fate could not demonstrate efficacy." (*Id.* at 16–17, 19–20.) Finally, Plaintiffs contend that certain of Defendants' risk disclosures are misleading because the risks warned of had already materialized. (*Id.* at 17–18.)

3:23-cv-00111-RBM-AHG

In their Reply, Defendants reject Plaintiffs' assertion that they gave the misleading impression of frictionless progression towards IND submissions to the FDA.  (Doc. 41 at 11–12.)  Defendants reiterate that any statement after the termination of FT562 said nothing (even by implication) about FT562 and instead focused on other product candidates.  (*Id.* at 12.)  Defendants also assert that that their risk disclosures did not leave the impression that the hypothetical risks had not already occurred because no reasonable investor would assume that Janssen must be moving forward with every product candidate under the Collaboration Agreement.  (*Id.* at 13.)  Likewise, Defendants argue that its risk disclosure regarding manufacturing difficulties were company specific and not hypothetical.  (*Id.* at 13–14.)

Given Plaintiffs' allegations and arguments regarding Janssen's termination of FT562, in conducting its analysis, the Court distinguishes between statements made prior to Janssen's termination of FT562 and statements made after Janssen's termination of FT562.  The Court addresses each category below.

### i.   2020 and 2021 Statements—Before Termination of FT562

As stated above, Plaintiffs contend that each statement made prior to the termination of FT561 was materially misleading because "Defendants failed to disclose that Fate's process development group was experiencing difficulties attempting to replicate iPSCs that had been developed by [Fate's] R&D group, … [which] led to Fate being unable to demonstrate to Janssen that the Company would be able to create a sufficient number of cells for use in a clinical setting with the same efficacy results previously observed by Fate's [R&D] group …."  (CCAC ¶¶ 31–33, 35, 38, 40, 42.)  The Court addresses each of Defendants' these statements in turn.

### (a)   August 5, 2020

Plaintiffs allege that Defendants' August 5, 2020 statement regarding the utilization of "already established clonal master engineered iPSC lines" was materially misleading because Defendants were "experiencing difficulties" replicating iPSCs that had been developed by the Company's R&D group.  (CCAC ¶ 32.)  The Court disagrees.

27

The CCAC reveals, and Plaintiffs do not dispute, that Fate's R&D group had developed iPSCs. (*See id.* ¶¶ 32, 79, 82.)  In light of R&D's success, the Court cannot find that Fate's statement that it had "already established clonal master iPSC lines," made only four months after Fate launched the Collaboration Agreement (*id.* ¶ 25), was materially misleading.

Fate also repeatedly disclosed the risks associated with the Collaboration Agreement.  From the outset of the Collaboration Agreement, Fate disclosed the risk of termination (*see* Doc. 38-8 at 3 [Ex. D, Q2 2020 Form 10-Q]; Doc. 38-10 at 6 [Ex. F, FY 2020 Form 10-K]; Doc. 38-13 at 3 [Ex. I, Q3 2021 Form 10-Q]) as well as the risk of "difficulties in manufacturing or supplying [Fate's] product candidates for clinical testing" (Doc. 38-7 at 5 [Ex. C, April 2, 2020 Form 8-K]).  Fate also explicitly stated that it was still developing optimized and reproducible manufacturing processes for clinical-scale manufacturing.  (*See* Doc. 38-8 at 7 [Ex. D, Q2 2020 Form 10-Q]; Doc. 38-10 at 7 [Ex. F, FY 2020 Form 10-K]; Doc. 38-13 at 7 [Ex. I, Q3 2021 Form 10-Q].)  Given these disclosures, the Court cannot find that Defendants' statement regarding the utilization of "already established clonal master engineered iPSC lines" was materially misleading.

### (b)     February 24, 2021

Plaintiffs allege that Defendants' February 24, 2021 statements regarding optimizing their manufacturing process and developing T cells and NK cells aggressively were materially misleading because Defendants were "experiencing difficulties" replicating its iPSCs.  (*Id.* ¶¶ 32–36.)  However, the CCAC reveals, and Plaintiffs do not seem to dispute, that Fate's R&D group had developed iPSCs, that Defendants repeatedly disclosed the risks associated with the Collaboration Agreement, and that Fate explicitly stated that it was still developing reproducible manufacturing processes for clinical-scale manufacturing.  (*See* Section II.B.1.a.i.a.)  In light of R&D's success and Defendants' disclosures, the Court cannot find these statements were materially misleading.

Additionally, while Defendants may have been "experiencing difficulties," Plaintiffs do not dispute that work under the Collaboration Agreement continued until the

termination of the Agreement approximately two years later.  (*See* CCAC ¶ 64.)  Looking at the statements as a whole and in context, it is apparent that Defendants' statements intended to convey that work under the Collaboration Agreement was moving forward, not that work under the Collaboration Agreement was proceeding without difficulty. Therefore, the Court cannot find that Defendants' statements that they were innovating and optimizing their manufacturing process and developing both cell types aggressively were materially misleading.

### (c)   November 4, 2021

Plaintiffs allege that Defendants' November 4, 2021 statements describing the Collaboration Agreement as going "very well" and stating that Janssen had added a third antigen to the collaboration were materially misleading because Defendants were experiencing difficulties replicating its iPSCs.  (CCAC ¶¶ 32, 38–39.)  As before, the Court cannot find that these statements are materially misleading because Fate's R&D group had developed iPSCs, Defendants repeatedly disclosed the risks associated with the Collaboration Agreement, and Fate explicitly stated that it was still developing reproducible manufacturing processes for clinical-scale manufacturing.  (*See* Sections II.B.1.a.i.a–b.)

Additionally, it is not apparent to the Court how the alleged difficulties replicating iPSCs rendered Defendants' statement regarding Janssen adding a third antigen to the collaboration materially misleading.  For this reason, the Court finds that Plaintiffs have failed to "specify the reason or reasons why the statements made by [Defendants] were misleading or untrue, not simply why the statement[s] were incomplete."  *Brody*, 280 F.3d at 1006 (citations omitted).

Finally, evaluating the November 4, 2021 statement as a whole, it is apparent to the Court that Defendants' assertion that the collaboration was going "very well" referred to the statements that followed—that revenue had continued to increase and that Janssen had added a third antigen target to the collaboration.  (*See* CCAC ¶ 38.)  No reasonable investor could conclude that Defendants' statement that the Collaboration Agreement was going

"very well" meant that the Collaboration Agreement was going "very well" in every respect.

### (d)   November 15, 2021

Plaintiffs allege that Defendants' November 15, 2021 statement regarding Fate's first product candidate—identified by Plaintiffs as FT562—and Defendants' November 15, 2021 statement that the Collaboration Agreement was "proceeding well through preclinical development with the aim of IND submissions over the course of the next 18 months" were materially misleading because Defendants were experiencing difficulties replicating iPSCs.  (CCAC ¶ 41.)  As before, the Court cannot find that these statements are materially misleading because Fate's R&D group had developed iPSCs, Defendants repeatedly disclosed the risks associated with the Collaboration Agreement, Fate explicitly stated that it was still developing reproducible manufacturing processes for clinical-scale manufacturing.  (*See* Sections II.B.1.a.i.a–c.)

Further, it is not clear how Defendants' difficulties replicating its iPSCs rendered Defendants' specific statement regarding FT562 (*see* CCAC ¶ 40) misleading.  Therefore, in this respect, the Court finds that Plaintiffs have failed to "specify the reason or reasons why the statements made by [Defendants] were misleading or untrue, not simply why the statement were incomplete."  *Brody*, 280 F.3d at 1006 (citations omitted).

### ii.   2022 Statements—After Termination of FT562

Plaintiffs contend that each statement made after the termination of product candidate FT562 was materially misleading because Fate was having difficulty replicating its iPSCs and producing enough cells for a clinical setting, and, during the fourth quarter of 2021, Janssen had declined to proceed with product FT562.  (CCAC ¶¶ 5, 32, 45–47, 49–54, 56–61, 63, 84.)

For the same reasons set forth above (*see* Sections II.C.1.a.i.a–d), the Court cannot find that Fate's difficulties replicating iPSCs previously developed by Fate's R&D group and producing enough cells for clinical trials rendered **any** of its statements made after the termination of FT562 (addressed below) materially misleading.  As before, prior to the

30

termination of FT562, Fate's R&D group had developed iPSCs (*see id.* ¶¶ 32, 79, 82); Defendants repeatedly disclosed the risks associated with the Collaboration Agreement, including termination and the risk that "difficulties in manufacturing or supplying the Company's product candidates for clinical testing" (*see* Doc. 38-7 at 5 [Ex. C, April 2, 2020 Form 8-K]; Doc. 38-8 at 3 [Ex. D, Q2 2020 Form 10-Q]; Doc. 38-10 at 6 [Ex. F, FY 2020 Form 10-K]; Doc. 38-13 at 3 [Ex. I, Q3 2021 Form 10-Q]); and Fate admitted that they were still developing optimized and reproducible manufacturing processes for clinical-scale manufacturing (*see* Doc. 38-8 at 7 [Ex. D, Q2 2020 Form 10-Q]; Doc. 38-10 at 7 [Ex. F, FY 2020 Form 10-K]; Doc. 38-13 at 7 [Ex. I, Q3 2021 Form 10-Q]).  In 2022, Fate made similar disclosures and explicitly stated, "[w]e have not yet caused any of our product candidates to be manufactured or processed on a commercial scale and may not be able to do so for any of our product candidates."  (Doc. 38-17 at 10 [Ex. M, FY 2021 Form 10-K]; *see also* Doc. 28-20 at 10 [Ex. P, Q1 2022 Form 10-Q] ["We are still developing optimized and reproducible manufacturing processes for clinical and commercial-scale manufacturing of our product candidates …."]; Doc. 38-22 at 9 [Ex. R, Q2 2022 Form 10-Q] [same]; Doc. 38-25 at 9 [Ex. U, Q3 2022 Form 10-Q] [same].)

Therefore, going forward, the Court only addresses whether Fate's failure to disclose the termination of FT562 rendered Defendants' 2022 statements materially misleading.

### (a)     February 9, 2022

Plaintiffs allege that Defendants' statements that work under the Collaboration Agreement was "good" and that they expected to nominate a second and third IND candidate in the next couple of months were materially misleading because Janssen had declined to proceed with its first IND candidate—FT562. (CCAC ¶ 46.)  The Court agrees. The Court finds that Defendants' statement that they expected to nominate a second and third IND candidate without informing investors that Janssen had terminated the first IND candidate was materially misleading.  By not disclosing that Janssen had terminated the first IND candidate, Defendants left the mistaken impression that they would soon have three IND candidates in the pipeline.  In fact, at this time, it seems that Defendants did not

have any IND candidates in the pipeline.  Therefore, Defendants' statements painted a "state of affairs that differ[ed] in a material way from the one that actually exist[ed]." *Brody*, 280 F.3d at 1006.

### (b)    February 28, 2022

Plaintiffs allege that Defendants' statement that they were developing multiplexed-engineered CAR NK and CAR T-call product candidates for solid tumors was materially misleading because Janssen had declined to proceed with its first IND candidate—FT562. (CCAC ¶ 47, 49.)  However, the Court cannot find that Defendants' statement that they were developing product candidates was materially misleading because the CCAC reveals, and Plaintiffs do not dispute, that work under the Collaboration Agreement continued for approximately 10 more months (*see id.* ¶ 64) and Fate subsequently worked on additional IND candidates, e.g., FT862 (*see id.* ¶¶ 45, 58, 60, 62).

Plaintiffs also allege that Defendants' statement that they believed their "approach has the potential to improve cell product consistency and potency, reduce manufacturing costs, shorten time to treatment and reach more patients" was materially misleading because Janssen had terminated FT562. (CCAC ¶ 50–51.)  The Court disagrees.  As before, the Court cannot find that these statements were materially misleading because Fate's R&D group had developed iPSCs (*see id.* ¶¶ 32, 79, 82), work under the Collaboration Agreement continued for approximately 10 more months (*see id.* ¶ 64) and Fate subsequently worked on additional IND candidates, e.g., FT862 (*see id.* ¶¶ 45, 58, 60, 62).

Finally, Plaintiffs allege that the risk disclosure regarding Janssen's failure to select a product candidate included in Fate's December 31, 2021 Form 10-K, filed on February 28, 2022, was materially misleading because the risk had already materialized. (CCAC ¶¶ 52–53.)  The Court agrees.  "The Ninth Circuit has noted that 'risk factors' are not actionable without … factual allegations indicating that the risks had already 'come to fruition.'"  *In re Pivotal Sec. Litig.*, Master File No. 3:19-cv-03589-CRB, 2020 WL 4193384, at *6 (N.D. Cal. July 21, 2020) (quoting *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1181 (9th Cir. 2009)).  Put another way, "[r]isk disclosures may be

actionable 'as material omissions when the disclosures speak to entirely ... as-yet-unrealized risks and contingencies' and fail to alert 'the reader that some of these risks may already have come to fruition.'"  *Doyun Kim v. Advanced Micro Devices, Inc.*, Case No. 5:18-cv-00321-EJD, 2019 WL 2232545, at *7 (N.D. Cal. May 23, 2019) (quoting *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 986 (9th Cir. 2008)); *see also In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 949 (9th Cir. 2023) (finding shareholders adequately pleaded falsity when Facebook's 2016 10-K noted the risk of third parties improperly accessing and using Facebook users' data as hypothetical when "the exact risk had already transpired"); *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 704 (9th Cir. 2021) (finding the complaint plausibly alleged that Alphabet's warning in each Form 10-Q of risks that "could" or "may" occur was misleading to a reasonable investor when Alphabet knew that those risks had materialized).  Applying these principles, the Court finds that Fate's risk disclosure filed on February 28, 2022 (*see* CCAC ¶ 52) was materially misleading because the "risk" that Janssen could "fail to select a product candidate for advancement" had already come to pass when it declined FT562.  Identifying such a risk as something that "could" happen "if" Janssen failed to select a product candidate for advancement wrongly implies that such an event had not yet occurred.

<b>(c)</b>    <b>March 16, 2022; May 4, 2022; August 3, 2022; and September 12, 2022</b>

On March 16, 2022, Defendants stated that Fate's programs for four different targets were going "very, very well" and that they expected to file the first IND by the end of the year.  (CCAC ¶ 54.)  On May 4, August 3, and September 12, 2022, Wolchko updated investors on two iPS-derived CAR NK cell collaboration candidates, for which he projected submitting IND applications.  (*See* CCAC ¶¶ 56, 58, 60.)  Plaintiffs allege that these statements were materially misleading because Janssen had terminated Defendants' first IND candidate.  (*See id.* ¶¶ 54–61.)  The Court agrees.  Defendants' statements that the Collaboration Agreement was going "very, very well" and projecting future IND submissions without disclosing that the first IND candidate had been terminated left the

33

impression that Fate had more IND candidates than it did.  (*See* Section II.B.1.a.ii.a.)  In other words, Defendants' statements painted a "state of affairs that differ[ed] in a material way from the one that actually exist[ed]."  *Brody*, 280 F.3d at 1006.

### (d)   November 2, 2022

Plaintiffs allege that Defendants' November 2, 2022 statement that their second CAR T-cell product candidate, FT862, has the potential to effectively infiltrate and eliminate tumor cells was materially misleading because Janssen had terminated FT562. (CCAC ¶¶ 62–63.)  However, Plaintiffs do not allege how Defendants' specific statements regarding FT862 relate to the termination of FT562.  Therefore, Plaintiffs have failed to "specify the reason or reasons why the statements made by [Defendants] were misleading or untrue, not simply why the statement were incomplete."  *Brody*, 280 F.3d at 1006 (citations omitted).  The Court cannot find that Defendants' specific statements regarding FT862 misled investors about work under the Collaboration Agreement in a broader sense.

### b)   Safe Harbors and Judicial Doctrines

### i.   Puffery

"Statements of mere corporate puffery, 'vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers,' are not actionable because 'professional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives.'"  *Police Ret. Sys. of St. Louis*, 759 F.3d at 1060 (quoting *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010)); *see also Tadros v. Celladon Corp.*,  Case No. 15cv1458 AJB (DHB), 2016 WL 5870002, at *10 (S.D. Cal. Oct. 7, 2016) (same); *Kovtun v. VIVUS, Inc.*, No. C 10-4957 PJH, 2012 WL 4477647, at *11 (N.D. Cal. Sept. 27, 2012) (same).  "[These] mildly optimistic, subjective assessment[s] hardly amount[] to a securities violation."  *In re Cutera Sec. Litig.*, 610 F.3d at 1111; *see e.g., Sneed v. AcelRx Pharms., Inc.*, Case No. 21-cv-04353-BLF, 2023 WL 4412164, at *8 (N.D. Cal. July 7, 2023) (finding that statement that drug launch was "progressing well" was mere corporate puffery); *In re Sorrento Therapeutics, Inc. Sec. Litig.*, Case No. 20-cv-00966-AJB-DEB, 2021 WL 6062943, at *7 (S.D. Cal. Nov. 18, 2021) (finding that statements "there is a

34

cure" and "[t]here is a solution that works 100 percent" were statements of corporate optimism or puffery).  Puffery is "not capable of objective verification and lack a standard against which a reasonable investor could expect them to be pegged."  *In re Impac Mortg. Holdings, Inc. Sec. Litig.*, 554 F. Supp. 2d 1083, 1096 (C.D. Cal. 2008).

"But even 'general statements of optimism, when taken in context, may form a basis for a securities fraud claim' when those statements address specific aspects of a company's operation that the speaker knows to be performing poorly."  *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1143 (9th Cir. 2017) (quoting *Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996) (finding that optimistic public statements that FDA-approval was progressing positively were misleading when the company knew that drug product would never be approved by the FDA)); *see also Rihn v. Acadia Pharms. Inc.*, Case No.: 15cv00575 BTM (DHB), 2016 WL 5076147, at *7 (S.D. Cal. Sept. 19, 2016) (finding that statements regarding company remaining "on track" to submit a New Drug Application ("NDA") were misrepresentations about current conditions and were not vague statements of optimism).  Thus, whether a statement constitutes puffery hinges in large part on what Defendants knew at the time the statement was made.

Here, Defendants assert that Plaintiffs challenge many examples of corporate puffery.  (Doc. 38-1 at 33.)  Plaintiffs respond that Defendants statements go beyond mere puffery when taken in context because they contain misleading factual assertions regarding Fate's progress under the Collaboration Agreement.  (Doc. 39 at 20–21.)  As before, the Court addresses Defendants' pre- and post-2022 statements in turn.

### (a)    2020 and 2021 Statements—Before Termination of FT562

As set forth above, the Court does not find any of Defendants' 2020 and 2021 statements materially misleading.  (*See* Section II.B.1.a.i.)  The Court also agrees with Defendants that many of their statements of mere puffery.  For example, prior to the termination of FT562, Defendants stated:

"We have successfully launched this collaboration with <u>strong momentum</u>."

35

(CCAC ¶ 31 (emphasis altered).)

"We also continue to <u>innovate and optimize</u> our manufacturing process …." (*Id.* ¶ 33 (emphasis altered).)

We are absolutely developing both cell types <u>aggressively</u>." (*Id.* ¶ 35 (emphasis altered).)

"[T]he Janssen collaboration has continued to go <u>very well</u>. … So collaboration is <u>moving forward</u> …." (*Id.* ¶ 38 (emphasis altered).)

Valamehr assured investors that the Collaboration Agreement was "'<u>proceeding well</u> ….'" (*Id.* ¶ 42.)

The Court finds that statements that the Collaboration Agreement has "strong momentum," is going "very well," is "moving forward," and is "proceeding well" are inactionable "'statements of optimism.'" *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d at 1143 (quoting *Warshaw*, 74 F.3d at 959); *see also Sneed*, 2023 WL 4412164, at *8 (finding that a statement that drug launch was "progressing well" was mere corporate puffery). Relatedly, the Court finds that, in this instance, the use of corporate buzzwords like "innovate" and "optimize," as well as hyperbolic adverbs like "aggressively," are inactionable puffery. *See e.g., Johnson-Jack v. Health-Ade LLC*, 587 F. Supp. 3d 957, 968 (N.D. Cal. 2022) (addressing puffery in the deceptive advertising realm and finding that "the addition of adverbs and adjectives can turn an actionable objective term like 'nutritious' into a non-actionable subjective term like 'unbelievably nutritious' because the modifier 'unbelievably' makes consumers less likely to rely on those terms."). Lastly, while "even general statements of optimism … may form a basis for a securities fraud claim when those statements address specific aspects of a company's operation that the speaker <u>knows</u> to be performing poorly[,]" *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d at 1143 (quotation omitted), as set forth in detail below (*see* Section II.B.2.g), the Court finds that Plaintiffs have not adequately alleged that Defendants knew or recklessly disregarded that Fate's work under the Collaboration Agreement was going poorly prior to the termination of

FT562.  Therefore, the Court cannot find that the aforementioned statements exceed mere puffery.

### (b)    2022 Statements—After Termination of FT562

As set forth above, the Court finds some of Defendants' 2022 statements materially misleading.  (*See* Section B.1.a.ii.)  Additionally, the Court cannot find that Defendants' statements constitute mere puffery.  Following the termination of FT562, Defendants stated:

> Wolchko stated that the Collaboration Agreement was "good" and that "[he] expect[ed] that in the next couple months, [Fate] [would] nominate [their] second and third IND candidates under the J&J collaboration."  (CCAC ¶ 45 (emphasis altered)).

> "Those programs are going very, very well. … It's going really, really well. And we expect to file at least the first IND for the [first] program for J&J by the end of the year.""  (*Id.* ¶ 54 (emphasis altered).)

> "We continue to show strong momentum …. …  Under our collaboration with Janssen, we have now initiated IND-enabling activities for 2 iPS-derived CAR NK cell collaboration candidates. And we are actively working together with Janssen to prepare and submit IND applications for both of these candidates."  (*Id.* ¶ 56 (emphasis altered).)

While at first glance these statements appear to be classic examples of puffery, as set forth below (*see* Section II.B.2.g), in 2022, Defendant knew, at a minimum, that Janssen had terminated its first IND candidate, a "fatal blow" to management.   In other words, Defendants knew that certain aspects of the Fate's work under the Collaboration Agreement were "performing poorly."  *See In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d at 1143 (quoting *Warshaw*, 74 F.3d at 959).  Thus, any statements of corporate optimism after Janssen's termination of FT562, specifically those regarding progress towards IND submissions, were not mere puffery.  *See Rihn*, 2016 WL 5076147, at *7.

### ii.    Forward-Looking Statements

"The PSLRA also provides an additional barrier at the pleading stage in the form of a safe harbor for 'forward-looking statements.'"  *In re Cutera Sec. Litig.*, 610 F.3d at 1111.

"[I]n any private action … based on an untrue statement of a material fact or omission of a material fact necessary to make the statement not misleading, a person … shall not be liable with respect to any forward-looking statement, whether written or oral, if and to the extent that—

> (A) the forward-looking statement is—(i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; … or
>
> (B) the plaintiff fails to prove that the forward-looking statement—(i) if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading; or (ii) if made by a business entity; was— (I) made by or with the approval of an executive officer of that entity; and (II) made or approved by such officer with actual knowledge by that officer that the statement was false or misleading."

15 U.S.C.A. § 78u-5(c).

"Under subsection (A)(i) … if a forward-looking statement is identified as such and accompanied by meaningful cautionary statements, then the state of mind of the individual making the statement is irrelevant, and the statement is not actionable <u>regardless of the plaintiff's showing of scienter.</u>"  *In re Cutera Sec. Litig.*, 610 F.3d at1112  (emphasis added).  In other words, "[t]hese statements cannot be a basis for liability—<u>even if they are untrue or deceptive when made.</u>"  *In re Arrowhead Pharms., Inc. Sec. Litig.*, Case No. CV 16-08505 PSG-PJW, 2017 WL 5635422, at *4 (C.D. Cal. Sept. 20, 2017) (emphasis added).

"Subsection (B) governs unidentified forward-looking statements and forward-looking statements unaccompanied by meaningful cautionary language.  Those statements fall outside the safe harbor if the plaintiff can allege facts that would create a strong inference that the defendants made the forecast(s) at issue with '<u>actual knowledge</u> ... that the statement was false or misleading.'"  *In re Cutera Sec. Litig.*, 610 F.3d at 1112 (quoting 15 U.S.C. § 78u–5(c)(1)(B)(i)) (citing *Employers Teamsters Local Nos. 175 and 505 Pension Tr. Fund v. Clorox Co.*, 353 F.3d 1125, 1134 (9th Cir. 2004)) (emphasis added).

38

The Court will first identify statements that are potentially protected under the PSLRA as "forward-looking" and then discuss whether these statements were accompanied by cautionary language or, alternatively, made with "actual knowledge" that the statement was false or misleading.

### (a)     Forward-Looking

"The definition of forward-looking statements … expressly includes statements of the plans and objectives of management for future operations … and statements of the assumptions underlying or relating to those plans and objectives …." *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1191 (9th Cir. 2021) (quotation omitted) (finding that Tesla's goal to produce 5,000 vehicles per week was unquestionably a "forward-looking statement"). "Consequently, in order to establish that a challenged statement contains non-forward-looking features that avoid this definition, a plaintiff must plead sufficient facts to show that the statement goes beyond the articulation of 'plans,' 'objectives,' and 'assumptions' and instead contains an express or implied 'concrete' assertion concerning a specific 'current or past fact.'" *Id.* (quoting *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1142, 1144 (9th Cir. 2017)).

"Forward-looking language [also] includes statements that a company 'expects,' 'believes,' or 'is confident' that certain projections will be realized in the future." *In re Arrowhead Pharms., Inc. Sec. Litig.*, 2017 WL 5635422, at *4, 9–11 (statements by pharmaceutical company that the data "gives us great confidence" and predicting success with newer products are forward-looking statements); *see also Crihfield v. CytRx Corp.*, Nos. CV 16-05519 SJO (SKx), CV 16-05666 SJO (SKx), 2017 WL 2819834, at *12–14 (C.D. Cal. June 14, 2017) (finding that statements by a pharmaceutical company (1) that it would complete enrollment in a trial by the end of 2015, that it would disclose clinical data by mid-2016, that it would submit an NDA by the end of 2016, and that the product would launch commercially in 2017 were forward-looking statements); *In re Intrexon Corp. Sec. Litig.*, Case No. 16-cv-02398-RS, 2017 WL 732952, at *3 (N.D. Cal. Feb. 24, 2017)

(finding that a company's statement regarding its future expectations for collaborations are forward-looking statements).

### (i) 2020 and 2021 Statements—Before Termination of FT562

As set forth above, the Court does not find Defendants' 2020 and 2021 statements materially misleading.  (*See* Section B.1.a.i.)  The Court also agrees with Defendants that many of its 2020 and 2021 statements are forward-looking.  Prior to the termination of FT562, Defendants stated:

> "We <u>are … leveraging</u> our unique ability to build multiplexed engineered cell products of increasing complexity using already established clonal master engineered iPSC lines with our collaboration partners …."  (CCAC ¶ 31 (emphasis altered).)

> "We … <u>continue to</u> innovate and optimize our manufacturing process …."  (*Id.* ¶ 33 (emphasis altered).)

> We <u>are … developing</u> both cell types aggressively."  (*Id.* ¶ 35 (emphasis altered).)

> "[W]e <u>continue to</u> increase the resources under the collaboration."  (*Id.* ¶ 38 (emphasis altered).)

> "<u>I think we'll</u> be able to get a – give a little bit of visibility on the first product candidate at the solid tumor day, although we may not be able to disclose the target quite yet."  (*Id.* ¶ 38 (emphasis altered).)

> "[W]e <u>are incorporating</u> novel Janssen binding domains into our multiplex ITC drug NK cell and T cell backbones."  (*Id.* ¶ 40 (emphasis altered).)

The Court finds that Defendants' statement that they "think" they will be able to give visibility into the first product candidate in the future (CCAC ¶ 38) is a forward-looking statement.  *See In re Arrowhead Pharms., Inc. Sec. Litig.*, 2017 WL 5635422, at *4 ("Forward-looking language [also] includes statements that a company 'expects,' 'believes,' or 'is confident' that certain projections will be realized in the future.").  The Court also finds that Defendants' statements that they "continue to innovate and optimize

40

[their] manufacturing process," that they "are developing both cell types," that they "continue to increase" resources, and that they "are incorporating" Janssen binding domains are forward-looking statements.  While these statements convey the "concrete assertion" that they are currently working on the Collaboration Agreement, *see Wochos*, 985 F.3d at 1191 (quotation omitted), these statements do not convey that Fate had already been successful.  Rather, these statements convey that Defendants were working towards a goal that may be "realized in the future." *In re Arrowhead Pharms., Inc. Sec. Litig.*, 2017 WL 5635422, at *4.  To find otherwise would impractically limit a research company's ability to discuss its work.

### (ii)    2022 Statements—After Termination of FT562

As set forth above, the Court finds some of Defendants' 2022 statements materially misleading.  (*See* Section B.1.a.ii.)  However, the Court also finds that many of Defendants' 2022 statements are forward-looking and potentially subject to the PSLRA's absolute safe-harbor for forward-looking statements.  Following the termination of FT562, Defendants stated:

> Wolchko stated that "[he] expect[ed] that in the next couple months, [Fate] [would] nominate [their] second and third IND candidates under the J&J collaboration."  (*Id.* ¶ 45 (emphasis altered).)

> "[W]e are … developing multiplexed-engineered CAR NK and CAR T-cell product candidates for solid tumors …."  (*Id.* ¶ 47 (emphasis altered).)

> "[W]e seek to use clonal master iPSC lines to manufacture, develop and commercialize first-in-class cellular immunotherapies. We believe our approach has the potential to improve cell product consistency and potency, reduce manufacturing costs, shorten time to treatment and reach more patients."  (*Id.* ¶ 50 (emphasis altered).)

> "[W]e expect to continue to rely on our current corporate collaborators and to enter into new collaborations in the future …."  (*Id.* ¶ 52 (emphasis altered).)

> "[J&J is] working on the fourth target ….  …  And we expect to file at least

41

<u>the first IND</u> for the [first] program for J&J by the end of the year." (*Id.* ¶ 54 (emphasis altered).)

"We <u>continue to</u> show strong momentum <u>in bringing</u> multiplexed-engineered iPS-derived CAR NK and CAR T cell product candidates to patients …. … And <u>we are … working … to prepare and submit IND applications</u> for both of these candidates." (*Id.* ¶ 56 (emphasis altered).)

"We <u>are currently working</u> with Janssen to prepare and submit 2 IND applications[.]" ." (*Id.* ¶ 58 (emphasis altered).)

"[W]e <u>expect to file an IND</u> this year on the first one and early next year on the second one." (*Id.* ¶ 60 (emphasis altered).)

"[M]ultiplexed-engineered iPS-derived CAR T-cells targeting KLK2 have the <u>potential</u> to effectively infiltrate tumor mass and eliminate tumor cells in a highly selective manner and to prolong survival in xenograft models of prostate cancer." (*Id.* ¶ 62 (emphasis altered).)

As before, the Court finds that the above statements regarding Fate's expectations (*see id.* ¶¶ 45, 52, 54, 60), goals (*see id.* ¶ 50 ("we seek")), and potential for the Collaboration Agreement (*see id.* ¶ 62) are forwarding-looking statements potentially protected by the PLSRA's safe harbor for forward-looking statements. *See In re Intrexon Corp. Sec. Litig.*, 2017 WL 732952, at *3. The Court also finds that the above statements projecting future IND submissions (*see id.* ¶¶ 56, 58, 60) are forward-looking statements potentially subject to the PLSRA's safe harbor. *See Crihfield*, 2017 WL 2819834, at *12–14. Finally, the Court finds that Defendants' statements that they "are developing," "are working," and "continue to show strong momentum in bringing" various projects related to the Collaboration Agreement (*see* CCAC ¶¶ 47, 54, 56, 58) are forward-looking statements. While these statements convey the "concrete assertion" that they are currently working on the Collaboration Agreement, *see Wochos*, 985 F.3d at 1191 (quotation omitted), these statements do not convey that Fate had already been succesful. Rather, these statements convey that Defendants are working towards a goal that may be "realized in the future." *In re Arrowhead Pharms., Inc. Sec. Litig.*, 2017 WL 5635422, at *4.

**(b)     Cautionary Language**

The Court also finds that the forward-looking statements noted above (*see* Section II.B.1.b.ii.a)—save for those made at the Guggenheim Oncology Days on February 9, 2022, the Barclays Global Healthcare Conference on March 16, 2022, and the Morgan Stanley Global Healthcare Conference on September 12, 2022 (*see id.* ¶¶ 45, 54, 60; Doc. 38-16 at 2–3 [Ex. L, Guggenheim Conference Transcript]; Doc. 38-19 at 3–4 [Ex. O, Barclays Conference Transcript]; Doc. 38-24 at 3 [Ex. T, Morgan Stanley Conference Transcript])—were identified as such and were accompanied by meaningful cautionary statements.  In fact, Fate repeatedly disclosed in SEC filings and on earnings calls that its statements were intended to be forward-looking statements (*see* Doc. 38-9 at 3 [Ex. E, Q2 2020 Earnings Call]; Doc. 38-11 at 3 [Ex. G, Q4 2020 Earnings Call]; Doc. 38-14 at 3 [Ex. J, Q3 2021 Earnings Call]; Doc. 38-15 at 3 [Ex. K, November 15, 2021 Investor Call]; Doc. 38-18 at 3 [Ex. N, Q4 2021 Earnings Call]; Doc. 38-17 at 3–4, 16 [Ex. M, FY 2021 Form 10-K; Doc. 38-23 at 3 [Ex. S, Q2 2022 Earnings Call]; Doc. 38-26 at 3 [Ex. V, Q3 2022 Earnings Call]).  Therefore, the Court finds that the forward-looking statements identified above (*see* Section II.B.1.b.ii.a)—save for those made at the Guggenheim Oncology Days, the Barclays Global Healthcare Conference, and the Morgan Stanley Global Healthcare Conference—are protected by the PLSRA's safe harbor for forward-looking statements "regardless of [Plaintiffs'] showing of scienter."  *In re Cutera Sec. Litig.*, 610 F.3d at 1112.

**(c)     Actual Knowledge**

Forward-looking statements unidentified as such and unaccompanied by meaningful cautionary language "fall outside the safe harbor if the plaintiff can allege facts that … create a strong inference that the defendants made the forecast(s) at issue with 'actual knowledge ... that the statement was false or misleading." *In re Cutera Sec. Litig.*, 610 F.3d at 1112 (quotation and citations omitted).  "Actual knowledge" is a "stricter standard" than the heightened pleading requirement for scienter under the PLSRA.  *See Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1039 n.18 (9th Cir. 2002) ("Because plaintiffs'

43

allegations do not satisfy the general standard of deliberate or conscious recklessness, … we need not assess whether any of the challenged statements are forward-looking and thus require the stricter standard of actual knowledge ….").

As stated above (*see* Section II.B.1.b.ii.b), the Court has identified three forward-looking statements that were not identified as such and were not accompanied by cautionary language. (*See* CCAC ¶¶ 45, 54, 60 (identifying statements made at Guggenheim Oncology Days, Barclays Global Healthcare Conference, and Morgan Stanley Global Healthcare Conference unaccompanied by cautionary statements).) They are:

> Wolchko stated that he "expect[ed] that in the next couple months, [Fate] [would] nominate [their] second and third IND candidates under the J&J collaboration." (*Id.* ¶ 45 (emphasis altered).)
>
> J&J is "working on the fourth target …. … And we expect to file at least the first IND for the program for J&J by the end of the year." (*Id.* ¶ 54 (emphasis altered and bracketed information inserted by Plaintiffs removed).)
>
> "With the J&J, the 2 hematologic malignancy candidates, we expect to file an IND this year on the first one and early next year on the second one." (*Id.* ¶ 60 (emphasis altered).)

As set forth in more detail below (*see* Section II.B.2.g), these statements, made after Defendants knew Janssen had terminated FT562, fall outside of the PSLRA's safe harbor Plaintiffs have alleged facts creating a strong inference that Defendants made these IND forecasts with "actual knowledge ... that the statement[s] [were] … misleading." *In re Cutera Sec. Litig.*, 610 F.3d at 1112 (quotation and citations omitted).

### iii.   Statements of Opinion

Because theories of falsity are required "with respect to a 'material fact,' there are substantial limits in applying such theories to a pure statement of honest *opinion*." *Wochos*, 985 F.3d at 1188–89 (citations omitted) (emphasis in original). The Supreme Court explored the distinction between fact and opinion in *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund* ("*Omnicare*"):

44

> A fact is "a thing done or existing" or "an actual happening."  An opinion is "a belief, a view," or a "sentiment which the mind forms of persons or things." Most important, a statement of fact ("the coffee is hot") expresses certainty about a thing, whereas a statement of opinion ("I think the coffee is hot") does not.

575 U.S. 175, 183 (2015) (citing Webster's New International Dictionary 782 (1927) and 7 Oxford English Dictionary 151 (1933)).  Put simply, "a fact is a thing done or existing or an actual happening, while an opinion is a belief, a view, or a sentiment which the mind forms of persons or things."  *Homyk v. ChemoCentryx, Inc.*, No. 21-CV-03343-JST, 2023 WL 3579440, at *13 (N.D. Cal. Feb. 23, 2023) (quotation marks, citations, and brackets omitted); *Markette v. XOMA Corp.*, Case No. 15-cv-03425-HSG, 2017 WL 4310759, at *5 (N.D. Cal. Sept. 28, 2017) (finding "[t]here is no reasonable basis to read a statement of hopefulness, encouragement, or expectation as anything other than an opinion[.]").  A statement can contain both facts and opinions.  *Id.* ("All of the statements Defendants identify contain both facts and opinions.")

The Ninth Circuit has found that "*Omnicare* establishe[d] three different standards for pleading falsity of opinion statements."  *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 615–16 (9th Cir. 2017).

> First, when a plaintiff relies on a theory of material misrepresentation, the plaintiff must allege both that the speaker did not hold the belief she professed and that the belief is objectively untrue.
>
> Second, when a plaintiff relies on a theory that a statement of fact contained within an opinion statement is materially misleading, the plaintiff must allege that the supporting fact the speaker supplied is untrue.
>
> Third, when a plaintiff relies on a <u>theory of omission</u>, the plaintiff must allege facts going to the basis for the issuer's opinion ... whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context.

*Id.* (quotation marks, brackets, and citations omitted) (emphasis added) (applying *Omnicare* to section 10(b) claims).  Therefore, "[t]o plead fraud based on an opinion

45

statement under an omissions theory, a plaintiff must identify particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context.  That is, the plaintiff must plead facts that call into question the issuer's basis for offering the opinion." *Bos. Ret. Sys. v. Uber Techs., Inc.*, Case No. 19-cv-06361-RS, 2020 WL 4569846, at *8 (N.D. Cal. Aug. 7, 2020) ("*Uber*") (quotation marks and citations omitted) (finding that Uber's statements that it was complying with the law, keeping its passengers safe, and performing well financially were misleading when the facts known to Uber at the time demonstrated otherwise); *Homyk*, 2023 WL 3579440, at *13–14 (finding opinion statements misleading because the defendants failed to disclose the FDA's concerns).  Put simply, "the court must ask whether the alleged omission rendered [the] opinions misleading ... because the excluded fact shows that [the speaker] lacked the basis for making those statements that a reasonable investor would expect." *Omnicare*, 575 U.S. at 196.

Thus, the first question is whether a statement is fact or opinion.  *See Homyk*, 2023 WL 3579440, at *13 ("As a preliminary matter, the Court must determine whether these statements are facts or opinions.").  Here, the Court finds that the following statements are statements of opinion:

> "So I would say that, while, for instance, our NK cell pipeline is more mature, I would not take that as an indication that we were -- we are significantly betting on an NK cell approach over a T cell approach."  (CCAC ¶ 35 (emphasis altered).)

> "[T]he Janssen collaboration has continued to go very well.  … I think we've disclosed in the past that the collaboration started with 2 antigen targets, 1 in hematologic malignancies, 1 in solid tumors.  … So collaboration is moving forward, we're really pleased with it.  I think we'll be able to get a – give a little bit of visibility on the first product candidate at the solid tumor day, although we may not be able to disclose the target quite yet."  (*Id.* ¶ 38 (emphasis altered).)

46

Valamehr assured investors that Collaboration Agreement was "proceeding well through preclinical development …." (*Id.* ¶ 42 (emphasis altered).)

Wolchko stated that the Collaboration Agreement was "good." (*Id.* ¶ 45 (emphasis altered).)

"We believe our approach has the potential to improve cell product consistency and potency, reduce manufacturing costs, shorten time to treatment and reach more patients. (*Id.* ¶ 50 (emphasis altered).)

"We do benefit from 2 collaborations. … [A]nd then Janssen, just to remind everyone, it's a pretty big collaboration for us. … Those programs are going very, very well. … It's going really, really well. … I also think what's on the table are potentially larger strategic collaborations. … They can be a great partner to help broaden the development program move very, very quickly and then commercializing the footprint that a very small up-and-coming company like ours cannot do. So I think there's multiple levers to consider around that." (*Id.* ¶ 54 (emphasis altered).)

We continue to show strong momentum in bringing multiplexed-engineered iPS-derived CAR NK and CAR T cell product candidates to patients for the treatment of hematologic malignancies and solid tumors. (*Id.* ¶ 56 (emphasis added).)

Because Plaintiffs plead fraud under an omissions theory (*see* section II.B.1.a), the second question is whether Plaintiffs "[identified] particular (and material) facts … whose omission [made] the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Bos. Ret. Sys.*, 2020 WL 4569846, at *8. Here, as before, the Court distinguishes between opinion statements made before and after the termination of FT562. For the reasons set forth above and below (*see* Sections II.B.1.a.i.a– d and II.B.2.g), the Court finds that Defendants' opinion statements made prior to the termination of FT562 are not materially misleading because Fate's R&D group had developed iPSCs, Defendants repeatedly disclosed the risks associated with the Collaboration Agreement, Fate explicitly stated that it was still developing reproducible manufacturing processes for clinical-scale manufacturing, and Plaintiffs have not alleged facts that compel a strong inference of scienter or "call into question the issuer's basis for

47

offering the opinion." *Bos. Ret. Sys.*, 2020 WL 4569846, at *8.  However, as explained above and below (*see* Sections III.B.1.a.ii and II.B.2.g), some of the statements made after Janssen terminated FT562 wrongly implied that Defendants were progressing seamlessly toward IND submissions when Defendants knew that its first IND candidate had been terminated.  To the extent those statements contained Defendants' opinions, Plaintiffs have alleged facts that "call into question the issuer's basis for offering [those] opinion[s]." *Bos. Ret. Sys.*, 2020 WL 4569846, at *8.  Therefore, misleading opinion statements made after the termination of FT562, and not otherwise protected by the PSLRA's absolute safe harbor for forward-looking statements, are potentially actionable.

### c)   Conclusion

Based on the foregoing, the Court finds that the following statements are misleading and potentially actionable:

> Wolchko stated that the Collaboration Agreement was "good" and that "[he] expect[ed] that in the next couple months, [Fate] [would] nominate [their] second and third IND candidates under the J&J collaboration." (*Id.* ¶ 45 (emphasis removed).)

> "Because we expect to continue to rely on our current corporate collaborators and to enter into new collaborations in the future, the development and commercialization of any of our product candidates could be substantially delayed, and our ability to receive future funding could be substantially impaired if one or more of our current or future collaborators … fails to select a product candidate for advancement into preclinical development, clinical development, or subsequent clinical development into a marketed product." (*Id.* ¶ 52 (emphasis removed).)

> "We do benefit from 2 collaborations. … [A]nd then Janssen, just to remind everyone, it's a pretty big collaboration for us. We have 4 different targets, solid and liquid tumors, can be NK or T cells. Those programs are going very, very well. J&J has already selected the first 3 targets. We have – we're not able to disclose those yet, and they're working on the fourth target, and we've been accelerating that work. So that collaboration is 2 years in. It's going really, really well. And we expect to file at least the first IND for the [first] program for J&J by the end of the year. It's important from an innovation perspective. We really value our partners. We could choose to do more such

48

collaborations, but I also think what's on the table are potentially larger strategic collaborations. We're at that point where at the end of the Phase I study, where we have a derisked profile for lymphoma and then to myeloma that aligns really well with what larger biopharma companies look more on what they do well, right? We can take it through Phase I. They can be a great partner to help broaden the development program move very, very quickly and then commercializing the footprint that a very small up-and-coming company like ours cannot do. So I think there's multiple levers to consider around that. The collaborations are on the forefront of our minds, and we're constantly talking to existing parties and trying to see what might be possible." (*Id.* ¶ 54 (emphasis removed).)

"And then importantly, we have a collaboration with J&J and in that collaboration with J&J, we have 4 targets that are under that collaboration. 2 are in hematologic malignancies, 2 are in solid tumors. With the J&J, the 2 hematologic malignancy candidates, we expect to file an IND this year on the first one and early next year on the second one." (*Id.* ¶ 60 (emphasis removed).)

The Court now addresses the remaining elements—scienter and loss causation.

### 2. Scienter

"To adequately plead scienter, the complaint must now 'state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind.'" *Zucco Partners, LLC*, 552 F.3d at 991 (quoting 15 U.S.C. § 78u–4(b)(2)) (citing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976)). "Congress did not merely require plaintiffs to provide a factual basis for their scienter allegations, i.e., to allege facts from which an inference of scienter rationally could be drawn. Instead, Congress required plaintiffs to plead with particularity facts that give rise to a strong—i.e., a powerful or cogent—inference." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 323 (2007) (quotation and citations omitted).

"The PSLRA's 'strong inference' requirement has teeth. It is an 'exacting' pleading obligation that 'presents no small hurdle for the securities fraud plaintiff.'" *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 414 (9th Cir. 2020) (quoting *Zucco Partners*, 552 F.3d at 990 and *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 705 (9th Cir. 2016)). "[T]he

inference of scienter must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations.  A complaint will survive, we hold, only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc.*, 551 U.S. at 324.

Scienter is the "'mental state embracing intent to deceive, manipulate, or defraud.'" *Nguyen*, 962 F.3d at 414 (quoting *Tellabs, Inc.*, 551 U.S. at 319).  "To allege the required scienter, a complaint must 'allege that the defendants made false or misleading statements either intentionally or with deliberate recklessness.'"  *Id.* (quoting *Zucco Partners*, 552 F.3d at 991).  "'Deliberate recklessness' is more than 'mere recklessness or a motive to commit fraud.'"  *Id.* (quoting *Schueneman*, 840 F.3d at 705).  "It is instead 'an extreme departure from the standards of ordinary care,' which 'presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'"  *Id.* (quoting *Zucco Partners*, 552 F.3d at 991).

### a)      Fraud-by-Hindsight[15]

In their Motion, Defendants argue that Plaintiffs' CCAC rests entirely on "fraud by hindsight."  (Doc. 38-1 at 16–17.)  In other words, Defendants argue that Plaintiffs rely on their own opinions, reached with the benefit of hindsight, that the Collaboration Agreement would fail.  (*Id.* at 17.)  Defendants assert that Plaintiffs judge the allegedly misleading statements by how things turned out, which is not adequate to state a claim.  (*Id.*)  In support of this position, Defendants cite *In re LeapFrog Enter., Inc. Sec. Litig.*, 200 F. Supp. 3d 987, 1005 (N.D. Cal. 2016) ("*LeapFrog*") and *Immanuel Lake v. Zogenix, Inc.*, Case No. 19-cv-01975-RS, 2020 WL 3820424, at *8 (N.D. Cal. Jan. 27, 2020) ("*Immanuel Lake*").

---

[15] The Court notes that "fraud by hindsight" concerns both scienter and falsity.  The Court addresses "fraud by hindsight" in this section to parallel the arguments presented in Defendants' Motion.

Plaintiffs respond that their allegations are those of "classic fraud," not fraud by hindsight. (Doc. 39 at 26–27, n.10–11.)  In support of their position, Plaintiffs distinguish *LeapFrog* and *Immanuel Lake* and cite *Uber*.  (*Id.*)  Plaintiffs assert that, unlike the Plaintiffs in *LeapFrog* and *Immanuel Lake*, they have alleged "specific contemporaneous facts known by Defendants at the time of their misleading statements." (*Id.*)  Relatedly, Plaintiffs argue that Defendants deliberately disregarded various "red flags." (*Id.* at 25–26.)

In their Reply, Defendants argue that "[t]he Opposition responds with Plaintiff[s'] own opinion, developed with the benefit of hindsight, that the [Collaboration] Agreement was not going well." (Doc. 41 at 7.)  Defendants assert that any purported "red flags," such as Janssen's declination of FT562 and the cell replication issues, only look "red" in hindsight.  (*Id.*)  Defendants conclude that Plaintiffs fail to allege that the Individual Defendants believed at the time of the allegedly misleading statements that Janssen might terminate the Collaboration Agreement.  (*Id.* (citing *Boykin v. K12, Inc.*, 54 F.4th 175, 185 (4th Cir. 2022).)

### i.   Case Law

The Ninth Circuit has found that "Congress enacted the PSLRA to put an end to the practice of pleading 'fraud by hindsight.'" *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 988 (9th Cir. 1999) (citing *Medhekar v. United States Dist. Ct.*, 99 F.3d 325, 328 (9th Cir. 1996)); *see also Gompper v. VISX, Inc.*, 298 F.3d 893, 897 (9th Cir. 2002) (finding that Congress's basic purpose was "to eliminate abusive and opportunistic securities litigation and to put an end to the practice of pleading fraud by hindsight"); *In re Vantive Corp. Sec. Litig.*, 283 F.3d at 1084 (same); *In re Daou Sys., Inc.*, 411 F.3d at 1021 (9th Cir. 2005).

In *LeapFrog*, the plaintiffs filed a class action against LeapFrog Enterprises Inc. and two of its officers for violations of federal securities laws. *LeapFrog*, 200 F. Supp. 3d at 991–92.  The plaintiffs alleged that LeapFrog made false and misleading statements about LeapFrog's inventory. *Id.*  Specifically, the plaintiffs alleged that LeapFrog faced a

51

substantial retail inventory hangover that management knew would impact both margins and sales heading into 2014. *Id.* at 994. The plaintiffs alleged that the defendants made false and misleading statements that inventories had come down by a fair amount and that they did not have higher inventories across the board, only pockets of inventory. *Id.* The plaintiffs also alleged that the defendants made false and misleading statements that the costs associated with the inventory would not be significant, that the inventories would take some time to work down but that the bulk of the inventory would be cleared going into the fall of 2014, and that the company had already given all the discounts and promotional offers needed. *Id.* at 1002. The plaintiffs concluded that these statements were false and misleading because there remained a massive volume of carryover inventory that required additional discounts to sell, that the defendants deliberately concealed the nature and impact of the carryover inventory, that defendants knew the carryover inventory would harm their financial results, and that they attempted to conceal this future harm. *Id.* at 994, 1002. The district court held, in part, that the plaintiffs' theory was "basically an assertion of fraud by hindsight—judging statements on how things actually turned out subsequently." *Id.* at 1005. Likewise, the district court found that the plaintiff alleged no facts establishing that the defendants did not believe the inventory problem would be resolved. *Id.*

In *Immanuel Lake*, the plaintiffs alleged that the company defendant withheld material information from the public when discussing its NDA submitted to the FDA for its product candidate—FINTEPLA—for which the active ingredient is fenfluramine. 2020 WL 3820424, at *1. Because fenfluramine was previously approved by the FDA, the FDA informed the company defendants that it could submit the NDA under Section 505(b)(2) of the Federal Food, Drug, and Cosmetic Act, which provides a more streamlined pathway to FDA approval. *Id.* The market reacted favorably to this news. *Id.* Two months later, the FDA refused to file the NDA because it did not meet the threshold requirements. *Id.* at *2. The FDA indicated that the company defendant had not submitted existing non-clinical studies assessing toxicity. *Id.* The company's stock dropped 20 percent. *Id.*

52

The plaintiffs alleged the NDA was doomed from the start because the company opted not to reference the existing non-clinical fenfluramine toxicity literature and to instead rely solely on the strength of its own recent clinical trials. *Id.* The plaintiffs alleged that, because the company had touted the benefits of being able to submit the NDA through the expedited Section 505(b)(2) pathway, which leverages prior studies and published literature previously reviewed by the FDA, the market was led to believe the prior non-clinical toxicology studies on fenfluramine would be included in the NDA. *Id.* The plaintiffs concluded that the company's announcement that it had completed its NDA filing, without also disclosing that it opted not to reference these prior toxicity studies, was a material omission that concealed from the market the high risk that the FDA would refuse to file the NDA. *Id.* at *2, 7. The district court concluded that failing to inform the public that the company did not reference the toxicity study in the NDA fell short of constituting a material omission because the plaintiffs' allegations constituted fraud by hindsight. *Id.* The district court reasoned that the plaintiffs failed to allege that it knew that the absence of the study would result in the NDA's rejection at the time the company defendant filed the NDA. *Id.* Without these allegations, securities fraud plaintiffs could sue a pharmaceutical company any time an NDA was rejected for any deficiency. *Id.* at *9.

In *Uber*, the plaintiffs alleged false and misleading statements and omissions in connection with Uber's IPO in violation of Sections 11, 12(a)(2), and 15 of the Exchange Act. 2020 WL 4569846, at *1. Specifically, the plaintiffs alleged that Uber omitted material facts about the legality of Uber's business model, its passenger safety record, and its financial condition leading up to the IPO. *Id.* at *5. The plaintiffs alleged that Uber's registration statement said that Uber was "subject to national, state, local, or municipal laws and regulations that are ambiguous in their application or enforcement or that we believe are invalid or inapplicable." *Id.* It provided examples of such laws, for example, the California Supreme Court's decision in *Dynamex Operations W. v. Superior Ct.*, 4 Cal. 5th 903 (2018), which addressed the distinction between employees and independent contractors and found Uber's classification of its drivers as independent contractors, as

opposed to employees, was illegal.  *Id.*   The registration statement also disclosed "numerous incidents and allegations worldwide" of sexual assault, abuse, and kidnapping and stated that the company planned to release a "transparency report" about these instances which could result in "negative media coverage and increased regulatory scrutiny." *Id.*  Finally, the registration statement disclosed that Uber expected its operating expenses to increase, that it would incur losses "in the near term," and that the company expected growth to continue.  *Id.* at *5, 8.

The district court in *Uber* found that the plaintiffs' complaint did not engage in impermissible hindsight pleading because the plaintiffs relied on contemporaneous events to support their claim that statements made in the registration statement were untrue.  *Id.* at *8.  The district court reasoned that, due to the California Supreme Court's decision in *Dynamex* and the forthcoming enactment of legislation codifying *Dynamex*, Uber was aware prior to issuing its registration statement that its classification of its drivers as independent contractors, as opposed to employees, was illegal and the law in this area was not "ambiguous." *Id.*  Rather than disclose this, Uber listed it as a mere "risk factor."  *Id.* Likewise, when Uber stated that it expected growth to continue, it had already sustained (but had not disclosed) its biggest losses to date and had planned massive restructuring and layoffs for shortly after the IPO.  *Id.*  The district court concluded that Uber's statements were misleading given the information known to them at the time.  *Id.*

### ii.   Analysis

The Court agrees with Defendants that the present case is more akin to *LeapFrog* and *Immanuel Lake* than *Uber*.  As a preliminary matter, in the *Uber* case, the plaintiffs alleged false or misleading statements and omissions in connection with Uber's IPO in violation of Sections 11, 12(a)(2), and 15 of the Exchange Act, not violations of Section 10(b) or Rule 10b-5.  *See* 2020 WL 4569846, at *1.  As the district court in *Uber* explained, Section 11 is limited to misrepresentations and omissions in registration statements, whereas Section 10(b) sweeps more broadly to all securities fraud and different defenses or doctrines may apply.  *See id.* at *6 (noting that certain defenses are less applicable to

pre-IPO registration statements). Additionally, the plaintiffs in *Uber* did not base their allegations on a theory of omissions as Plaintiffs do here. Rather, the plaintiffs alleged, and the district court agreed, that statements in Uber's registration were false. *See id.* at *8. In *LeapFrog* and *Immanuel Lake*, however, the plaintiffs pursued an omissions theory. In *LeapFrog*, the plaintiffs alleged that the defendants deliberately <u>concealed</u> the nature and impact of the carryover inventory, 200 F. Supp. 3d at 994, just as Plaintiffs here have alleged that Defendants concealed the iPSC replication issues and the declination of FT562. Likewise, in *Immanuel Lake*, the plaintiffs alleged that the defendants <u>concealed</u> the fact that they had not submitted the pre-existing nonclinical studies to the FDA, which was a material omission. 2020 WL 3820424, at *2, 7. Nevertheless, both district courts found that the plaintiffs merely pled "fraud by hindsight." *See LeapFrog*, 200 F. Supp. 3d at 1005; *Immanuel Lake*, 2020 WL 3820424, at *8–9.

Here too, the Court finds that, at first glance, Plaintiffs have pled mere "fraud by hindsight." As the Fourth Circuit explained in *Boykin v. K12, Inc.*, "the mere presence of friction does not portend the end of a business partnership." 54 F.4th 175, 185 (4th Cir. 2022). "Even the most fruitful relationships can encounter bumps along the road." *Id.* It is a logical leap for the Court to assume that Defendants knew (or recklessly disregarded) that the alleged omissions, which caused "friction" in Fate's work in support of the Collaboration Agreement, increased the risk that the Collaboration Agreement would be terminated and the stock price would drop.

Plaintiffs' CCAC also reveals that, in other respects, Fate was making progress under the Collaboration Agreement, further undermining Plaintiffs' theory of scienter. For example, as of November 4, 2021, Jansen had selected three out of four possible antigen targets. (*Id.* ¶ 38.) As of May 4, 2022, Fate had initiated 2-iPS-derived CAR NK cell collaboration candidates. (*Id.* ¶ 56.) As of August 3, 2022, Janssen had exercised its option on a first antigen program, triggering a $10 million payment. (*Id.* ¶ 58.) As of September 12, 2022, Fate had four targets under collaboration. (*Id.* ¶ 60.) As of November 2, 2022,

Fate had a second CAR T-cell product candidate (FT862).  (*Id.* ¶ 62.)  These milestones undermine Plaintiffs' theory of scienter.

Defendants also repeatedly disclosed the risks associated with the Collaboration Agreement, including termination and the risk that "difficulties in manufacturing or supplying the Company's product candidates for clinical testing."  (*See* Doc. 38-7 at 5 [Ex. C, April 2, 2020 Form 8-K]; Doc. 38-8 at 3 [Ex. D, Q2 2020 Form 10-Q]; Doc. 38-10 at 6 [Ex. F, FY 2020 Form 10-K]; Doc. 38-13 at 3 [Ex. I, Q3 2021 Form 10-Q]).  Further, Fate admitted that they were still developing optimized and reproducible manufacturing processes for clinical-scale manufacturing.  (*See* Doc. 38-8 at 7 [Ex. D, Q2 2020 Form 10-Q]; Doc. 38-10 at 7 [Ex. F, FY 2020 Form 10-K]; Doc. 38-13 at 7 [Ex. I, Q3 2021 Form 10-Q]; Doc. 28-20 at 10 [Ex. P, Q1 2022 Form 10-Q]; Doc. 38-22 at 9 [Ex. R, Q2 2022 Form 10-Q]; Doc. 38-25 at 9 [Ex. U, Q3 2022 Form 10-Q].)  In fact, Fate explicitly stated, "[w]e have not yet caused any of our product candidates to be manufactured or processed on a commercial scale and may not be able to do so for any of our product candidates."  (Doc. 38-17 at 10 [Ex. M, FY 2021 Form 10-K].)  These disclosures further undermine Plaintiffs' theory of scienter.

Thus, without more, the Court cannot find that Plaintiffs have pled a strong, i.e., cogent, compelling, and powerful, inference of scienter.  As the Ninth Circuit noted in a similar case, "drug candidates do not always live up to their potential … that does not mean that a pharmaceutical company has defrauded the investing public."  *In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828, 831 (9th Cir. 2022).  The question now is whether Plaintiffs' confidential sources; Plaintiffs' stock sale, compensation, and offering allegations; or the "Core Operations" doctrine revive Plaintiffs' theory of scienter.

### b)   Confidential Sources

Defendants argue that Plaintiffs' confidential sources do not save Plaintiffs' theory of scienter. (Doc. 38-1 at 18–21.)  Plaintiffs respond that Defendants' attempts to discount Plaintiffs' confidential sources are unavailing.  (Doc. 39 at 27–30.)

56

"[A] complaint relying on statements from confidential witnesses must pass two hurdles to satisfy the PSLRA pleading requirements.  First, the confidential witnesses whose statements are introduced to establish scienter must be described with sufficient particularity to establish their reliability and personal knowledge.  Second, those statements which are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of scienter."  *Zucco Partners, LLC*, 552 F.3d at 995.

"As to the first prong, for a confidential witness allegation to be credited at the pleading stage, the confidential witness must be described with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged."  *McGovney v. Aerohive Networks, Inc.*, 367 F. Supp. 3d 1038, 1053 (N.D. Cal. 2019) (quotation omitted).  "To determine whether a confidential witness has the requisite knowledge, courts look to the level of detail provided by the confidential sources, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia."  *Id.* (quotation omitted).

For example, a plaintiff's allegations must detail each confidential witnesses' employment information, including their responsibilities.  *See e.g., id.* (finding the plaintiffs' allegations regarding their confidential witnesses lacked important details about the witnesses' employment information, particularly their responsibilities); *Applestein v. Medivation, Inc.*, 861 F. Supp. 2d 1030, 1037 (N.D. Cal. 2012) ("Plaintiffs have failed to sufficiently describe the confidential witnesses' job positions and responsibilities …."); *In re ESS Tech., Inc. Sec. Litig.*, No. C-02-04497 RMW, 2004 WL 3030058, at *3 (N.D. Cal. Dec. 1, 2004) (finding a confidential witness not credible when the plaintiffs provided no information about the witness's job title, tenure, or job responsibilities); *c.f. In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1145 (9th Cir. 2017) ("[T]he complaint includes each confidential witness's job description and responsibilities, and, in some instances, the witness's exact title and to which [company] executive the witness reported.") (quotation

57

omitted); *In re Daou Sys., Inc.*, 411 F.3d at 1016 ("Plaintiffs here describe the confidential witnesses with a large degree of specificity.  Plaintiffs number each witness and describe his or her job description and responsibilities.").  The timing of a confidential witnesses' statements is also important.  *See e.g., Mauss v. NuVasive, Inc.*, No. 13-CV-2005 JM (JLB), 2014 WL 4161431, at *8 (S.D. Cal. Aug. 19, 2014) ("Plaintiff offers factual allegations from confidential witnesses to … provide an inference of their scienter at the time the statements were made. However, the CCAC rarely provides any dates associated with their factual allegations."); *but see In re SeeBeyond Techs. Corp. Sec. Litig.*, 266 F. Supp. 2d 1150, 1159 (C.D. Cal. 2003) ("[A]dditional information, such as the exact dates of employment, would significantly erode the confidentiality of these sources.").

Confidential sources also generally must have firsthand knowledge of their allegations.  *See Police Ret. Sys. of St. Louis*, 759 F.3d at 1063 ("the witnesses lack first-hand knowledge regarding what the individual defendants knew or did not know"); *In re ESS Tech., Inc. Sec. Litig.*, No. C-02-04497 RMW, 2004 WL 3030058, at *4 (N.D. Cal. Dec. 1, 2004) ("CW2 apparently has no firsthand basis for this information but relies instead on an unnamed source …."); *but see Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008) ("It's entirely plausible that 'engineers or technical editors' would know, or could reasonably deduce, that the company had suffered such setbacks[.]"); *In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1060 (C.D. Cal. 2008) ("Defendants contend that none of the confidential sources … is alleged to have personal knowledge relating to the two management directors.  However, evidence of this sort is not necessary here.") (quotation omitted); *Roberts v. Zuora, Inc.*, Case No. 19-cv-03422-SI, 2020 WL 2042244, at *11 (N.D. Cal. Apr. 28, 2020) ("CWs' personal knowledge of integration projects and customer feedback comes as a direct result of their positions …"); *In re InfoSonics Corp. Sec. Litig.*, No. 06cv1231 BTM(WMc), 2007 WL 2301757, at *7 (S.D. Cal. Aug. 7, 2007) ("Plaintiffs have alleged enough to conclude that CW1 occupied a position that provided him with access to information regarding the problems ….").

As to the second prong—that witness statements must themselves be indicative of scienter—"a shared opinion among confidential witnesses does not necessarily indicate … a strong inference of scienter if the allegations themselves are not specific enough."  *In re Dot Hill Sys. Corp. Sec. Litig.*, 594 F. Supp. 2d 1150, 1163 (S.D. Cal. 2008); *see also In re Downey Sec. Litig.*, No. CV 08-3261-JFW (RZx), 2009 WL 2767670, at *9 (C.D. Cal. Aug. 21, 2009) ("[S]tatements of a confidential witness are disregarded if lacking in specificity or based on hearsay, rumor, or speculation."); *but see Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1208 (9th Cir. 2016) ("[T]he fact that a confidential witness reports hearsay does not automatically disqualify his statement from consideration in the scienter calculus.  Instead, we examine a confidential witness's hearsay report to determine if it is sufficiently reliable, plausible, or coherent.") (quotations omitted).

Likewise, to be indicative of scienter, a confidential source typically must have communicated with the individual defendants or upper management.  *See In re Accuray, Inc. Sec. Litig.*, 757 F. Supp. 2d 936, 949 (N.D. Cal. 2010) (finding confidential witness allegations insufficient when they "had no personal interactions" with any of the individual defendants); *Kovtun v. VIVUS, Inc.*, No. C 10-4957 PJH, 2012 WL 4477647, at *18 (N.D. Cal. Sept. 27, 2012) ("[N]owhere does plaintiff allege … that a CW reported to upper management about a particular result of a clinical trial … and that upper management proposed (or agreed) to conceal this result from the public, or in fact did conceal it."); *Jun Shi v. Ampio Pharms.*, Inc., Case No. 2:18-cv-07476-RGK-RAO, 2020 WL 5092910, at *6 (C.D. Cal. June 19, 2020) ("There are no particularized allegations that any of these confidential witnesses communicated concerns … to Defendants."); *but see In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d at 1060 ("Defendants contend that none of the confidential sources are alleged to have ever spoken or had other contact with any of the seven non-management directors ... However, evidence of this sort is not necessary here.") (quotation omitted).  Further, so long as one individual defendant or upper management employee is found to have knowledge, this knowledge may be imputed to the company and the other individual defendants.  *See e.g., In re Cadence Design Sys.*,

59

*Inc. Sec. Litig.*, 692 F. Supp. 2d 1181, 1192–93 (N.D. Cal. 2010) ("[H]aving penetrated the Defendants' executive circle, so to speak, Plaintiffs may support an inference that the other executive officers were aware of certain key facts about certain key deals …."); *Robb v. Fitbit Inc.*, No. 16-CV-00151-SI, 2017 WL 219673, at *6 (N.D. Cal. Jan. 19, 2017) (information given to one individual defendant "would also have been known to the [other] individual defendants").

However, the fact that a confidential witness expressed concern to an individual defendant or upper management does not automatically raise an inference that the company or the individual defendants intended to deceive investors. *See e.g., Sneed* , 2023 WL 4412164, at *11 ("[T]he fact that the [a former employee] expressed concern … to Defendants … is not sufficient to raise an inference that [Defendants] intended to deceive investors.") (citing *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 883 (9th Cir. 2012) (stating that allegations that a defendant was aware of a fact was not sufficient to show the defendant believed they made false or misleading statements about that fact)); *In re Talis Biomedical Corp. Sec. Litig.*, Case No. 22-cv-00105-SI, 2022 WL 17551984, at *26 (N.D. Cal. Dec. 9, 2022) (finding former employee's allegations were vague as to when he or she briefed an individual defendant on the company's manufacturing issues and did not state that the individual defendant ever accepted his or her view that the goal was impossible) (citing *Wochos*, 985 F.3d at 1194).

In sum, assessing the credibility of confidential sources is a fact-intensive inquiry, and the Court will addresses each confidential witness in turn.

### i. CS1

As stated above, CS1 was a Fate "scientist" from 2020 to 2022. (CCAC ¶ 77.) CS1's work at Fate included determining why the T cells developed in support of the Collaboration Agreement lacked efficacy. (*Id.*) CS1 had concerns regarding the lack of efficacy of the T cells but left Fate before the products that he was working on could move into IND-filing phase. (*Id.* ¶¶ 77–78.) In late 2021 or early 2022, CS1 expressed this

concern to senior management, including Valamehr, who acknowledged it but shut down the communication and failed to follow up.  (*Id.* ¶ 78.)

While Plaintiffs adequately allege CS1's position and job responsibilities related to the Collaboration Agreement, the Court is not persuaded that CS1 was employed during the relevant time period.  *See Mauss*, 2014 WL 4161431, at *8 (finding confidential witness allegations insufficient because employment periods were not always specified).  Plaintiffs admit that CS1 left before the IND-filing phase.  Plaintiffs also allege CS1 was a Fate scientist from 2020 to 2022 but do not allege the specific dates or even the months.  This is significant because a scientist employed until the end of 2022 would have more insight into what Defendants knew at the time they made the potentially actionable statements (*see* Section II.B.1.c) and more information regarding the allegedly "significant problems" that might have led to the termination of the Collaboration Agreement (which occurred in January 2023).

Additionally, while Plaintiffs adequately allege that CS1 had firsthand knowledge of the efficacy of T cells and communicated efficacy concerns to senior management, including Valamehr, this communication does not automatically raise an inference of scienter.  While Valamehr "acknowledged" the efficacy problems in T cells, Plaintiffs do not allege that he shared CS1's concern or that he believed these problems meant the Collaboration Agreement was not going well, rendered Fate's goals under the Collaboration Agreement impossible, or would lead to the termination of the Collaboration Agreement.  *See Wochos*, 985 F.3d at 1194 ("[T]he district court correctly held that Plaintiffs failed to plead any facts showing that Musk ever accepted those employees' views that the goal was impossible.").  Additionally, the fact that employee expresses concern to upper management is not sufficient to raise an inference that upper management subsequently intended to deceive investors.  *See Sneed*, 2023 WL 4412164, at *11.

Therefore, the Court finds that CS1's allegations do not strengthen Plaintiffs' theory of scienter.[16]

### ii.   CS2

As stated above, CS2 was a Fate Process Development Scientist who started working at Fate in April 2020 and resigned in October 2021.  (CCAC ¶ 79.)  CS2's role was, in part, to replicate iPSCs that had been produced in small quantities by Fate's R&D group and manufacture large batches of T and NK cells for use in clinical trials.  (*Id.*)  CS2's work was also related to and in support of the Collaboration Agreement.  (*Id.*)  CS2 stated that replicating the R&D results was an ongoing struggle and a significant problem in process development.  (*Id.* ¶¶ 79–80.)  CS2 stated that he or she communicated the data replication issues to another Fate employee who had observed similar problems.  (*Id.*)

As with CS1, while Plaintiffs adequately alleged CS2's position and job responsibilities related to the Collaboration Agreement, the Court is not persuaded that CS2 was employed during the relevant time period.  *See* Mauss, 2014 WL 4161431, at *8.  CS2 resigned in October 2021, before many of Defendants' allegedly misleading statements and over a year before the termination of the Collaboration Agreement.  Therefore, it is improbable that CS2 had insight into what Defendants knew at the time of the allegedly misleading statements made after CS2's departure or whether the allegedly "significant problems" ultimately resulted in the termination of the Collaboration Agreement.  Further, while Plaintiffs adequately allege that CS2 had firsthand knowledge of Fate's replication issues, CS2 did not communicate his or her concerns to any of the Individual Defendants or upper management.  *See In re Accuray, Inc. Sec. Litig.*, 757 F. Supp. 2d at 949 (finding confidential witnesses' allegations insufficient when they "had no personal interactions"

---

[16] Even if the Court were to find CS1's allegations regarding Valamehr persuasive, CS1 only expressed his or her concerns to Valamehr in late 2021 or early 2022, <u>after</u> many of Defendants' allegedly misleading statements.  Therefore, CS1's allegations could not strengthen Plaintiffs' theory of scienter for statements made prior to late 2021 or early 2022.

with any of the individual defendants); *Kovtun*, 2012 WL 4477647, at *18 ("[N]owhere does plaintiff allege … that a CW reported to upper management about a particular result of a clinical trial …."); *Jun Shi*, 2020 WL 5092910, at *6 ("There are no particularized allegations that any of these confidential witnesses communicated concerns … to Defendants.").  Thus, the Court cannot find that CS2 strengthens Plaintiffs' theory of scienter.

### iii.   CS3

As stated above, CS3 was a Fate Senior Research Associate from December 2021 to January 2023.  (CCAC ¶ 81.)  CS3 stated that the cell development process from R&D was inherently flawed and not properly designed, and that the process needed to go back for further R&D.  (*Id.* ¶¶ 81–82.)  CS3 further stated that upscaling production experienced numerous "hiccups" during his or her employment.  (*Id.* ¶ 81.)  "In short, CS3 stated that Fate had a problem optimizing cell production, and Fate had not been meeting Janssen's requirements under the Collaboration Agreement."  (*Id.*)

While Plaintiffs adequately alleged CS3's position, job responsibilities, and employment period, Plaintiffs do not explicitly allege that that CS3's work related to or was in support of the Collaboration Agreement.  Therefore, it is unclear how CS3 knew that "Fate had not been meeting Janssen's requirements under the Collaboration Agreement."  *See Police Ret. Sys. of St. Louis*, 759 F.3d at 1063 ("This impression of a low-level employee is … an unsubstantiated statement without substance or context …."); *In re ESS Tech., Inc. Sec. Litig.*, 2004 WL 3030058, at *4 ("CW2 apparently has no firsthand basis for this information ….").  Even assuming CS3's work supported the Collaboration Agreement, as with CS2, CS3 did not communicate his or her concerns to any of the Individual Defendants or upper management.  *See In re Accuray, Inc. Sec. Litig.*, 757 F. Supp. 2d at 949; *Kovtun*, 2012 WL 4477647, at *18; *Jun Shi*, 2020 WL 5092910, at *6.  Thus, the Court cannot find that CS3's allegations strengthen Plaintiffs' theory of scienter.

### iv.   CS4

As stated above, CS4 was a biopharmaceutical manager who began working at Fate prior to the beginning of the Class Period and left Fate prior to the end of the Class Period. (CCAC ¶ 83.)  CS4 had regular involvement with the Collaboration Agreement, including attending weekly and monthly meetings with Janssen representatives.  (*Id.*)  CS4 "expressed the opinion" that it was apparent from these meetings that Janssen was unhappy with Fate's performance under the Collaboration Agreement and appeared skeptical about Fate's transparency.  (*Id.*)  CS4 also stated that Janssen's decision to scrap FT562 was "perceived as a negative blow to Valamehr" because an IND application represented a significant milestone under the Collaboration Agreement.  (*Id.* at 84.)  The Court finds these allegations persuasive.

Although CS4 asked that his or her job title and dates of employment be obscured, in this instance, CS4's failure to provide these details is not fatal to his or her allegations. CS4 specifically stated that he or she was concerned about being identified by current members of Fate's management team.  *See In re SeeBeyond Techs. Corp. Sec. Litig.*, 266 F. Supp. 2d at 1159 ("[A]dditional information, such as the exact dates of employment, would significantly erode the confidentiality of these sources.").  Further, Plaintiffs have alleged enough to conclude that CS4 was actively involved with the Collaboration Agreement, e.g., CS4's attendance at weekly and monthly meetings.  *In re InfoSonics Corp. Sec. Litig.*, 2007 WL 2301757, at *7 ("Plaintiffs have alleged enough to conclude that CW1 occupied a position that provided him with access to information regarding the problems ….").  Most importantly, Plaintiffs have alleged facts indicating that CS4 had first-hand knowledge of Valamehr's negative reaction to Janssen's decision to scrap FT562, which prevented Fate from reaching a "significant milestone" under the terms of the Collaboration Agreement.  Valamehr's negative reaction can be imputed to the company and the other Individual Defendants.  *See In re Cadence Design Sys., Inc. Sec. Litig.*, 692 F. Supp. 2d 1181, 1192–93 (N.D. Cal. 2010) ("[H]aving penetrated the Defendants' executive circle, so to speak, Plaintiffs may support an inference that the other executive

64

officers were aware of certain key facts about certain key deals …."). Therefore, the Court finds that CS4's allegations strengthen Plaintiffs' theory of scienter for statements made after Janssen's decision to scrap FT562.

### c) Stock Sales

Defendants argue that the Individual Defendants' stock sales undermine scienter. (Doc. 38-1 at 21–24.) First, Defendants argue the Individual Defendants' stock sales were non-discretionary, i.e., each was made to cover tax obligations or pursuant to Rule 10b5-1 trading plans, undermining Plaintiffs' allegations of scienter. (*Id.* at 21–22.) Second, Defendants argue that the amount and percentage of stock sales undermine Plaintiffs' allegations of scienter because each Individual Defendant increased his holdings of Fate stock and vested options on a percentage basis over the Class Period. (*Id.* at 22.) Third, Defendants argue that the timing of the sales is not suspicious because the Individual Defendants did not sell any after August 2022, more than three months before Fate announced the termination of the Collaboration Agreement. (*Id.* at 23.) Finally, Defendants argue that the Individual Defendants' prior trading history in terms of net sales is not the relevant inquiry. (*Id.* at 24.) Instead, Defendants contend the relevant inquiry is whether the Individual Defendants holdings changed on a percentage basis. (*Id.* (citing *Metzler Inv. GmbH*, 540 F.3d at 1067).) Each of Defendants' arguments relies upon Exhibits Y–AA.

Plaintiffs respond that Wolchko's net sales during the Class Period ($43.9 million) were 17 times greater than his net sales prior to the Class Period ($2.6 million) and, therefore, were inconsistent with his prior trading history. (Doc. 39 at 31–32.) Likewise, Plaintiffs responded that Valamehr's net sales during the Class Period ($13.3 million) were 65 times greater that his sales prior to the Class Period ($203,889), and Dulac had net stock sales of $1.6 million during the Class Period. (*Id.* at 32.) Plaintiffs assert that the Individual Defendants' trading plans, without more, are insufficient to negate the effect of otherwise suspicious stock sales. (*Id.* at 32–33 (citing *In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp.

2d 964, 976 (N.D. Cal. 2009)).)   Finally, Plaintiffs contend that most of the holdings retained by the Defendants appear to be vested options, not stock.  (*Id.* at 24.)

"'[A]lthough 'unusual' or 'suspicious' stock sales by corporate insiders may constitute circumstantial evidence of scienter, insider trading is suspicious only when it is 'dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information.''"  *Zucco Partners, LLC*, 552 F.3d at 1005 (quoting *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d at 986).  "Among three factors that must be considered to determine whether stock sales raise a strong inference of deliberate recklessness are: '(1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history.'"  *Id.* (quoting same).

Regarding the first factor—the amount and percentage of sales—the Ninth Circuit traditionally gives "great weight to the percentage of stock sold[,]" although there are exceptions.  *Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226, 1232 (9th Cir. 2004) (finding a CEO's stock sales presented a novel situation where $900 million worth of stock amounted to only 2.1% of CEO's holdings and that, under such circumstances, "less weight should be given to the fact that [the stock sales] represent [only] a small portion of the [CEO's] holdings"); *but see No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 939 (9th Cir. 2003) (finding the percentage of shares sold suspicious when most of the individuals sold 100% of their shares, with the lowest percentage being 88%).

Regarding the second factor—the timing of the sales—courts consider whether the stock sales were designed to "maximize the personal benefit" of any defendant.  *Brodsky v. Yahoo! Inc.*, 630 F. Supp. 2d 1104, 1118 (N.D. Cal. 2009).  However, those stock sales only demonstrate scienter "when those sales are able to be related to the challenged statements" or tied to the manifestation of any alleged risks known to the defendants.  *In re Vantive Corp. Sec. Litig.*, 283 F.3d at 1093; *see also In re LeapFrog Enter., Inc. Sec. Litig.*, 527 F. Supp. 2d at 1052 ("[P]laintiffs make no attempt to plead how the timing of

any specific sale by any specific defendant is linked to intentional misrepresentations or omissions or gives rise to an inference of scienter as to specific misstatements or omissions."); *In re Apple Inc. Sec. Litig.*, Case No. 19-cv-02033-YGR, 2020 WL 2857397, at *21 (N.D. Cal. June 2, 2020) ("Plaintiff's only allegation regarding suspicious timing is that defendants made the sales while aware of the alleged risks, but plaintiff does not connect the timing to the manifestation or onset of any risk."); *Ferreira v. Funko Inc.*, Case No. LACV 20-02319-VAP (PJWx), 2021 WL 880400, at *29 (C.D. Cal. Feb. 25, 2021) ("Both of these sales, however, took place several months before [the defendant's] corrective disclosures and the drop in [its] stock price."). Further, when the Class Period is long "it becomes difficult to see how particular stock sales would strengthen allegations that particular statements were uttered with deliberate recklessness at the times they were made." *In re Vantive Corp. Sec. Litig.*, 283 F.3d at 1093 (finding a 63-week class period "unusually long"); *see also Brodsky*, 630 F. Supp. 2d at 1118 ("Plaintiffs have selected an unusually long class period of over 118 weeks.").[17]

---

[17] With regards to timing, courts sometimes consider whether the stock sales were discretionary. *See e.g., Metzler Inv. GMBH*, 540 F.3d at 1067 n.11 ("Sales according to pre-determined plans may 'rebut [] an inference of scienter.'") (quoting *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1427–28 (9th Cir.1994)); *Provenz v. Miller*, 102 F.3d 1478, 1491 (9th Cir. 1996) ("[C]redible and wholly innocent explanations for stock sales … if unrebutted are sufficient to defeat any inference of bad faith."); *In re Fastly, Inc. Sec. Litig.*, Case No. 20-cv-06024-PJH, 2021 WL 5494249, at *17 (N.D. Cal. Nov. 23, 2021) ("Defendants did not have immediate control over these planned sales, so these sales … cut against a finding of scienter."). However, as explained above, the Court does not incorporate by reference or take judicial notice of the truth of the matters set forth in Defendants' publicly-filed Form 4s—Exhibits Y, Z, and AA—for the purposes of disputing Plaintiffs' theory of scienter. (*See* Section II.A.1.b.) The Court will address Defendants' stock sale allegations at a later stage if necessary. *See In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d at 976 n.16 ("[A]lthough evidence of the nondiscretionary nature of Defendants' sales may ultimately provide … an affirmative defense at a later stage of the litigation, it suffices that, at the pleading stage, Plaintiffs have alleged significant and suspiciously timed securities sales."); *In re Infosonics Corp. Derivative Litig.*, No. 06CV1336 BTM(WMc), 2007 WL 2572276, at *9 (S.D. Cal. Sept. 4, 2007)

Regarding the third and final factor—consistency with the insider's prior trading history—Plaintiffs "must provide a 'meaningful trading history' for purposes of comparison to the stock sales within the class period." *Zucco Partners, LLC*, 552 F.3d at 1005 (quoting *In re Vantive Corp. Sec. Litig.*, 283 F.3d at 1095 ("[b]ecause [the defendant] had no trading history, we cannot conclude that his trades were out of line with his past practice")).

Here, Plaintiffs allege that the Individual Defendants' net sales increased during the Class Period.  (*See* CCAC ¶¶ 85–89.)  Specifically, Plaintiffs allege that the Class Period was 833 days long.  (*Id.* at 2 (defining Class Period).)  Plaintiffs then allege that Wolchko's Class Period net sales were $43.9 million, approximately 17 times greater than the previous 833-day period (*id.* ¶¶ 85–86); that Valamehr's Class Period net sales were $13.3 million, approximately 65 times greater than the previous 883-day period (*id.* ¶¶ 88–89); and that Dulac's Class Period net sales were $1.6 million (*id.* ¶ 87).  However, as stated above, the Ninth Circuit traditionally gives "great weight to the percentage of stock sold[,]" not the net sales.  *Nursing Home Pension Fund, Loc. 144,* 380 F.3d at 1232.  Unlike in *Nursing Home Pension Fund, Loc. 144,* the net sales alleged here are not significant enough to stray from the Ninth Circuit's typical percentage analysis.  *See* 380 F.3d at 1232 (finding that net stock sales of $900 million created an inference of scienter).

Additionally, Plaintiffs have not alleged that the timing of the Individual Defendants' stock sales were suspiciously designed to maximize personal benefit.  *See Brodsky*, 630 F. Supp. 2d at 1118.  And even if they had, here Plaintiffs have alleged a Class Period of approximately 833 days or 110 weeks, which "makes it difficult to see how particular stock sales would strengthen allegations that particular statements were uttered

---

("[W]hether these trading plans were legitimately adopted or were put in place after learning of material, nonpublic information that could affect the price of stock, cannot be resolved at the pleading stage.").

with deliberate recklessness at the times they were made." *In re Vantive Corp. Sec. Litig.*, 283 F.3d at 1093 (finding a 63-week class period "unusually long").

Finally, Plaintiffs have not, and cannot, allege that Dulac's Class Period stock sales were greater than the prior 833-day period because Dulac did not begin working at Fate until after the start of the Class Period.  (See CCAC ¶ 15 (alleging that Dulac started at Fate in August 2020).)  Nevertheless, Plaintiffs have alleged that Wolchko and Valamehr's stock sales were significantly greater than the prior 833-day period, which may be indicative of scienter.  *Zucco Partners, LLC*, 552 F.3d at 1005.

Overall, the Court finds that, applying the relevant principles, Plaintiffs' stock sale allegations do little to strengthen Plaintiffs' theory of scienter.  At most, Plaintiffs' stock sale allegations strengthen Plaintiffs' theory of scienter as to Fate, Wolchko, and Valamehr only.

### d)     Executive Compensation

"[A]llegations of routine corporate objectives such as the desire to obtain good financing and expand are not, without more, sufficient to allege scienter; to hold otherwise would support a finding of scienter for any company that seeks to enhance its business prospects." *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d at 884 (citing *Lipton*, 284 F.3d at 1038).  "In addition, it is common for executive compensation, including stock options and bonuses, to be based partly on the executive's success in achieving key corporate goals. Thus, especially given the holistic approach to assessing scienter adopted in *Tellabs* and the requirement that we take into account plausible opposing inferences, [the Ninth Circuit] will not conclude that there is fraudulent intent merely because a defendant's compensation was based in part on such successes." *Id.* (citing *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1166 (9th Cir. 2009)).  "If simple allegations of pecuniary motive were enough to establish scienter, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions." *Zucco Partners, LLC*, 552 F.3d at 1005 (internal quotation omitted).  "Indeed, if the existence of performance-based compensation and motive to increase short-term profits were enough to establish

scienter, scienter could be found for almost any executive." *In re Maxwell Techs., Inc. Sec. Litig.*, 18 F. Supp. 3d 1023, 1045 (S.D. Cal. 2014).  Accordingly, the Court finds that Plaintiffs' allegations regarding performance-based executive compensation (*see* CCAC ¶¶ 90–95) do not strengthen Plaintiffs' theory of scienter.

### e)   January 2021 Offering

As stated above, "allegations of routine corporate objectives such as the desire to obtain good financing and expand are not, without more, sufficient to allege scienter; to hold otherwise would support a finding of scienter for any company that seeks to enhance its business prospects." *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d at 884 (citing *Lipton*, 284 F.3d at 1038); *see also Ikeda v. Baidu, Inc.*, Case No. 20-CV-02768-LHK, 2021 WL 1299046, at *17 (N.D. Cal. Apr. 7, 2021) ("Plaintiff also points to [the] April 2, 2020 bond offering on the Singapore Stock Exchange as a potential motive to conceal [the defendant's] issues with regulatory compliance.  However, [the defendant's] 'routine corporate objectives' do not provide a motive to commit fraud.") (emphasis added). Accordingly, the Court cannot find that Plaintiffs' allegations regarding the January 2021 follow-on offering, a routine corporate objective that occurred before all but one of the allegedly misleading statements and two years before the termination of the Collaboration Agreement, strengthen Plaintiffs' theory of scienter.  *See also Ikeda*, 2021 WL 1299046, at *17.

### f)   "Core Operations" Doctrine

"The core operations theory of scienter relies on the principle that corporate officers have knowledge of the critical core operation of their companies." *Police Ret. Sys. of St. Louis*, 759 F.3d at 1062 (quotation omitted).  "As a general matter, 'corporate management's general awareness of the day-to-day workings of the company's business does not establish scienter—at least absent some additional allegation of specific information conveyed to management and related to the fraud' or other allegations supporting scienter." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784–85 (9th Cir. 2008) (quoting *Metzler Inv. GmbH, Inc.*, 534 F.3d at 1087 (concluding that the bare core

70

operations inference fell short of the *Tellabs* standard)).  "Where a complaint relies on allegations that management had an important role in the company but does not contain additional detailed allegations about the defendants' actual exposure to information, it will usually fall short of the PSLRA standard." *Id.*  Thus, "[p]roof under this theory is not easy. A plaintiff must produce either specific admissions by one or more corporate executives of detailed involvement in the minutia of a company's operations … or witness accounts demonstrating that executives had actual involvement …." *Police Ret. Sys. of St. Louis*, 759 F.3d at 1062.

Here, Plaintiffs have adequately alleged that the Collaboration Agreement was a central component of Fate's operations.  (*See* CCAC ¶¶ 74, 101–104.)  Plaintiffs have also alleged that Valamehr has served as Fate's Chief R&D Officer beginning in March 2021 and oversaw Fate's R&D activities.  (*Id.* ¶ 16.)  Plaintiffs have also alleged that Valamehr was informed of the lack of efficacy of the T cells in late 2021 or early 2022.  (*Id.* ¶ 78.) Finally, Plaintiffs have alleged that Valamehr regular participated in weekly and monthly meetings with Janssen representatives and that Janssen's decision to scrap FT562 "was perceived as a negatve blow to Valamehr."  (*Id.* ¶ 84.)  Therefore, the Court finds that, at a minimum, Valamehr was involved in Fate's "core operations" and was aware of various problems in late 2021 or early 2022, around the time that FT562 was scrapped.  *See Police Ret. Sys. of St. Louis*, 759 F.3d at 1062.  Therefore, the Court finds that the "core operations" doctrine strengthens Plaintiffs' theory of scienter for statements made after the termination of FT562.

### g)   Conclusion

Evaluating Plaintiffs' scienter allegations in their totality, while the Court does not find Plaintiffs' stock sale, executive compensation, or January 2021 offering allegations persuasive, the Court does find Plaintiffs' allegations regarding CS4 and the "core operations" doctrine persuasive.  Defendants also had actual knowledge that Janssen scrapped FT562 during the fourth quarter of 2021.  Therefore, the Court finds that Plaintiffs' allegations support a "strong—i.e., a powerful or cogent—inference" of scienter

71

1   for statements made after the termination of FT562.  *See Tellabs, Inc.*, 551 U.S. at 308,

2   323.  However, the Court cannot find that Plaintiffs' allegations support a strong inference

3   of scienter for statements made prior to the termination of FT562.

### 3.   Loss Causation

5   Defendants argue that the Plaintiffs have not adequately pled loss causation because

6   they fail to allege that the omissions—the iPSC replication problems and the termination

7   of FT562—caused Janssen to terminate the Collaboration Agreement.  (Doc. 38-1 at 37–

8   38.)  Plaintiffs respond that their allegations that Defendants, through their omissions,

9   artificially inflated Fate's stock price, which plummeted when Fate announced the

10  termination of the Collaboration Agreement, "more than meet" the pleading standard.

11  (Doc. 39 at 37–38.)  Relatedly, Plaintiffs argue that that "Janssen's sudden termination of

12  the Collaboration Agreement on January 5, 2023, was a foreseeable consequence of the

13  [Fate's] failures to produce product candidates that would satisfy the basic requirements of

14  an [IND] to be filed with the [FDA]."  (*Id.* at 12.)

15  As stated above, the Ninth Circuit has found, as a matter of first impression, that the

16  heightened pleading requirements of Rule 9(b) "applies to all elements of a securities fraud

17  action, including loss causation."  *Oregon Pub. Emps. Ret. Fund*, 774 F.3d at 605.  "'To

18  prove loss causation, the plaintiff must demonstrate a causal connection between the

19  deceptive acts that form the basis for the claim of securities fraud and the injury suffered

20  by the plaintiff.'"  *Curry v. Yelp Inc.*, 875 F.3d 1219, 1225 (9th Cir. 2017) (quoting

21  *Ambassador Hotel Co., Ltd. v. Wei–Chuan Inv.*, 189 F.3d 1017, 1027 (9th Cir. 1999)).  In

22  other words, "Plaintiffs … must show a 'causal connection between the fraud and the loss

23  by tracing the loss back to the very facts about which the defendant lied.'"  *In re Nektar

24  Therapeutics Sec. Litig.*, 34 F.4th at 838 (quoting *Mineworkers' Pension Scheme v. First

25  Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018)).  "[T]he plaintiff in a securities fraud action

26  must [also] demonstrate that an economic loss was caused by the defendant's

27  misrepresentations, <u>rather than some intervening event</u>."  *Lloyd*, 811 F.3d at 1209 (citing

28  *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 343–44 (2005)) (emphasis added).

"[L]oss causation is a 'context-dependent' inquiry as there are an 'infinite variety' of ways for a tort to cause a loss." *Mineworkers' Pension Scheme*, 881 F.3d at 753 (quotations and citations omitted).   Though "[t]he 'burden of pleading loss causation is [often] satisfied by allegations that the defendant revealed the truth through 'corrective disclosures' which 'caused the company's stock price to drop and investors to lose money.'" *In re Nektar Therapeutics Sec. Litig.*, 34 F.4th at 838 (quoting *Lloyd*, 811 F.3d at 1209 (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 264 (2014))).

The present case is atypical in that the announcement of the termination of the Collaboration Agreement, rather than the revelation of the allegedly material omissions or some other corrective disclosure, caused Fate's stock price to drop and Plaintiffs to lose money.   It is incumbent on Plaintiffs to connect the allegedly material omissions to the termination of the Collaboration Agreement.   The termination of the Collaboration Agreement "must … relate back to the misrepresentation and not to some other negative information about the company." *Lloyd*, 811 F.3d at 1210 (quotation omitted).

The Court finds that Plaintiffs have failed to allege that the allegedly "significant problems"—i.e., the material omissions—resulted in the termination of the Collaboration Agreement.   (*See* CCAC ¶¶ 6, 64 (passively alleging that the Collaboration "had been terminated" but not that Janssen terminated the Agreement because of the alleged omissions.)   Instead, Plaintiffs allege that Defendants' omissions artificially inflated Fate's stock price (*see id.* ¶¶ 12, 69–70, 119–21) and that, following the termination of the Collaboration Agreement, Fate's stock price fell 61% (*see id.* ¶¶ 7, 68).   Without allegations linking the allegedly material omissions to the termination of the Collaboration Agreement, there is a hole in the causal chain that is fatal to Plaintiffs' theory of the case. It is not sufficient to speculate in briefing that the termination of the Collaboration Agreement was a "foreseeable consequence" of the allegedly material omissions.   (*See* Doc. 39 at 12.)   Therefore, the Court finds that Plaintiffs have failed to adequately allege loss causation.

**C.      Exchange Act Section 20(a)**

"Section 20(a) claims may be dismissed summarily … if a plaintiff fails to adequately plead a primary violation of section 10(b)."  *Zucco*, 552 F.3d at 990.  Because Plaintiffs have failed to adequately plead a violation of Section 10(b), Plaintiffs have also not pled a violation of Section 20(a).

### III.   <u>CONCLUSION</u>

Based on the foregoing, Defendants' Motion is **<u>GRANTED</u>** with leave to amend. Plaintiffs may file an amended complaint on or before **<u>October 18, 2024</u>**.

**IT IS SO ORDERED.**

DATE:  September 19, 2024

HON. RUTH BERMUDEZ MONTENEGRO
UNITED STATES DISTRICT JUDGE